## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

### Appeal No.: 21-1634

| | | |
|---|---|---|
| PAUL PALMER, JR. II, | ) | Appeal from the U.S. District Court |
| | ) | for the Southern District of Indiana, |
| Plaintiff-Appellant, | ) | Indianapolis Division |
| | ) | |
| *vs.* | ) | Cause No. 1:19-cv-4610-JMS-MJD |
| | ) | |
| INDIANA UNIVERSITY and | ) | Hon. Jane E. Magnus-Stinson |
| THE TRUSTEES OF INDIANA | ) | |
| UNIVERSITY | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

## BRIEF OF APPELLANT

Sandra L. Blevins
Courtney E. Endwright
BETZ + BLEVINS
One Indiana Square, Suite 1660
Indianapolis, Indiana 46204
Office: (317) 687-2222
Fax: (317) 687-2221
E-mail: litigation@betzadvocates.com

*Attorneys for Plaintiff-Appellant Paul Palmer, Jr. II*

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 21-1634

Short Caption: Paul Palmer, Jr. II v. Trustee of Indiana University

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Paul Palmer, Jr. II

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Betz + Blevins

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: *s/ Sandra L. Blevins*    Date: 7/23/2021

Attorney's Printed Name: Sandra L. Blevins

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ✓    No ☐

Address: One Indiana Square, Suite 1660, Indianapolis, IN 46204

Phone Number: (317) 687-2222    Fax Number: (317) 687-2221

E-Mail Address: sblevins@betzadvocates.com

# TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ...............................................i

TABLE OF CONTENTS .........................................................................................ii

TABLE OF AUTHORITIES ...............................................................................vii

I.     JURISDICTIONAL STATEMENT .................................................................1

II.    STATEMENT OF THE ISSUES ...................................................................1

III.   STATEMENT OF THE CASE.......................................................................2

   A. Procedural History........................................................................................2

   B. Factual Background .......................................................................................2

       1. Kesner and Maines have served as the top two executives of KSOB since 2013 ...............................................................................................2

       2. KSOB offers an undergraduate and an MBA program .......................3

       3. KSOB employs lecturers to teach KSOB classes .................................3

          a. IU annually reviews lecturers based primarily on student evaluations ...................................................................................3

          b. Faculty raises are given at the discretion of the department chair in consultation with the deans ..............................................5

          c. Teaching assignments are made by the Marketing Department Chairs ...................................................................................6

          d. The typical time frame for seeking a promotion to senior lecturer is 6 years, but a lecturer may seek an early promotion.....................................6

       4. In KSOB's Marketing Department, Burke or Krishnan have served as chair since 2009 ........................................................................................7

       5. KSOB's diversity and equity initiatives involve "seek[ing] diverse candidates" and students but no tangential targets ...................................8

6. Before joining IU, Palmer enjoyed a successful career in marketing and brand management at several large, national corporations ...............................................9

7. In Fall 2010, Palmer joined IU's KSOB as a Lecturer .........................................9

8. Despite indisputably excellent performance, IU only provided Palmer with a 1% salary increase his first 2 years ....................................................................11

9. In 2013, Krishnan refused to support Palmer's early promotion to senior lecturer ........................................................................................................12

10. IU promoted Palmer in Spring 2016 to senior lecturer.......................................13

11. Palmer lacked office space for 2 years and was the only senior lecturer without an office ........................................................................................................15

12. IU hired a Caucasian lecturer in 2016 and immediately provided him a window office, significant increases in salary, numerous overload teaching opportunities, and by 2019 an early promotion .....................................................16

   a. Gildea's compensation upon his hire at IU was higher than other lecturers ...............................................................................................16

   b. Between 2016 and 2018, IU provided 4.85% and 8.67% raises to Gildea, adding $12,000 to his salary alone ................................................16

   c. Gildea was provided multiple overload teaching opportunities ...........17

13. Krishnan and Burke enthusiastically supported Gildea's early promotion to senior lecturer........................................................................................18

14. Palmer complained in August 2018, October 2018, and in January 2019 about discrimination in salary, teaching opportunities, office space, and the early promotion of Gildea .....................................................................................19

IV.    SUMMARY OF ARGUMENT ........................................................................21

V.     LEGAL ARGUMENT.....................................................................................24

   A. Appellate Standard.......................................................................................24

   B. In examining Palmer's evidence as a whole as this Court instructed, rather than piecemeal as did the Order, a reasonable jury could find that Palmer was discriminated against based on his race ....................................................24

     1.   The Order erred by sifting out Palmer's evidence rather than considering it as a whole ................................................................................................24

     2.   Even if it was required, Palmer can also meet the prima facie requirements of *McDonnell Douglas* ..............................................................................25

C.  Considering the distinctly different ways that IU treated Palmer, the questionable explanations that supported Gildea's alleged superior performance, and the downplaying of Palmer's performance as a lecturer, a reasonable jury could find that IU's inequitably paying Palmer and denying Palmer's early promotion were connected to Palmer's race ...................................................................26

     1.   IU bestowed every advantage on Gildea from the date of his hire, while denying Palmer similar opportunities .............................................26

     2.   Palmer was the only senior lecturer without an office for 2 years, despite available office space...........................................................................27

     3.   Other black KSOB faculty were treated unfavorably by IU ......................29

     4.   IU offered false or misleading explanations for its differential treatment of Palmer, which is evidence of pretext .............................................30

          a.   The BMA's growth in number of students was not at all attributable to Gildea...........................................................31

          b.   Krishnan and Burke fully credited Gildea with creating and redesigning new classes for which he had not been solely responsible ...........................................................................32

          c.   Krishnan and Burke removed teaching opportunities from Palmer ...........................................................................................33

          d.   Palmer was excluded from being nominated for the Trustees Teaching Award, although this nomination was supposed to be automatic..............................................................................33

          e.   Kesner impugned Palmer's commitment as Diversity Coach .........33

          f.   During depositions and on summary judgment, additional false excuses were offered by IU, which is further evidence of pretext ...........................................................................................34

          i.     Kesner made multiple, unsupported assertions about Palmer's performance during her depositions.....................34

          ii.    On summary judgment, Krishnan and Burke offered new, albeit false, reasons for treating Palmer inequitably in assigning classes.................................................................35

D. The Order erroneously granted summary judgment on Palmer's inequitable pay claim by rejecting Gildea as a comparator and overlooking IU's and Krishnan's dubious and pretextual reasons for IU's paying Gildea $171,731.00 more in total compensation than Palmer between 2017 and 2019.................................37

    1. IU left undisputed that Gildea received $171,731.00 more than Palmer between 2017 and 2019.....................................................38

    2. Palmer and Gildea shared the same common core duties, which was more than enough to make a meaningful comparison between them.................38

    3. IU's explanations for failing to equitably pay Palmer were dubious, at best, and indicative of pretext..................................................................42

        a. IU's process for setting salaries was hardly fair or in line with faculty contributions to teaching and service.....................................42

        b. IU's offered explanation that the differences in pay can be explained by its paying faculty over a 10-month calendar explained nothing.........................................................................43

        c. Krishnan's explanations for the salary discrepancies also failed to pass muster.........................................................................43

E. Because Palmer was unaware of IU's discrimination until he discovered Gildea's promotion, treated far less favorably than Gildea, and applied but was rejected for a promotion, the Order erred in granting summary judgment on Palmer's failure to promote claim..................................................................45

    1. Because Palmer had insufficient reason to know IU discriminated against him in denying him an early promotion until Spring 2019, Palmer's discrimination claim should be equitably tolled until then..........................45

    2. The Order rejected Palmer's similarly situated comparator, Gildea, although both worked in the same department with the same job title, were judged by the same basic promotion standards, held administrative appointments at the time they sought early promotions, and Palmer's student evaluations were admittedly better than Gildea's ..........................47

a. The Order ignored Palmer was successfully promoted to senior lecturer in 2016 with essentially the same qualifications as when he sought an early promotion in 2013 .............................................. 48

b. Both Palmer and Gildea had significant administrative assignments when they sought early promotions .......................... 48

c. Although Palmer and Gildea both were lecturers in the Marketing Department, the Order found them incomparable because they had different marketing subspecialities ........................................... 50

d. Because IU lacked a minimum number of teaching hours to qualify as a senior lecturer, Gildea's ability to teach "certain types of classes" on an overload basis was irrelevant .............................. 50

3. As Palmer was either denied or deterred from seeking an early promotion by Krishnan and KSOB's biased environment generally, he met the requirements of a failure to promote claim under Title VII ....................... 51

VI.   CONCLUSION ........................................................................................... 53

VII.  CERTIFICATE OF COMPLIANCE .......................................................... 54

VIII. DIGITAL MEDIA STATEMENT ............................................................... 54

IX.   STATEMENT OF INCLUSION ................................................................. 54

X.    PROOF OF SERVICE ................................................................................ 55

# <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**

*Barthelus v. G4s Gov't Sols.*, 752 F.3d 1309 (11th Cir. 2014) ........................................29

*Brennan v. Daley*, 929 F.2d 346 (7th Cir. 1991) ............................................................45

*Cada v. Baxter Healthcare Corp.*, 920 F.2d 446 (7th Cir. 1990) ....................................45

*Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888 (7th Cir. 2016) ....................................28

*Coleman v. Donahoe*, 667 F.3d 835 (7th Cir. 2012) ..............................................47, 49-50

*David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216 (7th Cir. 2017) ............39

*Eaton v. Indiana Dep't of Corr.*, 657 F.3d 551 (7th Cir. 2011) ........................................25

*Hudson v. Chicago Transit Auth.*, 375 F.3d 552 (7th Cir. 2004) ....................................51

*Igasaki v. Ill. Dep't of Fin. & Prof'l Regulation*, 988 F.3d 948 (7th Cir. 2021)............... 24-25, 28-29

*Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923 (7th Cir. 2020)....................................24-25, 31

*Kellogg v. Ball State Univ.*, 984 F.3d 525 (7th Cir. 2021)........................................... 28, 38

*Loyd v. Phillips Bros.*, 25 F.3d 518 (7th Cir. 1994) ........................................................51

*Malin v. Hospira, Inc.*, 762 F.3d 552 (7th Cir. 2014)......................................................28

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)....................................25, 30-31

*McKinney v. Office of Sheriff of Whitley Cty.*, 866 F.3d 803 (7th Cir. 2017) ....................41

*Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016) ....................................... 23-25

*Perez v. Thorntons, Inc.*, 731 F.3d 699 (7th Cir. 2013)....................................................24

*Rozumalski v. W.F. Baird & Assocs.*, 937 F.3d 919 (7th Cir. 2019)................................47

*Scott v. Chuhak & Tecson, P.C.*, 725 F.3d 772 (7th Cir. 2013)........................................24

*Stern v. Trustees of Columbia Univ. in City of New York*, 131 F.3d 305 (2d Cir. 1997)....................31

*Summy-Long v. Pa. State Univ.*, 226 F. Supp. 3d 371 (M.D. Pa. 2016) ..........................49

*Thelen v. Marc's Big Boy Corp.*, 64 F.3d 264 (7th Cir. 1995) ........................................47

*Vega v. Chi. Park Dist.*, 954 F.3d 996 (7th Cir. 2020) ....................................................................30

*Volling v. Kurtz Paramedic Servs.*, 840 F.3d 378 (7th Cir. 2016) ......................................................52

*Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70 (2d Cir. 2016).................................................................25

*Zafar Hasan v. Foley & Lardner LLP*, 552 F.3d 520 (7th Cir. 2008)...............................................29

## Federal Statutes

28 U.S.C. § 451 ...............................................................................................................................1

28 U.S.C. § 1291 .............................................................................................................................1

28 U.S.C. § 1331 .............................................................................................................................1

28 U.S.C. § 1343 .............................................................................................................................1

42 U.S.C. § 2000e ...........................................................................................................................1

42 U.S.C. § 2000e-5.....................................................................................................................1, 38

## Federal Rules

Fed. R. Evid. 201...................................................................................................................... 11, n.2

# I. JURISDICTIONAL STATEMENT

This is an appeal taken from an Order entered on March 10, 2021, by the Honorable Jane E. Magnus-Stinson granting Defendants-Appellees' *Motion for Summary Judgment* against Plaintiff-Appellant Paul Palmer, Jr. II. No other motions are pending before the district court. Palmer timely filed his *Notice of Appeal* and *Docketing Statement* on April 9, 2021.

The district court had jurisdiction of this case pursuant to 28 U.S.C. §§ 451, 1331, and 1343, as well as 42 U.S.C. § 2000e-5. Palmer sought relief below for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). The federal question at issue was whether Defendants violated Title VII's provisions. This Court has jurisdiction of this appeal pursuant to 28 U.S.C. § 1291 permitting review of all final decisions issued by a district court.

# II. STATEMENT OF THE ISSUES

1. In considering all the evidence, including IU's and Krishnan's dubious and pretextual reasons for IU's paying Gildea $171,300.00 more than Palmer between 2017 and 2020, did the Order err by granting summary judgment on Palmer's inequitable pay claim?

2. Did the Order err in granting summary judgment on Palmer's failure to promote claim where the Order rejected the applicability of equitable tolling, although Palmer was unaware of his comparator's successful early promotion until April 2019; rejected Palmer's comparator despite numerous commonalities in their positions; found that Palmer failed to apply for the position of senior lecturer in 2013 when Palmer's

department chair rejected him; and ignored the overall pile of Palmer's evidence, including exaggerations of Gildea's record, understatements of Palmer's record, and the discriminatory treatment of other African Americans in KSOB?

### III.   STATEMENT OF THE CASE

#### A.   PROCEDURAL HISTORY

On December 19, 2019, Palmer filed a *Complaint for Damages and Trial by Jury* against Defendants-Appellees Indiana University and the Trustees of Indiana University ("IU") seeking to recover under Title VII for race discrimination. On January 9, 2020, IU filed *Defendant's Answer to Plaintiff's Complaint for Damages and Demand for Trial by Jury and Affirmative Defenses*.

On October 14, 2020, IU filed its *Motion for Summary Judgment*, which the district court granted on March 10, 2021.

#### B.   FACTUAL BACKGROUND

**1.   Kesner and Maines have served as the top two executives of KSOB since 2013.**

Since 2013, Idalene Kesner has served as the Dean of the Indiana University ("IU") Kelley School of Business in Bloomington ("KSOB"), and Laureen Maines has served as Executive Associate Dean. (A-782 at 12:8-11). As dean, Kesner holds the ultimate authority over KSOB decisions, including salary decisions. (A-785 at 23:9-24:5). Before IU appointed Kesner as dean, Kesner served as Executive Associate Dean (Maines' current role) between July 2009 and June 2013. (A-782 at 12:15-17; A-708 at 13:7-16, 15:2-13). KSOB has approximately 325 total faculty. (A-710 at 21:19-22:1). Of these, at most 11 faculty are

African American and one of those serves full time in IU's development office and does not teach in KSOB. (A-788 at 40:7-11; A-864 at 265:10-267:1).

### 2. KSOB offers an undergraduate and an MBA program.

KSOB offers an undergraduate program, MBA program, various other master's programs, certificate programs, and a doctoral program. (A-873 at 12:11-25). The MBA program has an in-person "residential MBA program" and an online program "Kelley Direct Online." (A-649 at 91:25-92:22). These two MBA programs are now "comparable in terms of the expectations for teaching quality and the quality of students." (A-649-50 at 91:25-93:18).

The KSOB undergraduate program has approximately 8,500 students, while the residential MBA program has about 225 full-time students, and the Kelley Direct program has about 1,100 total students. (A-873 at 12:11-12:25; A-121 at 13:1-8).

### 3. KSOB employs lecturers to teach KSOB classes.

Lecturers typically have "an 18-credit" teaching load, "unless they have some sort of administrative appointment." (A-641-42 at 56:16-57:11).

#### a. IU annually reviews lecturers based primarily on student evaluations.

In their annual reviews, IU rates lecturers on a scale between 1 and 5, with 1 being the highest rating. (A-636 at 27:1-28:5; A-480). The rating of 1.0 to 1.9 is considered "outstanding." (A-479). Lecturers' evaluations are weighted as .9 for teaching and .1 for service. (A-478).

As part of the annual review, the number of hours above the normal teaching load ("overload" hours) are considered. (A-650 at 94:19-95:7). Under KSOB's overload policy, a

lecturer is permitted to teach up to 15 credits over the lecturer's assigned teaching load, including 3 credits maximum for residential classes and 15 credits for Kelley Direct classes. (A-895). For residential classes, the base payment is $7,500 per 3 credits, Kelley Direct program's base amount is $15,000 per 3 credits. (A-649 at 90:10-91:10; A-750 at 100:22-24).

Under KSOB's *Performance Evaluation and Feedback System*, "student evaluations" are "the <u>primary</u> determinant of the quality of teaching performance." (A-480) (emphasis in original). Other considerations may include the "[d]evelopment of new courses, significant renovations of existing courses," "[t]eaching a breadth of courses and/or across multiple programs that enhances an individual's value to the department;" "[c]ourse/program difficulty;" and "[i]nvestments in teaching improvement and pedagogy." *Id.*

Under Ray Burke's interpretation, the more difficult courses to teach include "the MBA core course," "required courses," "graduate-level courses," and "large enrollment courses." (A-637 at 29:24-30:2). "[I]t is as challenging to teach in the online program as it is in the residential MBA program." (A-637 at 31:13-32:16). Palmer was not informed certain courses carried more weight than other courses for evaluation and promotion purposes, and this was not in writing in KSOB's policies. (A-835-36 at 84:20-85:17; A-861-62 at 256:13-259:17).

As for service under KSOB's *Performance Evaluation and Feedback System*, "faculty members' service contributions may vary across discipline," "university," "Kelley School," "department;" and "community," but "[l]eadership roles in any of these areas is highly valued," and KSOB "values service that balances external (discipline/company) with internal (department/school/university) contributions." (A-481-82). Krishnan claimed that work as

an academy director is "leadership" and is simultaneously "kind of" a "service" and provides teaching credits. (A-747 at 87:11-88:1).

Numerous awards are available to KSOB lecturers. The Trustees Teaching Award automatically compiles nominations for the "top 6% of full-time lecturer and clinical faculty—combined." (A-893). It is a "high honor." (A-800 at 140:23-141:6). The Panschar Award recognizes "outstanding teaching in the undergraduate program over the past three calendar years," and the "Department Chairperson" selects each nominee. (A-894; A-926).

### b. Faculty raises are given at the discretion of the department chair in consultation with the deans.

Faculty raises are determined annually based on these faculty evaluations and the chair's judgment in consultation with the deans. (A-638 at 34:18-35:3; A-516-19). Thus, although a faculty committee provides "a subjective evaluation" with a mathematical score for each faculty member, the chair ultimately uses his or her discretion to determine the raise for each faculty member, including considerations of "short-term ratings;" "long-term performance;" "internal equity" or a "comparison with" other faculty "in the same faculty class;" and "market equity," or how the faculty's "value might be relevant." (A-742 at 46:7-48:24; A-746-47 at 82:12-85:2).

Although a Marketing Department faculty committee provided numerical reviews each year, these reviews did not translate to higher raises for Palmer. For example, in 2013, Palmer had an overall composite score of 2.1 (A-446-47), yet he was given a 1.51% raise, which was 8th out of 10 of the lecturers in the Department who were rated for teaching and service, although his composite score was 4th highest for the year. (A-446-47).

While no "mathematical formula" exists for the chairperson's assignment of raises, a faculty member may receive up to a 10% increase with a promotion, or sometimes, a faculty member may receive a larger raise "as an equity concern." (A-746-47 at 84:13-85:2; A-637-38 at 32:22-34:17). It is "uncommon" for IU to provide a faculty member a 5% raise without a promotion or equity issue involved. (A-637-38 at 32:22-35:8). The proposed raises by the department chair are then reviewed with Maines and ultimately approved by Kesner. Kesner is a "very hands-on" dean and had "obviously more authority" than Maines on salaries and compensation. (A-783 at 13:10-13:23; A-785 at 23:9-24:5).

### c. Teaching assignments are made by the Marketing Department Chairs.

On scheduling, chairs looked at "at the faculty;" the faculty's "abilities;" the "time available on [the faculty's] schedule;" "the teaching needs;" "student demand;" the number of "sections of courses" needed; and how to satisfy student demand with faculty who can do "a good job in the classroom." (A-647 at 83:3-19).

Although Burke claimed he considered "any requests" he "received from faculty to teach a particular course or to create a new course" (A-227-28¶5), Palmer was never told he could make a "request[]" to teach a particular course;" he was simply told he could accept or decline the classes offered to him. (A-606¶19).

### d. The typical time frame for seeking a promotion to senior lecturer is 6 years, but a lecturer may seek an early promotion.

Although lecturers usually seek a promotion to senior lecturer during their sixth year, a lecturer can seek promotion early, but usually not before the third year. (A-504; A-755 at

120:12-24; A-489). Once a lecturer is promoted to senior lecturer, s/he is renewed on a five-year basis. (A-761 at 150:5-21).

In seeking an early promotion, the "first step" is for the lecturer to "indicate to the department chair" that s/he is interested and "set up a meeting" with the chair to "go through" the "record and rationale for doing so." (A-755 at 118:20-120:11). Seeking an early promotion is "quite rare." (A-755-56 at 120:12-121:8)

Because "the department chair is a surrogate for the department" and a "reflection of where the department usually stands," IU has never promoted a lecturer to a senior lecturer without the department chair's support. (A-767 at 221:4-222:3, 222:12-15; A-804 at 164:17-165:9; A-826 at 46:9-48:6).

4.    In KSOB's Marketing Department, Burke or Krishnan have served as chair since 2009.

Professor Ray Burke has served as the Chair of the Marketing Department between 2009 and 2012 as well as from 2018 to the present. (A-631 at 7:20-8:1). Professor Shanker Krishnan served as Chair between 2012 and 2018. (A-631 at 8:2-8:6).

KSOB's Marketing Department is comprised of over 40 faculty. Palmer was the only African American in the Department until Fall 2019 and continues to be the only African American lecturer. (A-631 at 8:7-8:21; A-633 at 15:15-16:1; A-854 at 215:20-216:18).

KSOB requires its MBA students to join certain academies in their first year, and the two that are applicable to the Marketing Department are the Business Marketing Academy ("BMA") and the Consumer Marketing Academy ("CMA"). (A-875 at 27:22-28:14; A-876 at 30:5-30:18; A-747 at 85:3-86:5). Marketing Department faculty members head these two academies as Directors. (A-747 at 85:3-14).

### 5. KSOB's diversity and equity initiatives involve "seek[ing] diverse candidates" and students but no tangential targets.

KSOB's diversity, equity, and inclusion ("DEI") initiatives do not have any specific targets. Instead, these initiatives involve "strategic hiring," i.e., KSOB departments are encouraged to "seek diverse candidates," and an "overarching faculty diversity plan" amounting to a "statement" with "appendices" containing "diversity plans submitted by departments." (A-710-11 at 24:2-26:12).

KSOB's Marketing Department lacks any "diversity committee" or formal faculty mentoring program; it only has a "diversity document" outlining its efforts to improve diversity among faculty and student recruiting. (A-655 at 120:18-123:11). Burke recognized that "diversity is incredibly important in marketing," and "sometimes diverse candidates aren't considered because they haven't had the opportunity to achieve everything that some other people may have been able to . . . ," but "they have the potential." (A-632 at 11:13-12:23). It is "important," per Burke, for "the department to operate in a transparent way," including "how course scheduling is done, how promotion reviews are done, and how resources are allocated." (A-632 at 9:7-10:3).

Allyn Curry, the Director of Diversity Initiatives at KSOB between 2015 and 2018, chose to retire from IU in 2018 "because of racial biases against African Americans" in KSOB, including believing Palmer was denied opportunities because he is African American. (A-945-46¶¶13-23). Curry had been "the only African-American to work in the Office of Diversity Initiatives" for most of his tenure as Director. (A-945¶13).

6. **Before joining IU, Palmer enjoyed a successful career in marketing and brand management at several large, national corporations.**

Palmer's robust educational background includes a BS in Mechanical Engineering from Rose-Hulman Institute of Technology and an MBA degree from IU's KSOB. (A-525; A-817 at 11:21-12:9; A-818 at 13:20-14:12). Palmer also has a Master of Education Leadership as well as an Educational Specialist Degree, and he has nearly completed his doctorate in education. (A-818 at 14:13-15:20).

Before joining academia, Palmer worked for many years in the corporate world for a variety of large businesses, including The American Greetings Company, The Hasbro Toy Company, and The Proctor & Gamble Company, leading marketing initiatives resulting in hundreds of millions of dollars in revenue for his employers. (A-525-27; A-818 at 13:1-11; A-818-19 at 15:21-18:10). Palmer's "industry experience" and "his degree from Rose-Hulman" were "especially impressive." (A-644 at 69:7-71:20).

Palmer first began teaching at John Carroll University's Boler School of Business as an Adjunct Professor of Marketing, where he successfully taught 2 of the required foundational marketing courses in the MBA/Executive MBA curriculum—"Consumer Behavior" and "Ethics & Corporate Social Responsibility." (A-525; A-819 at 18:23-19:23).

In 2009, Palmer also graduated from the Association to Advance Collegiate Schools of Business ("AACSB") Bridge Program for Professionally Qualified Faculty. (A-525).

7. **In Fall 2010, Palmer joined IU's KSOB as a Lecturer.**

Palmer has been a non-tenure track lecturer in KSOB's Marketing Department since Fall 2010, or over ten years. (A-603-604¶¶1-3). Accepting the job at IU required a pay cut of approximately $70,000 per year. (A-821 at 25:12-20).

IU initially provided Palmer with an administrative appointment as a Diversity Coach from his hire until the end of the 2016-17 school year. (A-521-22). The MBA Program chair told Palmer he would "serve as academic advisor and coach" for Consortium students."[1] (A-892; A-820 at 23:11-23:24; A-822 at 30:3-23). For this role, IU provided Palmer an additional $25,000 annually and a 6-credit release from teaching. (A-521).

Although IU never provided Palmer a job description for this role; specific objectives and goals; or a supervisor to evaluate Palmer's performance, Palmer spent at least 8 to 12 hours per week throughout the year in this role. (A-822 at 30:24-31:20; A-832 at 69:20-70:12). He devoted even more time during "signature events or capstone events," which sometimes required Palmer to be "on the road with the students for four to five days and/or an extensive amount of planning to execute." (A-832 at 70:14-71:12; A-860 at 250:19-252:16). IU never compensated for his summer work in this role despite a significant time expenditure on Palmer's part working on the orientation program. (A-832 at 71:8-72:8; A-840-41 at 104:1-105:25; A-860-61 at 252:10-255:2).

Palmer was "very active" with Consortium students in providing advice and mentoring these students throughout his career at IU. (A-946¶21). Palmer "absolutely" helped lower the number of Consortium students on academic probation during his time as Diversity Coach. (A-881 at 59:7-17). Between 2010 and 2013, the number of minority students who were on academic probation dropped by 43%. (A-532).

---

[1] The Consortium started in the 1960s and was meant to bring in underrepresented students into MBA programs. (A-665-66 at 44:7-45:21; A-719 at 76:9-24). IU was one of 3 founding members, and now 20 schools are part of the Consortium. (A-665-66 at 44:7-45:6).

Palmer also did "consistently well in his teaching" because he brought "a lot of energy to the classroom," had "industry experience," and "really commit[ted] himself to teaching." (A-645 at 73:20-74:13). Before his 2016 promotion to senior lecturer, Palmer never declined an opportunity to teach a class. (A-821 at 26:5-28:14; A-861 at 255:3-256:12).

Although Palmer continues to live near Cleveland, Ohio, he is on campus "at least three days a week." (A-823 at 33:17-34:12). Palmer readily volunteered to be at IU whenever needed, and no one advised Palmer of any issues with his "presence" on campus. (A-608¶34).

IU compensated Palmer as follows over the past 3 years: **2017:** $141,000.00; **2018:** $127,500.00; and **2019:** $133,304.00. (A-627; A-933; A-936; A-939).[2]

### 8. Despite indisputably excellent performance, IU only provided Palmer with a 1% salary increase his first 2 years.

During his first and second years with KSOB, Palmer earned multiple performance awards, including the Trustees Teaching Award in 2012, which honors excellent teaching that has positively impacted student learning. (A-531; A-893). Palmer was also chosen as a Finalist for the Trustees Teaching Award in 2011, 2013, and 2016 as well as a Finalist for the 2020 Panschar Teaching Excellence Award. (A-531; A-894; A-926). Palmer additionally earned the IU Access the World through Education Award 2011 (All Campuses); the Student Choice Award in 2012; and IU Athletics Teaching Recognition in 2012, 2017, and

---

[2] This information was collected from the Indiana Gateway for Government Units, "the collection platform for local units of government to submit required data to the State of Indiana, and a public access tool for citizens." (A-623-24¶51). Palmer asked the district court to take judicial notice of these reports under Fed.R.Evid. 201, and IU never disputed the accuracy of these reports. *See* A-403. The Order used the numbers from these reports in its Order. *E.g.*, A-1182-83.

2019. (A-531). Palmer was a finalist for the Neal-Marshall Teaching Award in 2012. (A-531). Palmer also went with students to the National Black MBA Association conference on an annual basis. (A-832-34 at 72:9-80:19).

During Palmer's first, second, and third years at KSOB, he received approximately a 1% salary increase each year. (A-521; A-523; A-604¶6; A-86-87¶10). IU prohibited Palmer from teaching residential overload courses, but he was permitted to teach and be paid for Kelley Direct overload courses. (A-546; A-895; A-228¶7). On multiple occasions, Palmer was only offered residential overload courses and denied Kelley Direct overload courses. (A-546; A-550-51; A-865-66 at 270:2-274:16). *E.g.*, A-550 ("reduc[ing]" an overload for Palmer).

### 9. In 2013, Krishnan refused to support Palmer's early promotion to senior lecturer.

In January 2013, Palmer informed his Marketing Department Chair Shanker Krishnan that he intended to seek an early promotion to senior lecturer. (A-758 at 140:5-13; A-826 at 46:9-25; A-828-29 at 56:20-57:9). Krishnan told Palmer it was "highly unlikely" that he would be promoted, and he "advise[d] against" Palmer's going up for promotion. (A-836 at 85:25-86:14). Ultimately, Krishnan told Palmer he would not "support or advocate" for Palmer's early promotion. *Id.*

When Palmer sought an early promotion in Spring 2013, Palmer's average rating on all responses in the student evaluations was 6.41 on a 7.00 scale, and Palmer's overall average in the Dean's 8 rating was 6.54 on a 7.00 scale. (A-470-72; A-628). The Dean's 8 rating was a selection of 8 particular questions on student evaluations that were deemed "the best indicators of a faculty member's performance." (A-271 at 189:5-190:3).

In the 2012-13 academic year, a KSOB colleague, "who was involved in some of the various different executive teaching opportunities," inquired whether Palmer was interested in an overseas teaching opportunity in Slovenia, but he later learned that Krishnan inserted himself into the situation and offered that opportunity to another Caucasian faculty member. (A-863-64 at 264:15-265:9).

**10.    IU promoted Palmer in Spring 2016 to senior lecturer.**

IU eventually promoted Palmer in Spring 2016 to senior lecturer in his sixth year, a position he still holds. (A-528). While Krishnan later asserted on summary judgment that "Palmer continued to be a highly rated professor and accomplished all of those things that [Krishnan] recommended he do [in 2013]," which allowed Palmer to "sail[] through the promotion process" in 2016 (A-169¶15), nothing significantly changed in Palmer's dossier between his third and sixth year when he was promoted: he taught the same classes, kept up the same excellent student evaluations, and continued the same service. (A-862-63 at 260:9-261:1). When IU promoted Palmer, Palmer's Dean's 8 rating average was 6.41 out of 7.00. (A-536; A-539).

During the promotion process, Palmer did not receive any assistance with compiling his dossier for his promotion. (A-863 at 262:18-263:23). In May 2020, IU reappointed Palmer as a Senior Lecturer through and including May 31, 2026. (A-529).

After the promotion process in 2016, IU attempted to change Palmer's compensation in his administrative role. (A-606-607¶¶20-22). Although IU was only paying Palmer what it had agreed to in Palmer's offer letter, and Kesner approved Palmer's offer letter containing these terms (A-521; A-523), in August 2016, Kesner accused Palmer of receiving an "easy

ride of things relative to others." (A-548; A-724-25 at 148:14-150:14). IU gave no job description to Palmer for this role, and no one asked Palmer about his time expenditure in his role as Diversity Coach, which was substantial, before reaching this judgment. (A-822 at 30:24-31:20; A-832 at 69:20-70:8; A-605¶11).

In October 2016, Palmer provided a memo to IU explaining the substantial time commitment needed for this role. (A-605¶11; A-718-19 at 72:19-73:2; A-728 at 162:20-163:3; A-884-86 at 91:6-97:15; A-557-61). This explanation was accepted by Ash Soni, Executive Associate Dean for Academic Programs, who oversees the MBA Program, and IU did not change Palmer's compensation for the 2016-17 school year. (A-606-607¶¶20-22; A-884-86 at 91:6-97:15; A-557-61).

In January 2017, however, IU asked Palmer to assume additional recruiting duties in this administrative role, which Palmer did not believe he could handle in addition to his role as Diversity Coach and his teaching duties. (A-845 at 122:12-123:23; A-553-56). Palmer suggested that IU create a full-time position to fulfill these additional duties. *Id.* IU agreed and first offered the position to Palmer in Spring 2017, but Palmer declined to accept that full-time role in lieu of his senior lecturer role. (A-730 at 170:18-171:7; A-844 at 119:16-120:21). IU hired another individual to fill this full-time role, which encompassed Palmer's Diversity Coaching role, and Palmer lost his $25,000 administrative pay. (A-845 at 122:12-123:2). IU declined Palmer's offer to help transition this new, full-time employee into this role. (A-607¶22).

Despite Palmer's nomination for the 2020 Panschar Teaching Award, which examines performance from the previous 3 years, Palmer was not considered for an IU Trustees

Teaching Award for 2017, 2018, or 2019 even though this was supposed to be an automatic consideration. (A-926; A-607¶¶23-26; A-893). In 2019, as one example, the nominee from the Marketing Department for the IU Trustees Teaching Award, Jennifer Riley Simone, only had an average of 6.55/7.00 for her student evaluation scores in comparison to Palmer's average of 6.65/7.00 over the same time period. (A-607¶23-26).

**11. Palmer lacked office space for 2 years and was the only senior lecturer without an office.**

The Marketing chairs had responsibility for assigning offices. (A-170¶19). Between Fall 2017 and Summer 2019, Palmer was the only Senior Lecturer in the Marketing Department without an assigned office, although offices were available. (A-816-17 at 8:13-9:11; A-145-46 at 123:18-125:20; A-847 at 129:2-132:4; A-848 at 134:9-11; A-856-57 at 223:16-225:3; A-808 at 182:18-183:13). While Maines admitted on summary judgment that these offices were vacant, she claimed they were unavailable to Palmer, although Palmer was aware of vacant offices available to the Marketing Department during this time, and the offices Maines claimed were unavailable to Palmer between 2017-19 are now occupied by Marketing Department faculty. (A-816-17 at 8:13-9:11; A-145-46 at 123:18-125:20; A-847 at 129:2-132:4; A-848 at 134:9-11; A-856-57 at 223:16-225:3; A-808 at 182:18-183:13; A-604¶8). IU even assigned an office in the Marketing Department to a former PhD student for an entire summer before Palmer received his assigned office. (A-856-57 at 223:16-225:3).

IU instead gave Palmer a small cube without a door in the common area of the Marketing Department, which was the same as 5 of the Marketing Department's graduate students and 2 program administrators. (A-604¶7; A-847 at 129:2-131:5). Given its size and its lack of confidentiality, it was very difficult to meet with students or guest speakers in that

open space. *Id.* Palmer asked Krishnan for an office and complained about the office space situation, but nothing was done to correct the situation until 2019. (A-845-46 at 124:19-127:1; A-856-57 at 223:16-225:3; A-459).

> **12. IU hired a Caucasian lecturer in 2016 and immediately provided him a window office, significant increases in salary, numerous overload teaching opportunities, and by 2019 an early promotion.**

> **a. Gildea's compensation upon his hire at IU was higher than other lecturers.**

In Fall 2016, KSOB hired a Caucasian, Joshua Gildea, as a lecturer in the Marketing Department (the same position Palmer started in) with a starting salary of $82,500. (A-688 at 26:13-16; A-698 at 69:11-71:5; A-462). At his hire, IU informed Gildea how to "find more work and thus more compensation." (A-686-87 at 19:25 -22:7; A-688 at 25:17-26:12).

IU also paid Gildea an additional $30,000 per year for his work with the BMA (if he taught an 18-hour course load) and a $7,500 summer stipend. (A-689 at 31:6-32:2). Gildea had no teaching experience before beginning at IU but had some corporate experience. (A-684-85 at 11:12-16:8; A-436). IU provided Gildea an office with a window at his hire. (A-847 at 129:2-129:17).

> **b. Between 2016 and 2018, IU provided 4.85% and 8.67% raises to Gildea, adding $12,000 to his salary alone.**

In 2017, Mr. Gildea's second year as a non-tenure track lecturer, KSOB gave him a 4.85% pay increase, moving his salary to $86,500. (A-452). In 2018, KSOB gave Gildea an 8.67% pay increase, moving his salary to $94,000, which was only $4,750 less than Palmer's 2018 salary of $98,750, despite Palmer's position as a senior lecturer and Palmer's six additional years of excellent teaching experience. (A-456; A-452; A-86-87¶¶10-11). Krishnan

justified Gildea's 8.67% raise because of a "[g]reat start to teaching, leader BMA, likely to go up for promotion 2018-19 cycle." (A-452; A-456). Krishnan later explained, on summary judgment, that this 2018 raise occurred because Gildea "had transformed [BMA] into the largest academy in the MBA program, in addition to teaching a portfolio of residential MBA, online Kelley Direct (including the core required marketing class), and undergraduate courses with consistently strong performance." (A-169¶16).

Palmer received a 2.07% increase the same year. *Id.* The only lecturer who had a higher percentage raise, Bastianelli (female), was found to be "behind other lecturers" so she received an increase based on "equality" concerns. (A-452).

In 2017, Krishnan nominated Gildea for the Panschar Award. (A-462; A-464; A-692 at 45:7-46:15; A-698 at 71:6-71:24; A-894). In April 2018, fewer than 2 years into his employment, IU gave Gildea the Fettig/Whirlpool Distinguished Lecturer Award at the sole discretion of Maines without departmental input or an application by Gildea. (A-457; A-464; A-641 at 54:4-55:4; A-695 at 57:8-58:9). This award provided an additional annual stipend to Gildea of $5,000 through May 2023. (A-457).

### c. Gildea was provided multiple overload teaching opportunities.

IU permitted Gildea to take on overload teaching as soon as his first year, and for most of his career at IU, he annually "taught a full load and a full overload" of "15 additional credits, plus the academy, which [was] an additional six or seven and a half credits." (A-688 at 27:20-28:8).

Gildea used all of his overload potential credits on Kelley Direct online courses because they paid better. (A-694 at 53:12-54:14). Overload courses were "assigned by the department chair in consultation with the Kelley Director program faculty chair." *Id.*

Accordingly, IU provided Gildea the following total compensation: **2017:** $144,300.00; **2018:** $213,925.00; and **2019:** $215,360.00. (A-627; A-932; A-935; A-938).

### 13. Krishnan and Burke enthusiastically supported Gildea's early promotion to senior lecturer.

When Gildea met with Krishnan about his desire for an early promotion, Krishnan told Gildea that his "contributions" were "lining up with the requirements" for promotion. (A-693-94 at 51:20-53:11). Krishnan told Gildea that his only risk was that if he didn't "get" the promotion in his third year, he would have to wait until his sixth year to reapply. (A-693 at 52:8-52:24). Throughout the process, Burke also directly assisted Gildea with his dossier materials, including assuring Gildea had a peer observation of his teaching and reviewing his promotion materials. *See* A-562-86; A-593-96.

Burke claimed Gildea deserved the "unusual" early promotion because he "had done a considerable amount of teaching," including "the quantity of courses he taught, the number of students he taught," and "a considerable teaching record." (A-646 at 77:7-79:10). Gildea was provided this "considerable amount of teaching" through overload hours, which Gildea was told, at his hire, could be "[p]rimarily" assigned by the department, MBA program, and Kelley Direct program chairs." (A-687 at 23:3-11).

Burke believed Gildea's "quality" was "reflected in "student evaluations of teaching" and his "service activities," including "teaching in the MBA program in the Kelley Direct

program," and "serv[ing] as academy director for the business marketing academy." (A-646-47 at 78:10-82:5; A-686 at 17:8-10).

Krishnan and Burke additionally credited Gildea with creating "new" and redesigning classes, but for one of these "new" classes, "Gildea was provided the necessary content and notes, and he reorganized these previously existing course materials." (A-611¶49; A-169¶17; A-241). For another class he was credited with creating, "it was a team project." (A-611¶49).

14. **Palmer complained in August 2018, October 2018, and in January 2019 about discrimination in salary, teaching opportunities, office space, and the early promotion of Gildea.**

On August 8, 2018, Palmer had a conference call with Maines wherein he outlined multiple concerns regarding racial discrimination, especially in comparison to Gildea, including that Palmer believed race discrimination negatively impacted his salary, promotion to Senior Lecturer, office space, and additional teaching opportunities. (A-851 at 161:19-164:22; A-600-602; A-607¶27).

On October 17, 2018, during an in-person meeting with Maines, Palmer again addressed the concerns he raised with Maines during the August 8th conference call. (A-459; A-607¶28). Maines acknowledged several of Palmer's concerns, including the discrepancy in his salary and salary increases compared to Gildea. (A-459; A-607-608¶¶28-30). Palmer also informed Maines that IU had assigned him to a cubicle while it provided Gildea, a significantly junior colleague, a window office. (A-608¶29). Maines said that Palmer would receive an $8,000 raise the following school year, but none of Palmer's other concerns were addressed. (A-544; A-607-608¶¶28-30; A-459).

In February 2019, Palmer learned Krishnan supported Gildea's early promotion to

Senior Lecturer in Gildea's third year with KSOB. *See* A-694 at 55:25-56:8; A-460-61. Palmer

learned that Krishnan assisted Gildea throughout the process of applying for promotion. *Id.*

Palmer asked Burke, "isn't [Gildea's promotion application] way early?" (A-929). Burke

responded:

> Kelley School lecturers have always had the option to come up early for
> promotion to senior lecturer. In Josh's case, he consulted with Shanker last
> year and, after reviewing evidence of his teaching quantity, breadth, and
> quality, they felt he had demonstrated "Excellence in Teaching" by the Kelley
> School standards. In Josh's three years at Kelley, he has taught more than 96
> credit hours across the undergraduate, graduate, and Kelley Direct programs
> in multiple disciplines[, which] works out to more than five years of full load
> teaching (18 credit hours per year). He has also contributed significantly on
> the service side with his leadership of the BMA, which is now the largest
> academy in the MBA program.

*Id.* Palmer again emailed Maines in February 2019, outlining his complaints of race

discrimination. (A-458-61).

During the Departmental meeting discussing Gildea's promotion on February 12, 2019,

when Palmer questioned the basis for Gildea's seeking an early promotion, another faculty

member responded it was the "lecturer's choice in consultation with the department chair."

(A-605¶14).

Some faculty referenced a few dips in Gildea's student evaluations and Gildea's

"miserable" explanation for these dips, but the Marketing Department faculty overall

focused on assuring Gildea's request for an early promotion was confirmed at higher levels

of IU's administration. (A-606¶¶17-18). Gilda's student evaluation numbers were never

listed in his promotion materials, but Gildea's mean in one score on the Dean's 8 was

5.34/7.00, and another was 6.29/7.00. (A-443).

Ultimately, on April 9, 2019, Palmer received an email confirming Gildea's promotion. (A-897). Gildea thanked Burke and Krishnan "for all of [their] support and leadership in helping [Gildea] get to this point," noting "[t]his career transition and achievement would not have been possible without [Krishnan's and Burke's] support." (A-896).

IU finally addressed some of Palmer's complaints during the 2019-20 school year by providing Palmer an office (no window) in the Marketing Department and an increase in his salary relatively comparable to Gildea. (A-608¶¶30-31; A-845-46 at 124:19-127:1; A-856-57 at 223:16-225:3; A-459). Nonetheless, significant discrepancies between Gildea's total compensation and Palmer's salary remain. (A-608¶32).

## IV.   <u>SUMMARY OF ARGUMENT</u>

IU's Ray Burke recognized "diversity is incredibly important in marketing," because "sometimes diverse candidates aren't considered because they haven't had the opportunity to achieve everything that some other people may have been able to . . . ," yet when it came to offering opportunities to the only African American lecturer (and 1 of only 2 total African American faculty members) in the 40+ faculty member Marketing Department, IU denied Paul Palmer the same opportunities as a Caucasian male (Joshua Gildea) in the same Department with several years less experience. (A-632 at 11:13-12:23).

IU left Palmer in the dark on the process for assigning classes and the early promotion process generally, whereas Gildea was given every advantage—additional salary raises, additional class teaching opportunities, awards, assistance at every step with the promotion process, an office with a window, and support for an early promotion from the very chair

who denied his own support to Palmer despite admitted issues with Gildea's student evaluations.

In contrast, at every turn, Palmer's contributions to the Marketing Department and the KSOB generally were downplayed and denigrated by multiple IU employees during their depositions, including Chair Shanker Krishnan and Dean Idalene Kesner, based on unwritten rules that were certainly never provided to Palmer but were communicated to Gildea.

IU's failure to treat Palmer equally was part of a systemic issue that significantly disadvantaged Palmer and led to a denial of an early promotion and significant compensation disparities between Palmer and Gildea. Allyn Curry, the Director of Diversity Initiatives at KSOB between 2015 and 2018, chose to retire from IU in 2018 "because of racial biases against African Americans" in KSOB, including Palmer who Curry believed was denied opportunities because he is African American. (A-945-46¶¶13-23). IU responded to racial bias issues with aspirations, "plans," and "aim[s]" rather than any actual structural changes at IU to address such bias. *E.g.*, A-961.

Ultimately, these distinct advantages that IU provided to Gildea resulted in an early promotion, additional teaching responsibilities, and greater than $170,000 more in compensation than Palmer, although Palmer had 6 more years of experience than Gildea, had been promoted to senior lecturer 3 years before, and admittedly had excellent teaching reviews.

Given that IU promoted Palmer without issue in his sixth year with no actual differences in Palmer's record from the time he sought an early promotion in 2013 except for additional

teaching experience, Palmer was qualified for an early promotion. Additional teaching experience was not a requirement or standard for promotion to senior lecturer. Nonetheless, IU denied Palmer—the only African American lecturer in the more than 40-person Marketing Department—an early promotion to senior lecturer.

Rather than offering a justification for its negative and differential treatment of Palmer, IU offered distortions of Palmer's comparator Gildea's performance, contradictory explanations for failing to assign Palmer additional classes, inconsistent explanations for providing Gildea with every advantage IU denied to Palmer, shifting and false explanations for Gildea's more favorable treatment generally, and completely irrelevant considerations, such as attributing the $170,000 compensation gap between Gildea and Palmer to a 10-month rather than 12-month pay period when that explained nothing at all. IU additionally failed to explain its substandard treatment of Palmer generally, such as failing to provide Palmer an office for two years when he was the only senior lecturer without one, despite vacant offices being available.

In granting IU's motion for summary judgment, the Order rejected the amalgamation of this evidence supporting Palmer's discrimination claims in favor of siloing evidence into categories in violation of this Court's instructions in *Ortiz* and requiring direct admissions of discrimination. The Order furthermore concluded that for both of his claims, Palmer and Gildea were insufficiently similar comparators, although each worked in the same department, in the same position as lecturers, and under the same policies regarding promotions and compensation. In doing so, the Order elevated form over function for its analysis of similarly situated comparators.

Nonetheless, by following this Court's instruction in *Ortiz*, considering all of Palmer's evidence together as a whole and construing all relevant facts and reasonable inferences in Palmer's favor, a reasonable jury could readily find that IU discriminated against Palmer based on his African American race. Accordingly, the Court should reverse the Order granting summary judgment in its entirety and allow Palmer's claims to be tried before a jury.

## V. <u>LEGAL ARGUMENT</u>

### A. APPELLATE STANDARD.

This Court reviews the district court's grant of summary judgment *de novo*, "construing all relevant facts and inferences in favor of [the] nonmoving party." *Scott v. Chuhak & Tecson, P.C.*, 725 F.3d 772, 779 (7th Cir. 2013). Palmer is entitled to "the benefit of conflicts in the evidence and any reasonable inferences in [Palmer's] favor." *Perez v. Thorntons, Inc.*, 731 F.3d 699, 700 (7th Cir. 2013). The "focus" in deciding whether the Order correctly granted IU's motion for summary judgment is "on the most persuasive story possible on the non-movant's behalf [in] asking whether a verdict in her favor would be reasonable or could result only from irrational speculation." *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 928 (7th Cir. 2020).

### B. IN EXAMINING PALMER'S EVIDENCE AS A WHOLE AS THIS COURT INSTRUCTED, RATHER THAN PIECEMEAL AS DID THE ORDER, A REASONABLE JURY COULD FIND THAT PALMER WAS DISCRIMINATED AGAINST BASED ON HIS RACE.

#### 1. The Order erred by sifting out Palmer's evidence rather than considering it as a whole.

This Court has unambiguously instructed that on summary judgment, "all evidence belongs in a single pile and must be evaluated as a whole." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016). Under *Ortiz*, courts "ask whether the totality of the evidence

shows discrimination, eschewing any framework or formula." *Igasaki v. Ill. Dep't of Fin. &*

*Prof'l Regulation*, 988 F.3d 948, 958 (7th Cir. 2021) (citing *Ortiz* 834 F.3d at 766).

Nevertheless, the Order unilaterally siloed Palmer's evidence into distinct categories

based on what the Order determined was four legal claims, even though Palmer clearly

alleged two total legal claims on summary judgment: (1) a failure to provide an early

promotion; and (2) inequitable pay.

The Order furthermore rejected evidence out-of-hand rather than considering the

evidence in a "single" pile as instructed by *Ortiz*. Palmer's overall evidence "[t]aken together"

would "permit a reasonable jury to infer an overall likelihood of discrimination that merits a

trial, not summary judgment." *Joll*, 953 F.3d at 929. *See Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d

70, 91 n.5 (2d Cir. 2016) (criticizing dissent that "consider[ed] the record solely in piecemeal

fashion, proffering innocent explanations for individual strands of evidence" because the

jury will "view the evidence as a whole in assessing whether there was impermissible

discrimination" and pretextual explanations for discrimination).

## 2. Even if it was required, Palmer can also meet the prima facie requirements of *McDonnell Douglas*.

Even if Palmer exclusively relied on *McDonnell Douglas*, which he did not, IU never

disputed that Palmer met 3 of the 4 prima facie requirements under *McDonnell Douglas*,

including that Palmer: (a) was a member of a protected class; (b) was meeting IU's

expectations; or (c) potentially suffered adverse actions in IU's failure to promote him early

and in the differential pay between Palmer and Gildea. *Eaton v. Indiana Dep't of Corr.*, 657

F.3d 551, 554 (7th Cir. 2011). Instead, IU focused on whether a similarly situated employee

outside the protected class was treated more favorably, which is addressed in Sections D.2

and E.2 of this Brief.

**C. CONSIDERING THE DISTINCTLY DIFFERENT WAYS THAT IU TREATED PALMER, THE QUESTIONABLE EXPLANATIONS THAT SUPPORTED GILDEA'S ALLEGED SUPERIOR PERFORMANCE, AND THE DOWNPLAYING OF PALMER'S PERFORMANCE AS A LECTURER, A REASONABLE JURY COULD FIND THAT IU'S INEQUITABLY PAYING PALMER AND DENYING PALMER'S EARLY PROMOTION WERE CONNECTED TO PALMER'S RACE.**

       **1.     IU bestowed every advantage on Gildea from the date of his hire, while denying Palmer similar opportunities.**

IU gave Gildea significant advantages from the date he began his employment as a

lecturer that were denied to Palmer. Gildea was provided numerous overload classes, maxing

out his limit in almost all semesters before his promotion, that were not offered to Palmer.

IU instructed Gildea at his hire about how to obtain these additional teaching opportunities,

but Palmer was not. Gildea was further offered opportunities to teach classes at different

levels, including undergraduate classes, residential MBA program classes, and Kelley Direct

classes. Palmer was never even informed he needed to ask to teach additional classes; he was

only told he could accept or reject the classes offered to him.

Fewer than two years into his employment, Maines gave Gildea the Fettig/Whirlpool

Distinguished Lecturer Award without any application by Gildea. After 1.5 years of teaching,

Krishnan nominated Gildea for the Panschar Award, an award that is supposed to consider a

lecturer's performance over the prior three years of teaching. By its very terms, Gildea

should not have even been eligible for this award after only 1.5 years of teaching.

Moreover, Gildea was offered full support in assembling his dossier for promotion to

senior lecturer. He was told what materials he needed, he was provided assistance in

gathering those materials for his dossier, and his dossier was fully reviewed and commented on by the Marketing Department leadership before its submission. In contrast, even when Palmer was promoted in 2016, he was not given similar support from Burke and Krishnan: no one reviewed his promotion materials, no one helped him assemble his dossier, and Palmer was left to apply for promotion on his own.

Krishnan fully supported Gildea and significantly advised Gildea he had met the requirements for early promotion. Gildea was also fully informed of the risks and consequences of a denial of an early promotion: Gildea could go back up for promotion during his sixth year. Palmer was denied similar advice and counsel.

By his own admission, Gildea was ultimately promoted in 2019 based on all this preferential treatment. Gildea recognized this special treatment in thanking Burke and Krishnan "for all of [their] support and leadership in helping [Gildea] get to this point," and acknowledging "[t]his career transition and achievement would not have been possible without [Krishnan's and Burke's] support." (A-896).

2.    **Palmer was the only senior lecturer without an office for 2 years, despite available office space.**

IU treated every other senior lecturer in the Marketing Department and Gildea—none of whom were African American—more favorably than Palmer with office space assignments. IU treated Palmer like a graduate assistant or program administrator rather than a lecturer or even his actual title of senior lecturer. Krishnan and Burke assigned all other senior lecturers and Gildea an office for a 2-year period that Palmer had a small cubicle that did not even allow enough space for meetings with students or guest speakers.

The Order, however, treated the assignment of offices as a separate legal claim instead of evidence supporting Palmer's failure to promote and inequitable pay claims and found this separate legal claim "time-barred." (A-1187). The Order also rejected Palmer's lack of an office "as evidence of pretext to support his other race discrimination claims" because "[t]here is simply no evidence that IU's rationale for not providing Professor Palmer with a private office until it did so was pretextual or that the office assignments had anything to do with race." (A-1189).

At this Court recently reemphasized, however, "when a plaintiff 'timely alleges a discrete discriminatory act,' 'acts outside of the statutory time frame may be used to support that claim.'" *Kellogg v. Ball State Univ.*, 984 F.3d 525, 529-30 (7th Cir. 2021); *Malin v. Hospira, Inc.*, 762 F.3d 552, 561 (7th Cir. 2014).

Furthermore, this evidence related to office space is relevant to circumstantial evidence of IU's treatment of all other non-black senior lecturers (i.e., similarly situated individuals) as well as pretext. This is only part of his evidence, not its entirety and should be considered in context with all of Palmer's other evidence.

Unlike the Order's cited case, *Cole*, the office space assignment was not Palmer's only evidence of discrimination. *See Cole v. Bd. of Trs.*, 838 F.3d 888, 899-901 (7th Cir. 2016) (aside from a "'laundry list' of negative experiences" and being "the only African-American foreman," the employee had no other evidence of disparate treatment, and another employee outside the protected class had been "demoted at the same time and for the same reason"). *C.f. Igasaki*, 988 F.3d at 958-59 (finding "a litany of past wrongs" insufficient because employee conceded he was unaware "what discriminatory reason [his supervisor]

had' for her harsh treatment," and this harsh treatment may have resulted from employee's poor performance: "a string of poor reviews, corrective action plans, and suspensions").

Rather than accepting all reasonable inferences in Palmer's favor, the Order fully accepted IU's "rationale" that a hierarchy for assigning offices existed, and a move prevented Palmer from receiving an office; and, the Order failed to consider IU's admission that offices were unoccupied for this 2-year period, and Palmer knew of offices that were available to the Marketing Department, but inexplicably none was provided to Palmer. As Palmer was denied an office, unlike all other non-black senior lecturers for a period of 2 years, although office space was available, this is evidence of a pattern of workplace discrimination based on Palmer's race that should have been considered by the Order. *See Barthelus v. G4s Gov't Sols.*, 752 F.3d 1309, 1314-17 (11th Cir. 2014) (reversing grant of summary judgment where district court overlooked evidence as a whole where employee alleged he "had been subjected to a pattern of workplace discrimination based on race and national origin," including that unlike all white employees, employee was denied a "pay increase" an office; "'extra days off' during the holiday season;" and leave; and, employee's negative performance reviews appeared overblown in consideration of concurrent TSA audits).

### 3. Other black KSOB faculty were treated unfavorably by IU.

Other African Americans in KSOB were treated similarly to Palmer, and "behavior toward or comments directed at other employees in the protected group" is one type of circumstantial evidence that can support an inference of discrimination. *Zafar Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 529 (7th Cir. 2008).

KSOB created an environment that systemically disfavored African Americans. Allyn Curry, the Director of Diversity Initiatives at KSOB between 2015 and 2018, who had worked in KSOBA for 30 years, noted that the environment was generally unfavorable to African Americans: there were "very few African Americans employed" at KSOB over Currey's 30-year employment with IU; and when he reported "issues of racial biases against African Americans" to Kesner, Soni, and James Wimbush, the Vice President for Diversity, Equity and Multicultural Affairs at IU, he received no response. (A-945-46¶¶13-23). Curry specifically chose to retire from his position within KSOB in 2018 "because of racial biases against African Americans," including believing Palmer was denied opportunities because he is African American. (A-945-46¶¶13-23).

This differential treatment is circumstantial evidence supporting an inference of discrimination. *Vega v. Chi. Park Dist.*, 954 F.3d 996, 1005 (7th Cir. 2020) (finding testimony by employee's former supervisor that "she was assigned to 'rough' parks on purpose" and another employee's testimony that "she retired from her 35-year career at the Park District after a police officer told her that the Park District investigators were watching her and her staff" supported employee's discrimination claim because "behavior toward or comments directed at other employees in the protected group is one type of circumstantial evidence that can support an inference of discrimination").

### 4. IU offered false or misleading explanations for its differential treatment of Palmer, which is evidence of pretext.

The Order found that Palmer failed to show that IU's failure to promote him and equitably pay him were pretextual. Nonetheless, because Palmer "does not rely solely on *McDonnell Douglas*, []he may survive summary judgment even without evidence that the

employer's explanation is dishonest. *Joll*, 953 F.3d at 933. Palmer has demonstrated, however, that IU's decisions to deny him an early promotion and IU's failure to pay him equitably were pretextual.

Rather than accepting reasonable inferences in Palmer's favor, however, the Order "credit[ed] [IU's] explanation of the reason[s] for its employment decision[s] as a matter of law" and multiple times repeated IU's arguments nearly verbatim without questioning their legitimacy based on Palmer's evidence, although "the reasons for [IU's] employment decision, including its alleged reliance on such standards, are subject to scrutiny under Title VII . . . .'" *See Stern v. Trustees of Colum. Univ.*, 131 F.3d 305, 313 (2d Cir. 1997).

Here, Palmer's achievements were either ignored or understated, while Gildea's achievements were inflated or falsely attributed to Gildea.

### a. The BMA's growth in number of students was not at all attributable to Gildea.

Burke and Krishnan ascribe Gildea's success as the BMA Director to the BMA's growth in the number of students. Yet, Academy directors had nothing to do with the size of the Academy. Rather, students choose their Academy "at the beginning of the first year just as they enter the program." (A-875 at 28:8-14; A-876 at 29:19-30:18). Admittedly, IU does not "look at the numbers" of students per Academy to determine "how successful an academy is" specifically because students come to IU with certain interests and select their academy based on those interests: "it's the structure of the [MBA] program." (A-875 at 27:22-28:14; A-876 at 30:5-30:18).

Even if the purported growth in the number of students of the BMA was attributable to Gildea, Burke and Krishnan also exaggerated the growth the BMA's growth. For instance, by

the time of their depositions in 2020, the BMA's growth in 2017 and 2018 had ground to a halt, slipping well below the Marketing Department's other Academy, the CMA, in 2019 and 2020. Burke and Krishnan were well aware by their depositions in August 2020 that the CMA had eclipsed the BMA in terms of growth, yet this went unmentioned by either Burke or Krishnan.

During the 2020-21 school year, the BMA had its lowest share of students since at least 2015, meaning that by Burke and Krishnan's alleged standards, the BMA was actually underperforming under Gildea's leadership. Yet, Burke and Krishnan still claimed that Gildea led the largest Academy and claimed the BMA's growth as a strong point of Gildea's performance.

As Burke and Krishnan both cited the BMA's continuing growth to justify Gildea's early promotion and significant pay increases, despite Gildea's having nothing to do with the number of students in the BMA and BMA's dwindling numbers, provides further evidence that the reasons given for the differential treatment of Gildea compared to Palmer were inflated and untruthful.

>   **b. Krishnan and Burke fully credited Gildea with creating and redesigning new classes for which he had not been solely responsible.**

Although Krishnan and Burke emphasized Gildea's creation and redesign of two classes as part of his superior qualifications, Gildea was not actually solely responsible for creating these classes: he was provided the materials for one of these classes, and the other was a class created within a team.

### c. Krishnan and Burke removed teaching opportunities from Palmer.

Krishnan and Burke removed overload teaching opportunities from Palmer, and in the 2012-13 academic year, Krishnan specifically became involved in providing another Caucasian faculty member with an overseas teaching opportunity after Palmer had been approached by someone else about the opportunity.

### d. Palmer was excluded from being nominated for the Trustees Teaching Award, although this nomination was supposed to be automatic.

Palmer was excluded from consideration for the Trustees Teaching Award between 2017 and 2019, even when he had a higher GPA than the Marketing Department nominee for the year. Nonetheless, Palmer was also nominated for the Panschar Teaching Award in 2020, when that examines performance from the previous 3 years.

### e. Kesner impugned Palmer's commitment as Diversity Coach.

Although IU was only paying Palmer what it had agreed to in Palmer's offer letter with Kesner's approval, in August 2016, Kesner accused Palmer of receiving an "easy ride of things relative to others." (A-521; A-523; A-548; A-724-25 at 148:14-150:14). Kesner had no personal knowledge as to Palmer's commitments as Diversity Coach and considering that IU gave no job description to Palmer, and no one asked Palmer about his time expenditure in his role as Diversity Coach before reaching this judgment, including Kesner, this conclusion was dubious.

As Dean, Kesner provided input and approval for the Marketing Department's decisions on compensation and adjustments to compensation, yet Kesner reached unfounded conclusions about Palmer's performance, which is suggestive of bias against Palmer.

### f. During depositions and on summary judgment, additional false excuses were offered by IU, which is further evidence of pretext.

#### i. Kesner made multiple, unsupported assertions about Palmer's performance during her depositions.

Despite lacking any personal knowledge about Palmer's performance as Diversity Coach, during her deposition, Kesner attacked Palmer's performance as a Diversity Coach with criticisms that were never previously disclosed to Palmer and contradicted by those with personal knowledge of Palmer's actual performance.

Kesner concluded, for example, that other faculty had a higher "level of engagement and involvement" than Palmer supposedly based on narratives from two total students during graduation ceremonies rather than personal observations or objective criteria. (A-714 at 41:8-42:23). Kesner also claimed Palmer's performance in the area of recruiting was "fairly flat" although Palmer was told to focus on being an "academic advisor and coach" for Consortium students, and Palmer was not the only person with diversity recruiting goals. (A-892; A-879 at 49:24-50:4; A-728 at 163:14-164:6; A-729 at 167:15-168:9; A-557-61; A-553-56; A-604-605¶¶9-11). Even when a large, 40-person Consortium class entered the year after Palmer left his duties as Diversity Coach, Kesner attributed the growth *entirely* to students. (A-724 at 145:18-147:1; A-608¶33).

In addition, although in 2016-17 Kesner, never questioned that Palmer's work as Diversity Coach helped significantly reduce the number of underrepresented minorities (URM) students who were on probation, Kesner raised doubts about this accomplishment during her deposition. (A-881 at 59:7-17; A-557-61; A-532). If Kesner truly believed Palmer was underperforming in his role in diversity recruiting, it is doubtful IU would have offered

34

Palmer the full-time position created for diversity recruiting. (A-730 at 170:18-171:7; A-844 at 119:16-120:21).

Soni, however, undermined and contradicted Kesner's assessments. Soni affirmed Palmer contributed to the academic success of Consortium students, including "absolutely" helping to lower the number of Consortium students who were on academic probation. (A-881 at 59:7-17). Curry additionally disputed Kesner's unfounded conclusions, finding Palmer has been "very active with Consortium students in his efforts to provide advice and mentor these students throughout his career." (A-946¶21).

### ii. On summary judgment, Krishnan and Burke offered new, albeit false, reasons for treating Palmer inequitably in assigning classes.

On summary judgment, Burke and Krishnan offered false justifications for treating Palmer differently in assigning classes, including assertions that Palmer's living near Cleveland, Ohio part-time affected his ability to teach on certain days and that Palmer was unqualified to teach a particular MBA class.

Specifically, Burke and Krishnan claimed that since Palmer "typically commute[d]," remaining "on campus Monday through Wednesday," this foreclosed them from assigning Palmer to Tuesday/Thursday classes. (A-228¶6; A-166-67¶8). Tellingly, neither Burke nor Krishnan ever asked Palmer about teaching a Tuesday/Thursday class, so Burke and Krishnan made any decisions about Palmer's availability without Palmer's input. (A-608-609¶¶34-37). In reality, Palmer "typically" was on campus 3 days a week "at a minimum," the same as other faculty, and he was willing to do "whatever" was "necessary to support students" at IU. (A-823 at 33:20-34:6).

Moreover, the vast majority of classes Palmer missed out on teaching were Kelley Direct online courses, where "presence" on campus is irrelevant. Neither Burke nor Krishnan explained the failure to assign Palmer to Kelley Direct courses.

Significantly, Krishnan's story changed from his deposition, where he only mentioned Palmer's absence at "graduation ceremonies, receptions to meet incoming students, receptions for workshop students, incoming students, recruiters wishing to meet with faculty on Friday," not classes. (A-764-65 at 212:16-213:10). Even this claim by Krishnan was false and contradicted by Palmer's annual attendance at Consortium graduation events, receptions, summer activities, and other events as part of his regular duties as a Diversity Coach. (A-832-33 at 70:9-75:17).

Krishnan furthermore claimed that he once "reached out to" another faculty member about allowing Palmer to teach a class—M544, but after the Marketing faculty member "voiced concerns" about Palmer's "ability to teach this course in the MBA program and said Palmer was not the "best fit for it," Krishnan reassigned the course to someone else. (A-166¶7). Krishan made this determination before either Krishnan or the Marketing faculty member "ever" observed Palmer's teaching, mentioned "any criticism about [his] teaching" to Palmer, "checked out any of these concerns with [Palmer]," or "actually check[ed]" Palmer's "record" or Palmer's "teaching." (A-609¶39). If Krishnan had actually examined Palmer's teaching record, he would have discovered Palmer "had twice previously taught X574 [also called M544], receiving high student evaluation scores;" "taught MBA-level courses at John Carroll before coming to KSOB;" and "was already deemed Professional Qualified by the AACSB to teach these classes." (A-609-10¶¶40-41). Despite Krishnan's

baseless allegations, IU assigned Palmer to teach M544 ten total times between 2013 and 2019. (A-610¶43).

Considering all of the evidence with reasonable inferences in Palmer's favor, Palmer has presented more than sufficient evidence for a reasonable jury to find that IU's failure to promote Palmer and inequitably pay him were pretextual and based on his race.

**D. THE ORDER ERRONEOUSLY GRANTED SUMMARY JUDGMENT ON PALMER'S INEQUITABLE PAY CLAIM BY REJECTING GILDEA AS A COMPARATOR AND OVERLOOKING IU'S AND KRISHNAN'S DUBIOUS AND PRETEXTUAL REASONS FOR IU'S PAYING GILDEA $171,731.00 MORE IN TOTAL COMPENSATION THAN PALMER BETWEEN 2017 AND 2019.**

The Order granted IU's summary judgment motion on Palmer's inequitable pay claim by separating his inequitable pay claim into two subclaims: (1) an inequitable salary; and (2) an equitable pay claim based on the assignment of overload teaching opportunities. The Order granted summary judgment because Gildea was an insufficient comparator, and "no evidence" showed "Krishnan's reasons for giving Professor Gildea higher percentage raises" were pretextual or that Palmer's "course assignments were in any way a product of race discrimination." (A-1185-86).

The Order erred by again defining comparators far too narrowly and ignoring the common core duties shared by Gildea and Palmer; omitting IU's dubious explanations for Gildea's pay; and ignoring other indications that the differences in pay between Gildea and Palmer were pretextual. Most fundamentally, the Order ignored that Palmer had 6 more years of experience than Gildea and was a senior lecturer for 2 years when Gildea was not, yet IU paid Gildea $171,731.00 more than Palmer over a 3-year period.

1. **IU left undisputed that Gildea received $171,731.00 more than Palmer between 2017 and 2019.**

The differences in compensation between Gildea and Palmer are as follows:

(a)   **2017:** Palmer made $3,300.00 less than Gildea;
(b)   **2018:** Palmer made $86,375.00 less than Gildea; and
(c)   **2019:** Palmer made $82,056.00 less than Gildea.

(A-627; A-932-33; A-935-36; A-938-39). This makes a total pay difference of **$171,731.00**.

Even factoring in Gildea's compensation from the Academy of $30,000 per year for 2018

and 2019 (after Palmer lost his administrative appointment paying an additional $25,000 per

year), IU still paid Gildea **$111,731.00** more than Palmer over the 3-year period. *Id.* Included

in this substantial pay gap are inequitable salary adjustments as well as additional

compensation based on teaching opportunities that were offered to Gildea but not Palmer.

IU never disputed this significant pay difference. Furthermore, because Palmer claimed

he has been and still is subject to differential and inequitable pay every time IU paid him

since 2017, and because Palmer filed his EEOC Charge while the discriminatory pay was still

occurring in May 2019, Palmer's EEOC charge was unquestionably timely under the

Ledbetter Act. 42 U.S.C. §2000e-5(e)(3)(A). Palmer is thus fully permitted to recover

backpay for up two years preceding his EEOC Charge, or between May 13, 2017 and May

13, 2019. *Kellogg*, 984 F.3d at 529.

2. **Palmer and Gildea shared the same common core duties, which was more than enough to make a meaningful comparison between them.**

The Order rejected Gildea as Palmer's comparator but in doing so, the Order defined

comparators far too narrowly. Here, Palmer and Gildea shared the same job title (lecturer);

worked in the same Marketing Department; worked under the same supervisor; and shared

the same core duties, which together provide a meaningful comparison between their positions. *C.f. David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 223-27 (7th Cir. 2017) (finding insufficient comparators where comparators had different job titles, different education prerequisites (i.e., a college degree), different levels of experience, and "totally different duties;" and, the "[t]he core duties" of the proposed comparators' positions "focused on" areas that employee "did not, and could not, perform").

Even if Gildea's administrative position warranted additional compensation, as the Order claimed, the Order ignored Gildea was separately (and handsomely) compensated for this administrative position—including an additional $30,000 per year (if he taught an 18-hour course load) and a $7,500 summer stipend or a total of $37,500 per year until the 2019-20 school year. (A-689 at 30:17-32:2).

The Order furthermore distinguished Palmer and Gildea by inexplicably crediting Krishnan's dubious explanation for Gildea's salary raises in 2017-18 and 2018-19 that "Gildea 'had transformed [the BMA] into the largest academy in the MBA program'" (A-1183) when Palmer presented evidence that Gildea had no influence over the size of the BMA, and Krishnan and Burke had exaggerated Gildea's gains at the BMA.

Moreover, though the Order claimed incompatibility between Gildea and Palmer because Gildea taught in the residential MBA program, the online Kelley Direct program, and undergraduate classes "with consistently strong performance" compared to Palmer's "receiv[ing] excellent teaching evaluations" in teaching "mainly in the undergraduate program, in addition to two online Kelley Direct elective courses" (A-1183-84), the Order omitted that Palmer's lack of assignment to additional classes was one of the very

disadvantages that IU created for Palmer—excluding Palmer from assignment to overload classes in Kelley Direct without explanation. This contributed to significant differences in pay between Gildea and Palmer.

The Order further distinguishes the incredibly disproportionate assignment of classes to Gildea because of the differences in their "expertise" within marketing when this was unrelated to Krishnan's professed reasons for failing to assign more classes to Palmer. Krishnan *never* mentioned a lack of additional, available courses for Palmer to teach— Krishnan only cited Palmer's supposed lack of presence on campus and alleged failure to make "requests to teach additional courses and/or to develop new courses." (A-167-68¶8). Krishnan also claimed that Palmer's "commuting choice" made him "not feel comfortable extending additional university service opportunities" to Palmer if "those opportunities would clash with times he was not on campus." *Id.* Tellingly, Krishnan never asked Palmer about these opportunities yet admittedly withheld these service opportunities. Again, whereas IU and Krishnan provided every opportunity for new classes and other opportunities, Krishnan made dubious, at best, judgments about Palmer without ever asking Palmer that were based on false premises, e.g., his lack of availability. Thus, the differences in "expertise" between Gildea and Palmer were irrelevant to the assignment of classes.

Most significantly, though the Order concluded Palmer and Gildea were incompatible because "Palmer was restricted to teaching only 12 overload credits in the Kelley Direct Program," this was a nonexistent restriction for all but one semester of the 3-year relevant period. (A-1185-86). Between Fall 2017 and 2019, Palmer had no restriction from teaching overload courses because Palmer had already resigned from his administrative position in

Spring 2017. When Palmer held his administrative position, he was also only restricted from teaching "residential" overload courses, not Kelley Direct overload basis. *See* A-228¶7. Finally, the maximum overload credits available to all lecturers was 15 credits. (A-116 at 91:7-91:10).

In addition, despite the Order's assertion Palmer only had his "own belief" he was as qualified as Gildea, even Krishnan admitted that both Gildea and Palmer were both "high performers" in the Department, and Palmer offered objective evidence demonstrating his comparability with Gildea. (A-1039 at 179:17-179:21; A-1040 at 181:12-182:7). Indeed, Krishnan admitted, "it's obvious that [Palmer] is a high performer" because "Paul's evaluations are very high, he has done very well, [and] he's well above average pretty much every year." (A-1040 at 181:12-182:7). It is furthermore undisputed that Palmer's student evaluations were higher than Gildea's. (A-646 at 79:11-79:21). Most significantly, Palmer had 6 more years of experience at IU, more years of teaching experience generally, and was promoted to senior lecturer in Fall 2016 (as opposed to Gildea who only was promoted in Spring 2019). Simply because Palmer is offering this evidence is not a basis for the Order to completely reject it. *McKinney v. Office of Sheriff of Whitley Cty.*, 866 F.3d 803, 814 (7th Cir. 2017).

If the Order's analysis is accepted, it would be nearly impossible for any faculty members in the same department to serve as comparators in a discrimination case. Because Palmer and Gildea shared a common core of responsibilities, the Order erred in finding that Gildea was not a similarly situated comparator to Palmer.

3. **IU's explanations for failing to equitably pay Palmer were dubious, at best, and indicative of pretext.**

Although the Order concluded that no evidence showed IU's reasons for paying Gildea far more in compensation than Palmer were pretextual, this ignores a plethora of evidence that demonstrates that IU's explanations for the inequitable pay were pretextual.

a. **IU's process for setting salaries was hardly fair or in line with faculty contributions to teaching and service.**

On summary judgment, IU claimed that "KSOB has a very fair and very detailed process for setting salaries," yet Palmer very much disputes that KSOB's system was "fair" or "detailed." (A-386). Despite IU's arguments that the salary differences are "based on each faculty member's contributions to teaching and service each year" *id.*, in practice, this is untrue. As Krishnan admitted, there is no "mathematical formula" in the chair's assignment of raises. (A-746-47 at 84:13-85:2).

For example, although a Marketing Department faculty committee provided numerical ratings of faculty each year, Palmer's ratings did not translate to higher raises for Palmer. For example, in 2013, Palmer had an overall composite score of 2.1 (A-447), which was 4th best in the Department, yet he was given a 1.51% raise, which was 8th out of 10 of the lecturers in the Department who were rated for teaching and service. (A-446-47).

In contrast, despite the fact that it was "uncommon" to receive a 5% raise without a promotion or equity issue, Gildea received over 5% raises without a promotion or evidence of an equity issue, including in 2017 (4.8% raise) and in 2018 (8.67% raise). Before Palmer's salary was finally raised, Gildea's salary alone in 2018-19 came within only $4,750.00 of Palmer's because Gildea's starting salary had risen by $11,500.00 over 2 years while Palmer's

had risen $3,250.00 over the same period (A-86-87¶¶10-11), despite Palmer's six additional years of teaching experience and earlier promotion to senior lecturer.

### b. IU's offered explanation that the differences in pay can be explained by its paying faculty over a 10-month calendar explained nothing.

IU also asserted that paying faculty "based on a ten-month academic year, which is quite different than a calendar year" (A-971 n.9), somehow explained the more than $170,000 pay difference between Palmer's and Gildea's pay. This explanation, however, lacked any elucidation as to how pay on a ten-month academic year would create <u>any</u> difference between Palmer's and Gildea's pay.

Whether IU pays its salaries over 10 months or over 12 months is irrelevant because faculty still earned the same salary over an annual period—they received no compensation over the summer and received their annual salary over 10 months. *E.g.*, A-521. Faculty could obtain additional pay beyond their salary over the summer with additional "teaching in the summer" or "administrative duties." (A-1030 at 91:14-92:23; A-830 at 63:7-63:16).

This 10-month v. 1-year difference does nothing to explain the $171,731.00 difference in pay between Palmer and Gildea during the years 2017, 2018, and 2019 alone, especially when for 2 of these 3 years, Palmer outranked Gildea, and for all of these years, Palmer had 6 more years of experience than Palmer.

### c. Krishnan's explanations for the salary discrepancies also failed to pass muster.

Krishnan's explanations for treating Palmer inequitably in compensation fail to add up. As discussed above, Krishnan falsely attributed the BMA's growth to Gildea and exaggerated Gildea's performance as Director in the BMA. Furthermore, it is undisputed Palmer had

better student evaluations overall than Gildea, and no one told Palmer that teaching undergraduate or elective courses would negatively impact his salary or that he could say anything other than "yes" or "no" when offered a class.

In addition, Gildea's availability "throughout the week" to teach courses is a nonissue—Palmer would have made himself available, but Krishnan never asked about his availability to teach classes on other days. (A-169¶17). This, moreover, failed to explain why Krishnan was unable to assign Kelley Direct courses (taught online) to Palmer, where presence on campus was clearly not an issue. That Krishnan assigned courses to Gildea that "align with his background and expertise" is also irrelevant: Krishnan never asserted there was a shortage of classes for Palmer to teach for those areas in which he was qualified. *Id.*

Though Krishnan faulted Palmer for lacking leadership positions with the Department or KSOB, Krishnan *admitted* he denied Palmer opportunities for service because of Palmer's alleged lack of presence on campus, which was—in fact—a nonexistent issue that Krishnan never addressed with Palmer. (A-166-67¶8).

Finally, that Gildea and was "very highly rated" over "several programs," which resulted in others "voic[ing] their preferences for Prof. Gildea to teach certain courses" is a problem created by Krishnan's disparate assignment of classes. (A-169¶17). Specifically, since Krishnan denied Palmer these opportunities to teach, including based on false assertions related to Palmer's presence on campus, then it would be impossible for Palmer to obtain others "voic[ing]" a preference for Palmer's teaching certain classes. Unlike Palmer, Gildea was also specifically instructed on how to obtain and did obtain the maximum amount of overload courses.

Because Gildea taught the maximum number of overload classes, Gildea also received a significant amount of additional compensation between 2017 to 2019 that Palmer was denied, which contributed to the windfall of $171,731.00 favoring Gildea.

Taking this evidence, in combination with the abundance of other evidence detailed above, a reasonable jury could find that IU's explanations for failing to equitably pay Palmer were pretextual.

**E. BECAUSE PALMER WAS UNAWARE OF IU'S DISCRIMINATION UNTIL HE DISCOVERED GILDEA'S PROMOTION, TREATED FAR LESS FAVORABLY THAN GILDEA, AND APPLIED BUT WAS REJECTED FOR A PROMOTION, THE ORDER ERRED IN GRANTING SUMMARY JUDGMENT ON PALMER'S FAILURE TO PROMOTE CLAIM.**

The Order granted summary judgment on Palmer's failure to promote claim because his EEOC charge was untimely on that claim, Gildea was not similarly situated, and Palmer purportedly failed to apply for an early promotion. Nonetheless, Palmer's EEOC charge was timely with equitable tolling; the Order's basis for rejecting Gildea as a comparator was a hyper-technical analysis that ignored the material commonalities between Gildea and Palmer; and Palmer applied or was deterred from applying for an early promotion to senior lecturer.

> **1. Because Palmer had insufficient reason to know IU discriminated against him in denying him an early promotion until Spring 2019, Palmer's discrimination claim should be equitably tolled until then.**

Equitable tolling "permits a plaintiff to avoid the bar of the statute of limitations if despite all due diligence he is unable to obtain vital information bearing on the existence of his claim.'" *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990). The statute of limitations is tolled until Palmer "'had sufficient information to be held to have sufficient knowledge of the basis" for a complaint. *Brennan v. Daley*, 929 F.2d 346, 349 (7th Cir. 1991).

Although the Order concluded Palmer had sufficient knowledge of the discrimination in the early promotion claim "by August 10, 2018, when he discussed the early promotion with Maines" (A-1175), the Order solely concluded Palmer raised discrimination claims about his "early promotion" in August 2018 based on a February 2019 email wherein Palmer stated that he "outlined" a "number of significant concerns regarding racial discrimination and/or bias by IU and [Krishnan]" during an August 2018 phone call, including "how racial discrimination had negatively impacted" Palmer's ". . . promotion to senior lecturer." (A-1175; A-345).

Nonetheless, this email references a promotion—not an early promotion. The Order ignored that Palmer had sought a promotion twice: in 2013 and 2016. Palmer lacked any knowledge Gildea was even applying for an *early* promotion until Spring 2019. (A-67 at 207:12-208:6).

As no one else had applied for an early promotion between 2013 and 2019, Palmer had no basis to assert a discrimination claim on the failure to grant him an early promotion until 2019. (A-855 at 220:4-7). The earliest Palmer could have suspected discrimination concerning his early promotion was not "until" February 8, 2019, when Palmer "got the email" from Burke "saying Josh Gildea was going to go up for promotion early." (A-67 at 207:12-208:6).

Palmer furthermore did not learn of Gildea's successful early promotion until April 9, 2019. (A-897). Palmer then filed his EEOC charge on May 14, 2019. (A-425; Dkt. 1-1). It was certainly understandable for Palmer to believe he lacked sufficient knowledge about actionable discrimination on the failure to promote him until Gildea actually received the

early promotion—i.e., if IU denied Gildea an early promotion, Palmer would have no basis to assert discrimination. Even considering the February 8, 2019 date, however, only three months passed before Palmer filed his EEOC charge.

Because Palmer filed his EEOC charge within weeks of learning Gildea received an early promotion, equitable tolling should apply. *C.f. Thelen v. Marc's Big Boy Corp.*, 64 F.3d 264, 268-69 (7th Cir. 1995) (employee waited nearly 10 months between discovery of discrimination and filing EEOC charge).

**2.      The Order rejected Palmer's similarly situated comparator, Gildea, although both worked in the same department with the same job title, were judged by the same basic promotion standards, held administrative appointments at the time they sought early promotions, and Palmer's student evaluations were admittedly better than Gildea's.**

"[T]he similarly-situated inquiry is flexible, common-sense, and factual" that essentially questions whether "enough common features" exist "between the individuals to allow a meaningful comparison." *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012). Only "when the facts of a case suggest that no reasonable jury could see enough commonality for a meaningful comparison between the employees" is summary judgment "appropriate." *Rozumalski v. W.F. Baird & Assocs.*, 937 F.3d 919, 927 (7th Cir. 2019).

Here, Gildea and Palmer shared the same title (lecturer), sought a promotion to the same title (senior lecturer), and were judged by the same basic standards for promotion to senior lecturer. Nevertheless, the Order concluded Gildea was not a comparator in an overly specific determination that Gildea's qualifications were simply superior to Palmer's when the question should have been whether Palmer and Gildea had both earned a promotion to

senior lecturer. The determination of comparability here should have been reserved for the jury, not an Order on summary judgment.

### a. The Order ignored Palmer was successfully promoted to senior lecturer in 2016 with essentially the same qualifications as when he sought an early promotion in 2013.

The Order critically ignored that IU promoted Palmer to senior lecturer during his sixth year. Other than additional teaching experience, which are not a consideration for promotion to senior lecturer, nothing had changed in Palmer's application since 2013, when he applied for early promotion to senior lecturer. (A-862-63 at 260:9-261:1). He taught the same classes, continued his service as Diversity Coach, and maintained his excellent teaching ratings.

The Order's analysis also omitted that in 2009, Palmer graduated from the AACSB Bridge Program for Professionally Qualified Faculty; thus, before he applied for promotion, he "was already deemed Professional Qualified by the AACSB." (A-530; A-609¶40). This fulfilled a direct promotion requirement that Gildea lacked. (A-489; A-491 n.3) (noting "achievement of AQ or PQ status" as a requirement for promotion). *See* A-438; A-440.

This is significant evidence, on its own, from which a reasonable jury could conclude that Palmer was qualified for an early promotion in 2013.

### b. Both Palmer and Gildea had significant administrative assignments when they sought early promotions.

Although both Palmer and Gildea had administrative assignments when applying for early promotions, the Order rejected Gildea as a comparator to Palmer based solely on IU's statement that Gildea's position as BMA Director "involved a level of responsibility

normally given to a clinical faculty member," whereas Palmer's Diversity Coach position "did not involve that level of responsibility." (A-1178).

If every position within university departments was distinguishable by the type of administrative assignment alone, comparators would be impossible to find within academia because jobs or assignments do not frequently fall within exactly identical areas. Courts "are looking for comparators, not 'clone[s].'" *Coleman*, 667 F.3d at 846. *See generally Summy-Long v. Pa. State Univ.*, 226 F. Supp. 3d 371, 406 (M.D. Pa. 2016) (quoting *Coleman*, 667 F.3d at 846) (non-precedential) (Seventh Circuit's instruction in *Coleman* that "clone[s]" are unnecessary "is particularly true in the academic setting, where although there may exist generalized departments, each scholar has his or her own unique qualifications, research goals, and aptitudes.").

The Order furthermore significantly ignored that no one at IU understood Palmer's "level of responsibility" as a Diversity Coach. Palmer had no job description, supervisor, or anyone tracking his work as Diversity Coach. Instead, IU diminished and downplayed Palmer's role as Diversity Coach, although Palmer spent significant time and effort in his role as Diversity Coach throughout the academic year—including summers, and he was successful in this role.

Whether these academic positions were sufficiently compatible should have been a determination for the jury, not the Order on summary judgment.

### c. Although Palmer and Gildea both were lecturers in the Marketing Department, the Order found them incomparable because they had different marketing subspecialties.

Ignoring that Palmer and Gildea were both Marketing Department faculty, the Order distinguished Gildea and Palmer because "Gildea had experience in business-to-busines [sic] marketing," qualifying Gildea "to teach courses in that area and to direct the BMA," whereas "Palmer had experience in consumer marketing." (A-1178). Again, if courts rejected every potential comparator at a university level for a different subspecialty area, it would be impossible to find comparators in university settings, as faculty members rarely share identical subspecialty areas or teaching focuses.

Regardless of these subspeciality differences, Palmer and Gildea were each qualified to teach classes in the Marketing Department at multiple levels, and Palmer and Gildea had (at least) the same level of education (Master's degrees). Since these "distinctions" were "not 'so significant that they render the comparison effectively useless,' the similarly-situated requirement is satisfied." *Coleman*, 667 F.3d at 84.

### d. Because IU lacked a minimum number of teaching hours to qualify as a senior lecturer, Gildea's ability to teach "certain types of classes" on an overload basis was irrelevant.

Although the Order distinguished Gildea from Palmer because Gildea had more total teaching hours, and "Gildea was not prohibited from teaching certain types of classes on an overload basis," whereas "Palmer could not teach certain classes on an overload basis because of his position as Diversity Coach," this bared little relevance on their comparability for an early promotion. (A-1178). No IU policy mentions a minimum number of hours

required for a promotion to senior lecturer. *See* A-489-91. Thus, teaching fewer hours would not have foreclosed Palmer's early promotion.

Because a reasonable jury could find that Palmer and Gildea were similarly situated, the Order erred in finding that Palmer and Gildea were not similarly situated comparators.

### 3. As Palmer was either denied or deterred from seeking an early promotion by Krishnan and KSOB's biased environment generally, he met the requirements of a failure to promote claim under Title VII.

Although the Order concluded Palmer's failure to promote claim failed because Palmer never applied for the early promotion, Palmer did apply but Krishnan rejected this promotion application. Even if there was no application or rejection for an early promotion, IU's "discriminatory practices deterred [Palmer] from applying" for the promotion. *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 558 (7th Cir. 2004).

Palmer admittedly took the important first step in 2013 of applying for the promotion: he informed Chair Krishnan he intended to apply for an early promotion. Krishnan, however, refused to support Palmer's early promotion request. Krishnan is admittedly the "surrogate" for the Marketing Department (A-767 at 221:4-222:3), and IU has never promoted *anyone* without the support of his chair. Accordingly, IU denied Palmer a promotion via Krishnan's refusal of support.

Even if Krishnan's refusal to support Palmer was not a denial of Palmer's early promotion application, Krishnan's refusal to support Palmer and the generally antagonistic environment against African Americans within KSOB created a promotion process that deterred Palmer from obtaining an early promotion. *Loyd v. Phillips Bros.*, 25 F.3d 518, 523 (7th Cir. 1994) ("[W]here an employer ordinarily entertains applications for a certain type of

job but a plaintiff is deterred from applying by the very discriminatory practices he is protesting yet can show that he would have applied had it not been for those practices, a sufficient preliminary link between discrimination and adverse consequence is established.").

Since a promotion was impossible without Krishnan's support, and because Krishnan clearly was biased against Palmer and treated Gildea far more favorably during the promotion process, Krishnan further deterred Palmer from applying for the promotion. *Volling v. Kurtz Paramedic Servs.*, 840 F.3d 378, 384 (7th Cir. 2016) ("Employees, for example, may be dissuaded from applying by the manner in which [the employer] publicizes vacancies [or] his recruitment techniques."). Significantly, unlike Palmer, Krishnan advised Gildea that the risks were minimal: Gildea could seek promotion again during his sixth year without consequence.

KSOB was, moreover, an environment that systemically disfavored African Americans. Curry, who had worked in KSOBA for 30 years up to 2018, noted that KSOB's environment was generally unfavorable to African Americans: there were "very few African Americans employed" at KSOB over Curry's 30-year employment; and when he reported "issues of racial biases against African Americans" to multiple administrators at KSOB, IU never responded. (A-945-46¶¶13-23). Curry chose to retire from KSOB in 2018 "because of racial biases against African Americans," including believing Palmer was denied opportunities because he is black. (A-945-46¶¶13-23).

Although KSOB and the Marketing Department recognized the need for DEI initiatives, neither KSOB nor the Marketing Department had anything but "plans" in place, rather than any actual changes or targets, despite Burke's recognition of a lack of opportunities and

equal consideration for "diverse candidates." This caused distinct disadvantages for Palmer compared to Gildea, including a lack of any support or assistance in either his early application for promotion in 2013 or his 2016 application for promotion—there was not even another black faculty member in the Department during either of Palmer's promotion applications. Palmer additionally was not told he could request to teach certain classes or informed that teaching certain classes would be outweighed by others in terms of promotion and salary. Whereas Palmer was marginalized from the Department, Gildea was provided all available resources by KSOB and the Department.

Taking consideration of all these circumstances, IU deterred Palmer from applying for an early promotion based on IU's discriminatory behavior against him.

## VI.    CONCLUSION

Because a reasonable jury could find in favor of Appellant Paul Palmer, Jr. II on each of his claims, the Court should reverse the Order granting Defendant's Motion for Summary Judgment in its entirety and allow Palmer to present his claims to a jury.

Respectfully submitted,

*s/ Sandra L. Blevins*
Sandra L. Blevins, Atty. No. 19646-49
Courtney E. Endwright, Atty. No. 30557-49

*Attorneys for Plaintiff-Appellant Paul Palmer, Jr. II*

## VII. CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Brief of Appellant complies with the type-volume limitations of Fed.R.App.P. 32(a)(7)(B). This brief contains no more than 14,000 words this 23rd day of July, 2021.

*s/ Courtney E. Endwright*
Courtney E. Endwright

## VIII. DIGITAL MEDIA STATEMENT

I hereby certify that pursuant to Circuit Rule 31(e) that the text of this brief has been provided on digital media.

*s/ Courtney E. Endwright*
Courtney E. Endwright

## IX. STATEMENT OF INCLUSION

I hereby certify that pursuant to Circuit Rule 30(a) and (b) that the parts of the record required to be included in the Appendix are provided.

*s/ Courtney E. Endwright*
Courtney E. Endwright

## X.    <u>PROOF OF SERVICE</u>

I hereby certify that a copy of the foregoing has been served upon the following counsel

of record this 23rd day of July, 2021, via ECF Service:

>    Michael C. Terrell
>    Melissa A. Macchia
>    TAFT STETTINIUS & HOLLISTER LLP
>    One Indiana Square, Suite 3500
>    Indianapolis, IN 46204


>    *s/ Courtney E. Endwright*
>    Courtney E. Endwright

BETZ + BLEVINS
One Indiana Square, Suite 1660
Indianapolis, Indiana 46204
Office: (317) 687-2222
Fax: (317) 687-2221
E-mail: litigation@betzadvocates.com

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

**Appeal No.: 21-1634**

| | | |
|---|---|---|
| PAUL PALMER, JR. II, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| *vs.* | ) | Cause No. 1:19-cv-4610-JMS-MJD |
| | ) | |
| INDIANA UNIVERSITY and | ) | Hon. Jane E. Magnus-Stinson |
| THE TRUSTEES OF INDIANA | ) | |
| UNIVERSITY | ) | |
| | ) | |
| Defendants- Appellees. | ) | |

# SHORT APPENDIX OF APPELLANT

Sandra L. Blevins
Courtney E. Endwright
BETZ + BLEVINS
One Indiana Square, Suite 1660
Indianapolis, Indiana 46204
Office: (317) 687-2222
Fax: (317) 687-2221
E-mail: litigation@betzadvocates.com

*Attorneys for Plaintiff-Appellant Paul Palmer, Jr. II*

## **CERTIFICATION**

I hereby certify that all materials required by Circuit Rule 30(a) and (b) are included in this Short Appendix of Appellant.

*s/ Courtney E. Endwright*
Courtney E. Endwright

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... i

ORDER ON MOTION FOR SUMMARY JUDGMENT AND RELATED MOTIONS
     DATED APRIL 12, 2021 ............................................................................................. 0001

FINAL JUDGMENT PURSUANT TO FED. R. CIV. P. 58 DATED APRIL 12, 2021
     ........................................................................................................................................ 0064

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

PAUL PALMER, JR. II,                                    )
                                                        )
                              *Plaintiff*,              )
                                                        )
                v.                                      )            No. 1:19-cv-04610-JMS-MJD
                                                        )
INDIANA UNIVERSITY and TRUSTEES OF INDIANA              )
UNIVERSITY,                                             )
                                                        )
                              *Defendants*.             )

## ORDER

Plaintiff Paul Palmer, Jr. II, who is African American, was hired by Defendant Indiana University ("IU") as a non-tenure track lecturer in the Kelley School of Business ("KSOB") Marketing Department in August 2010. After being discouraged from applying for an early promotion in 2013, Professor Palmer applied for and was promoted to the position of senior lecturer in 2016. In 2018, Professor Palmer began raising concerns with the Associate Dean of Faculty regarding racial discrimination based on the early promotion of a Caucasian lecturer, Joshua Gildea, and other favorable treatment. Professor Palmer ultimately initiated this litigation related to those concerns, and asserts claims against IU and the Trustees of Indiana University[1] for race discrimination in violation of Title VII of the Civil Rights Act of 1964. [Filing No. 1.] IU[2]

---

[1] Defendants state in one of their filings that "Plaintiff incorrectly names Indiana University as a defendant in this case. The Trustees of Indiana University is the proper legal entity. *See* Ind. Code § 21-27-4-2." [Filing No. 67 at 1 n.1.] The proper course of action to seek a change to the docket is for the parties to confer regarding whether the proper defendants are named, and to file the appropriate documentation seeking a change, if necessary. Should Defendants wish to eliminate IU as a party, they must file a motion.

[2] For simplicity, in this Order the Court will refer to Defendants collectively as "IU."

1

has filed a Motion for Summary Judgment, [Filing No. 46], and a Motion to Exclude the Expert Witness Statement of Dr. James R. Fairfield-Sonn, [Filing No. 66], and Professor Palmer has filed a Motion for Leave to File Surreply and Supplemental Designation of Evidence in Opposition to Defendant's Motion for Summary Judgment, [Filing No. 69].  All of these motions are now ripe for the Court's decision.

# I.
## STATEMENT OF FACTS

At the outset, the Court notes that Professor Palmer failed to comply with the Court's Practices and Procedures, which provide that "[i]n a supporting brief, [a party must] cite to the docket number, the attachment number (if any), and the applicable .pdf page as it appears on the docket information located at the top of the filed document."  [Filing No. 6 at 4.]  Instead of following this citation format, Professor Palmer cites to "DOE," which is not defined anywhere in his briefs but which presumably refers to the Designations of Evidence he has filed at Filing Nos. 57 through 60.  His citations are further confused by the fact that he does not explain the numbers he cites to within the "DOE."  For example, he cites to "DOE 124 at 12:8-11," to support the first sentence of his Factual Background and Statement of Material Facts in Dispute.  [Filing No. 54 at 2.]  Only after trial and error did the Court determine that this citation refers to "Exhibit 124" filed within the DOE.  Instead, the proper citation for this material is "Filing No. 60-6 at 4."

To further complicate matters, Professor Palmer's exhibits are not filed in numerical order within his "DOE."  For example, Exhibit 124 is the sixth attachment in his fourth "DOE" docket entry, [Filing No. 60-6], but Exhibit 133 is the fourth attachment in his second "DOE" docket entry, [Filing No. 58-4].  The haphazard fashion in which counsel filed the exhibits that make up Professor Palmer's "DOEs," coupled with the vague citations in Professor Palmer's briefs, have made the Court's review of the Motion for Summary Judgment unnecessarily and extremely

difficult, particularly given that Professor Palmer has filed over 500 pages of exhibits in opposition to the Motion for Summary Judgment. The Court does not have a duty to "scour every inch of the record" to find potentially applicable evidence, *Johnson*, 325 F.3d at 898, but has done its best to locate the evidence Professor Palmer has cited.[3] However, his counsel should ensure that they follow the Court's Practices and Procedures in this and other cases going forward.

The following factual background is set forth pursuant to the standards detailed below. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A.    KSOB Leadership, Programs, and Faculty

Idalene Kesner has been the Dean of the KSOB since 2013, and Laureen Maines has served as Executive Associate Dean during that time. [Filing No. 60-6 at 4.] Dean Kesner has the ultimate authority over KSOB decisions, including salary decisions. [Filing No. 60-6 at 7.] The KSOB has approximately 325 total faculty, 11 of whom are African American individuals. [Filing No. 60-6 at 10.]

The KSOB offers an undergraduate program, an MBA program, various other master's programs, certificate programs, and a doctoral program. [Filing No. 60-8 at 3-4.] The MBA program offers both an in-person residential program and an online program called "Kelley Direct Online." [Filing No. 60-1 at 21.] The residential and online MBA programs are "comparable in

---

[3] The Court also notes that while Fed. R. Civ. P. 56 and L.R. 56-1 require citation to the record to support each fact relied upon, those rules do not require citation to *every* spot in the record where support for each fact appears. The parties frequently provide long strings of citations to spots in the record that support the same fact, and these superfluous citations are cumbersome and unnecessary.

terms of the expectations for teaching quality and the quality of the students." [Filing No. 60-1 at 21.]

The KSOB employs both tenure track faculty and non-tenure track faculty, including clinical faculty and lecturers, to teach classes in the undergraduate and MBA programs. [Filing No. 60-1 at 13-14.] Lecturers typically carry a course load of 18 credits, "unless they have some sort of administrative appointment." [Filing No. 60-1 at 13-14.] Tenure-track faculty have a lighter teaching load to account for their research responsibilities, and clinical faculty (who must have a doctoral degree, but focus on teaching and service) teach 15 credits. [Filing No. 59-4 at PP2; Filing No. 60-1 at 21.]

**B.      Reviews of KSOB Lecturers**

Lecturers are reviewed annually, and are assigned a number from 1 to 4, with 1 being the highest. [Filing No. 60-1 at 8; Filing No. 57-1 at 3.] A rating of 1.0 to 1.9 is considered "outstanding." [Filing No. 57-1 at 2.] Lecturers' evaluation ratings are weighted at .9 for teaching and .1 for service. [Filing No. 57-1 at 1.]

The number of hours above the normal teaching load is considered as part of a lecturer's annual review. [Filing No. 60-1 at 22.] Pursuant to KSOB policy, a lecturer may teach up to 15 credits over his or her assigned teaching load, including 3 credits maximum for residential classes and 15 credits maximum for Kelley Direct classes. [Filing No. 58-1.] The base payment for teaching 3 credits for residential classes is $7,500, and the base payment for teaching 3 credits for Kelley Direct classes is $15,000. [Filing No. 60-1 at 21; Filing No. 60-5 at 15.]

The KSOB's Performance Evaluation and Feedback System provides that student evaluations are "the primary determinant of the quality of teaching performance," and that other considerations include the "[d]evelopment of new courses, significant renovations of existing

4

courses," "[t]eaching a breadth of courses and/or across multiple programs that enhances an individual's value to the department," "[c]ourse/program difficulty," and "[i]nvestments in teaching improvement and pedagogy." [Filing No. 57-1 at 3.] Professor Ray Burke, the eventual Dean of the KSOB Marketing Department, believed that the courses with more difficulty included the MBA core course, required courses, graduate-level courses, and large enrollment courses, and that "it is as challenging to teach in the online program as it is in the residential MBA program." [Filing No. 60-1 at 9.] Professor Palmer was not informed that certain courses carried more weight for evaluation and promotion purposes than other courses, and this was not in writing in KSOB's policies. [Filing No. 60-7 at 22-23; Filing No. 60-7 at 48-49.]

The Performance Evaluation and Feedback System also notes that "faculty members' service contributions may vary across discipline,…university,…Kelley School,…department,…and community," but "[l]eadership roles in any of these areas is highly valued," and the KSOB "values service that balances external (discipline/company) with internal (department/school/university) contributions." [Filing No. 57-1 at 4.] Service activities can include committees that faculty members serve on; the number of events that they attend; the ways that they serve the department, school, and university at large; and participation in career fairs, corporate dinners, lunches, and alumni events. [Filing No. 60-4 at 14; Filing No. 60-5 at 18-19; Filing No. 57-1 at 4.]

Lecturers have the opportunity to earn multiple awards, including the Trustee Teaching Award, which automatically compiles nominations for the "top 6% of full-time lecturer and clinical faculty – combined – whose primary duty is teaching." [Filing No. 59-7.] Additionally, the Panschar Award is based on the past 3 years of student evaluations for the Undergraduate level

of teaching, and for which faculty members are nominated by the Department Chairperson. [Filing No. 59-8.]

### C.   Faculty Raises

Faculty raises are determined annually based on the faculty evaluations and the chair's judgment, and with consultation with the deans. [Filing No. 60-1 at 10; Filing No. 57-4.] The chair of the Marketing Department, along with the KSOB's Executive Associate Dean for Faculty and Research, typically sets the starting base salary for a newly hired lecturer, and the base salary is determined pursuant to several factors including the lecturer's level of experience in academia and/or the marketing field prior to joining IU's faculty, the role the lecturer will have with the KSOB (e.g., leadership role), and the lecturer's versatility in terms of teaching a variety of marketing courses. [Filing No. 46-5 at 5; Filing No. 46-9 at 3; Filing No. 46-10 at 4; Filing No. 46-12 at 7-8.] The chair and the Executive Associate Dean also review the salaries of the other Marketing Department lecturers to determine a baseline range for a new faculty member's starting salary. [Filing No. 46-9 at 3.]

There is no mathematical formula for the assignment of raises – for example, a faculty member may get up to a 10% raise with a promotion, or a larger raise to achieve equity among other faculty members. [Filing No. 60-1 at 9-10; Filing No. 60-5 at 11-12.] It is uncommon for a faculty member to receive a 5% raise without a promotion or equity issue involved. [Filing No. 60-1 at 10.] Raises are ultimately reviewed by Associate Dean Maines and approved by Dean Kesner. [Filing No. 60-6 at 5-7.] Lecturers are typically given small annual base salary raises, and the Marketing Department has a specific process for assigning raises and also uses a faculty annual review process. [Filing No. 46-9 at 3.] Each January, faculty members submit an annual report for the previous calendar year and a curriculum vitae to the Marketing Department chair.

[Filing No. 46-9 at 3.]   The Marketing Department's administrative assistant compiles the submitted material into a spreadsheet for review.  [Filing No. 46-9 at 3.]  The chair then forwards the spreadsheet and the submitted material to a committee made up of two or three full professors from the Marketing Department, and the committee analyzes the information and each committee member independently evaluates each lecturer's contributions to teaching and service.  [Filing No. 46-9 at 3.]   After completing their review, the committee meets with the chair at the end of February to discuss and assign an evaluation score to each lecturer's teaching and service.  [Filing No. 46-9 at 3.]   The committee uses the Marketing Department's Performance Evaluation and Feedback System, assigning a score ranging from a "1.0" to a "5.0," with "1.0" being the highest. [Filing No. 46-9 at 3; Filing No. 46-9 at 10-11.]   The mathematical score assigned by a faculty committee is considered, but the chair ultimately uses his or her discretion to determine the raise percentage for each faculty member and takes into consideration short-term ratings, long-term performance, internal equity (or a comparison with other faculty in the same faculty class), and market equity (or how the faculty's value might be relevant).  [Filing No. 60-5 at 7; Filing No. 60-5 at 11-12.]

Each department is provided a finite allocation of dollars to use for salary raises, so allocating additional dollars to one faculty member necessarily decreases the amount left to allocate to other faculty members within the department.  [Filing No. 46-5 at 7-8; Filing No. 46-9 at 3-4.]  The chair distributes the budgeted dollars and assigns raises for each faculty member. [Filing No. 46-5 at 7-8; Filing No. 46-9 at 3-4.] The chair then meets with the Executive Associate Dean to discuss the recommended raise for each faculty member, and the salary raises are finalized after the Board of Trustees approves the budget in early summer.  [Filing No. 46-4 at 2.]

D.      **The KSOB's Policies for Promotion to Senior Lecturer**

The promotion process for lecturers is set forth in the KSOB's Policy Statement on the

Lecturer/Senior Lecturer Rank in the Kelley School of Business (Bloomington Campus) (the

"Lecturer Guidelines"). [Filing No. 46-4 at 3; Filing No. 46-13 at 2-13.] The Lecturer Guidelines

provide as follows:

**B. Promotion to Senior Lecturer**

> **1. Timing.**  Individuals are required to apply for the rank of Senior Lecturer
> during the sixth year of their probationary period as Lecturers.  Promotion
> to the rank of Senior Lecturer results in a 5-year renewable contract or a 3-
> year rolling contract.  In special or exceptional cases promotion to the rank
> of Senior Lecturer also may occur upon initial appointment or earlier than
> the sixth year of an individual's probationary period if the candidate
> demonstrates outstanding teaching and service contributions.  Shortened
> probationary periods may be the result of demonstrated teaching excellence
> at another institution and/or outstanding professional accomplishments
> related to the individual's area of teaching and/or service.  Lecturers who
> submit their dossiers earlier than the sixth year of probation and are denied
> promotion may be reconsidered at a future point in time.  It is recommended,
> however, that any subsequent promotion dossier submission follow the
> normal timeline, which requires submission in year 6 of the probationary
> period.
>
> **2. Promotion criteria.**  Promotion to Senior Lecturer shall be based on
> several criteria consistent with the overall mission of the [KSOB] including,
> but not limited to the following: high quality classroom teaching and
> contributions to pedagogical practice, high quality service to the School
> and/or University in support of teaching, and achievement of AQ or PQ
> status.
>
> Examples of the teaching components that may be taken into consideration
> in the evaluation process are listed below:
>
> - A record of high quality teaching demonstrated by excellent and
>   sustained classroom performance and evidenced by high numbers on
>   student evaluations
> - Evidence of peer observation/evaluation of teaching
> - Receipt of letters from students (particularly unsolicited)
> - Receipt of teaching awards (internal and external to the School) and
>   other recognition of one's teaching

8

- Evidence of leadership/participation in the development of School or departmental instructional goals and objectives
- Participation in curriculum development and innovation
- Development of new course materials for use in an instructor's own course that <u>extends beyond</u> basic or routine teaching materials
- Development of new teaching materials for use beyond an instructor's own course including textbooks, cases, instructor manuals, student guides, websites, videos, and other teaching media
- Receipt of grants to develop new courses or revise old ones
- Participation in teaching and learning development activities at the School, University or peer professional group level
- Publication of journal articles devoted to pedagogical issues
- Presentations at local and national conferences about pedagogical issues

Lecturers are expected to inquire into both the subject matter of their field and current pedagogy to maintain and advance the quality of instruction at the [KSOB]. As such, Lecturers are expected to participate in School and University pedagogical/learning activities (e.g., SOTL (Scholarship of Teaching and Learning) seminars, teaching workshops, Kelley's Professional Development Program), as well as national and regional peer professional groups focused on subject matter content and pedagogy.

[Filing No. 46-13 at 6-7 (emphasis in original).]

The Lecturer Guidelines provide some examples of service elements that will be examined when candidates are considered for promotion to senior lecturer, and also outline other conditions that must be met. [Filing No. 46-13 at 7-9.] They also provide the following:

**3. Promotion Procedure.** The departmental chairperson or equivalent supervisor may recommend Lecturers for promotion to the rank of Senior Lecturer during the probationary period. Promotion to the Senior Lecturer rank requires the preparation of a portfolio or dossier. Thus, before any decision is made within the department or School, the Lecturer should be notified that he or she is under consideration and that within a reasonable period of time, such as four to six weeks, he or she may submit materials relevant to such consideration for review by the appropriate department or area supervisor.

*          *          *

The department chairperson or equivalent supervisor should prepare a statement reviewing the candidate's qualifications. Prior to preparing this document, the department shall solicit input from the candidate's colleagues

9

within the department regarding the candidate's teaching and service contributions. Qualified colleagues who hold the rank of Senior Lecturer and above are eligible to participate in an advisory vote. To ensure consistency, the voting procedure used by the department shall be identical to the procedure used by the Senior Lecturer Review Committee, described in the next paragraph.

The completed dossier, along with a copy of the statement prepared by the department chairperson or equivalent supervisor, will be given to the Senior Lecturer Review Committee, which is a standing committee appointed by the Dean's Office. This committee is responsible for examining the candidate's total record in a comprehensive and rigorous fashion. The committee's members should vote on the candidate. The decision to promote should be based on the candidate achieving a distribution on scores that meets one of the following conditions:

a. The candidate scores an "excellent" (5) on teaching and at least a "satisfactory" (2) on service.

b. The candidate scores at least "very good" on one of the two dimensions (teaching or service) and at least "good" on the remaining dimension.

\*          \*          \*

The committee's vote shall be documented and supported by a written statement/report. This vote, the committee's report, and the statement of the department chairperson or equivalent supervisor shall be given to the [KSOB's] Associate Dean for Faculty & Research, who in turn, will provide a recommendation to the Dean of the [KSOB].

[Filing No. 46-13 at 8-9.]

If a lecturer seeks an early promotion, the first step is to indicate to the department chair that he or she is interested, and to set up a meeting with the chair to go through the record and rationale for seeking early promotion. [Filing No. 60-5 at 20.] Seeking an early promotion is rare, and the conversation between the department chair and the lecturer should take place the summer before the lecturer seeks the early promotion. [Filing No. 60-5 at 20-21.]

E.     **KSOB's Marketing Department**

Professor Burke was the chair of KSOB's Marketing Department between 2009 and 2012, and also from 2018 to the present.  [Filing No. 60-1 at 3.]  Professor Hari Shanker Krishnan served as the chair of the Marketing Department from 2012 to 2018.  [Filing No. 60-1 at 3.]

KSOB's Marketing Department is comprised of 41 faculty members, and Professor Palmer was the only African American faculty member in the Marketing Department until the Fall of 2019. [Filing No. 60-1 at 3-5; Filing No. 60-7 at 41.]

F.     **KSOB's Diversity and Equity Initiatives**

The  diversity, equity, and inclusion initiatives involve strategic hiring by seeking diverse candidates, and an overarching faculty diversity plan.  [Filing No. 60-4 at 7-8.]  Additionally, KSOB holds town halls and has a case competition which is created with the help of underrepresented minority students and involving underrepresented minority fact patterns.  [Filing No. 60-2 at 4-5.]  The Marketing Department has no formal faculty mentoring program or diversity committee, but does have a diversity document which outlines its efforts at improving diversity among faculty and student recruiting.  [Filing No. 60-1 at 27-28.]

G.     **Professor Palmer's Education and Experience**

Professor Palmer earned a Bachelor of Science degree in Mechanical Engineering from Rose-Hulman Institute of Technology and a Master of Business Administration degree from the KSOB.  [Filing No. 57-7 at 1.]  Professor Palmer also has a Master of Education Leadership, an Educational Specialist Degree, and is working toward a doctorate in education.  [Filing No. 60-7 at 5.]  Prior to teaching, Professor Palmer worked at several large businesses and led numerous successful marketing initiates.  [Filing No. 57-7.]

After working in the corporate world, Professor Palmer served as an Adjunct Professor of Marketing at John Carroll University's Boler School of Business, teaching two of the required foundational marketing courses in the MBA/Executive MBA curriculum. [Filing No. 57-7 at 1; Filing No. 60-7 at 6.]  In 2009, Professor Palmer graduated from the Association to Advance Collegiate Schools of Business Bridge Program for Professionally Qualified Faculty. [Filing No. 57-7 at 1; Filing No. 60-7 at 6.]

### H.    Professor Palmer's Initial Employment at IU

On August 1, 2010, Professor Palmer began his employment with IU as a non-tenure track lecturer in the KSOB Marketing Department. [Filing No. 46-1 at 6-8; Filing No. 46-2 at 1; Filing No. 46-3 at 1.]  His starting base salary was $80,000 for the ten-month academic year. [Filing No. 46-1 at 6.]  IU initially appointed Professor Palmer for three academic years, from August 1, 2010 through May 31, 2013, and reappointed him for several terms thereafter – most recently through the academic year 2025-2026. [Filing No. 46-4 at 1.]

When IU hired Professor Palmer, he also took an administrative position with the KSOB MBA program as Diversity Coach. [Filing No. 46-5 at 11.]  The Diversity Coach position "focus[ed] on student recruiting with an emphasis on diversity recruiting." [Filing No. 46-2 at 1.]  As Diversity Coach, Professor Palmer coached KSOB's MBA students who were members of the Consortium, an organization founded in the mid-1960s by three schools, including IU, to focus on recruiting underrepresented minority students to MBA programs. [Filing No. 46-1 at 6; Filing No. 46-6 at 2-3; Filing No. 46-6 at 6-8; Filing No. 46-7 at 5-6; Filing No. 46-8 at 6; Filing No. 46-8 at 11.]  IU paid Professor Palmer a $25,000 stipend for each year that he served as Diversity Coach, and he was released from six credits of the normal 18-credit lecturer teaching load, which reduced

his required teaching load to 12 credits.  [Filing No. 46-1 at 6-8; Filing No. 46-2 at 1; Filing No. 46-5 at 11; Filing No. 46-8 at 15.]

IU did not provide a job description for the Diversity Coach role, or a specific supervisor to evaluate Professor Palmer's performance in this role or to provide objectives and goals.  [Filing No. 60-7 at 9; Filing No. 60-7 at 19.]  Professor Palmer spent 8 to 12 hours per week in his role as Diversity Coach, and sometimes more time during "signature events or capstone events," which would sometimes require him to be "on the road with the students for four to five days and/or [require] an extensive amount of planning to execute."  [Filing No. 60-7 at 19.]

I.      **Professor Palmer's Teaching Load and Opportunities**

The chairman of the Marketing Department is responsible for assigning courses to faculty members each year, and also works with the chairs of the KSOB programs when determining which faculty members to assign to particular courses.  [Filing No. 46-9 at 2.]  Courses are assigned based on several factors, including the faculty member's expertise and experience, whether he or she was hired to teach a certain set of courses or in a certain subject area, his or her expression of interest to teach additional courses, his or her availability to teach certain courses, his or her interest in developing new courses, and student demand for particular courses.  [Filing No. 46-5 at 14; Filing No. 46-9 at 2; Filing No. 46-11 at 1-2; Filing No. 46-12 at 12-13.]

Professor Palmer has regularly taught in the undergraduate program since IU hired him, and he has taught in the online Kelley Direct program since the summer after his second year of being employed at IU.  [Filing No. 46-1 at 26; Filing No. 46-9 at 4.]  At one point, Professor Palmer expressed interest in creating a course for the Kelley Direct program, but he did not ask the Marketing Department chair to add additional courses to his teaching load.  [Filing No. 46-1

at 25-26; Filing No. 46-11 at 2.]  Before his promotion to senior lecturer, Professor Palmer had

never declined an opportunity to teach a class.  [Filing No. 60-7 at 8; Filing No. 60-7 at 48.]

Throughout his employment with IU, Professor Palmer has resided in the Cleveland, Ohio

area, travelling to Bloomington, Indiana and remaining on campus at least three days per week to

teach his courses and to participate in other IU-related activities.  [Filing No. 46-1 at 3; Filing No.

46-1 at 8-9.]  At times, the Marketing Department chairs have declined to offer Professor Palmer

certain teaching and service opportunities because of his lack of availability or presence on

campus.  [Filing No. 46-9 at 2-3; Filing No. 46-11 at 2.]  However, Professor Palmer volunteered

to be at IU whenever needed, and no one advised him that there were any issues with his presence

on campus.  [Filing No. 59-4 at 6-7.]  Additionally, Professor Palmer's position as Diversity Coach

restricted him from teaching residential "overload" courses – or credit hours over and above his

12-credit hour requirement.  [Filing No. 46-11 at 2.]  He was able, however, to teach overload

courses that were part of the Kelley Direct program.  [Filing No. 46-11 at 2.]

### J.      Professor Palmer Discusses Early Promotion With Professor Krishnan

In January 2013, Professor Palmer emailed Professor Hari Shanker Krishnan, chair of the

Marketing Department at the time, regarding concerns about the future of lecturers at the KSOB

and the possibility of going up early for a promotion to senior lecturer.  [Filing No. 46-12 at 23-

24; Filing No. 46-14 at 1.]  In his email, Professor Palmer stated:

> I do have a couple of things I need to talk to you about.
>
> I know that the Bloomington Faculty Council has been pushing for some changes
> to the process and criteria regarding lecturer appointments and reappoints.  A
> couple of those changes would not necessarily be favorable for, or to, lecturers.
> These changes could potentially impact me, so I wanted to discuss my situation
> with you.  I know that last year my contract was extended by one year to the end of
> the 2013/2014 academic year, which was very much appreciated.  However, under
> the original terms of my contract, I would be up for a new, renewed 3 year contract

14

now. That contract, if renewed would extend my employment until the end of the 2015/2016 academic year.

Net, I have a contract through 2014, but that does not provide the same security for me and my family as does one through 2016. We all know that the "system" could change next year and potentially adversely impact me. I'd like to talk to you about my options, specifically going through the review for the extension out to 2016 or going up early for a promotion to Sr. Lecturer.

[Filing No. 46-14 at 1.]

When Professor Palmer and Professor Krishnan met, Professor Krishnan explained that it is rare for lecturers to apply for a promotion to senior lecturer before their sixth year and, based on Professor Palmer's teaching record leading up to that point, cautioned him against doing so. [Filing No. 46-9 at 4; Filing No. 46-12 at 23-24.] Specifically, Professor Krishnan suggested that Professor Palmer wait to apply for a promotion so that he could strengthen his record over the next few years, have more data points for the decisionmakers to consider, and become more visible to the Marketing Department as the Diversity Coach and relating to other service activities. [Filing No. 46-9 at 5.] Professor Krishnan also explained to Professor Palmer that "no one had ever gone up early for promotion without the support of a department chair." [Filing No. 46-1 at 22.] Professor Palmer does not know whether Professor Krishnan's advice to him would have been different if he was white. [Filing No. 46-1 at 23.]

At the time that Professor Palmer would have sought early promotion, his average rating on all responses in the student evaluations was 6.41 on a 7.00 scale, and his overall average in the Dean's 8 rating (a selection of 8 particular questions on student evaluations that were deemed "the best indicators of a faculty member's performance") was a 6.54 on a 7.00 scale. [Filing No. 59-5 at 15.] Professor Palmer took Professor Krishnan's advice and did not apply for promotion during

15

his third year.  [Filing No. 46-1 at 23.][4]  He also did not apply for promotion during his fourth or fifth year.  [Filing No. 46-1 at 24-26.]

### K.    Professor Palmer Applies For and Receives a Promotion In Spring 2016

In the Spring of 2016, during his sixth year at IU, Professor Palmer applied for a promotion to senior lecturer.  [Filing No. 46-9 at 5.]  No one assisted Professor Palmer in compiling his dossier for promotion.  [Filing No. 60-7 at 50.]  At that point, Professor Palmer had taught a total of 84 credit hours, increased the number of courses he had taught, and had developed an immersion course for the Kelley Direct program.  [Filing No. 46-1 at 26-27; Filing No. 46-9 at 5.]  The Marketing Department and the Senior Lecturer Review Committee voted in favor of promoting Professor Palmer, and Professor Krishnan, who was still the chair of the Marketing Department, strongly supported Professor Palmer's promotion in a February 2016 memo to Dean Kesner, stating:

> Overall, I rate Professor Palmer's teaching performance as "Excellent."  He has shown that he is consistently one of the best teachers in the [KSOB], he has won a university-wide award, and has shown the ability to develop new courses.

[Filing No. 46-9 at 5; Filing No. 46-9 at  25; Filing No. 46-12 at 25; Filing No. 46-15.]    Dean Kesner and Associate Dean Maines ultimately approved Professor Palmer's promotion, and he was promoted to senior lecturer effective August 1, 2016.  [Filing No. 46-9 at 5.]

### L.    Professor Palmer Resigns as Diversity Coach

After Professor Palmer was promoted to senior lecturer, IU attempted to change his compensation for Diversity Coach, but Professor Palmer provided information to substantiate his

---

[4] During the 2012-2013 academic year, Professor Palmer discussed an overseas teaching opportunity, but later learned that Professor Krishnan offered the opportunity to a Caucasian faculty member.  [Filing No. 60-7 at 50-51.]

16

role and Ash Soni, Executive Associate Dean for Academic Programs who oversees the MBA

Program, accepted the information and his compensation was not changed. [Filing No. 59-4 at 4.]

In July 2016, Kyle Cattani became the program chair of the KSOB's full-time MBA

program. [Filing No. 46-7 at 3.] Thereafter, Professor Cattani and Rebecca Cook, the staff director

of the MBA program, determined that the Diversity Coach should place a greater emphasis on

recruiting new students. [Filing No. 46-1 at 30; Filing No. 46-6 at 11-12; Filing No. 46-7 at 7-8.]

On February 2, 2017, Professor Palmer emailed Professor Cattani and Ms. Cook to resign from

the position as Diversity Coach, stating:

> I am an advocate and supporter of [IU, the KSOB,] and diversity.  After careful
> consideration, I have concluded, that I am not the person who should be responsible
> for driving diversity recruiting at the [KSOB], nor am I interested in being the
> person.  The position should be a full-time endeavor conducted by someone who
> focuses on diversity and inclusion recruitment and retention in education.  I simply
> do not have such a background.  In addition, the job itself should be, and when done
> correctly is, a full-time role for someone.  Done well, diversity and inclusion is not
> something that is usually accomplished in 1.67 days per week, or in 12 hours per
> week… My background, interests and reasons for returning to IU were primarily
> to teach.  I agreed to help with our Consortium students, but it was not a principal
> reason for my employment.

[Filing No. 46-16 at 2.]  Professor Palmer listed "[a]dditional reasons why I am not a fit for this

role." [Filing No. 46-16 at 2-3.]

Professor Palmer continued to serve as the Diversity Coach for the 2016-2017 academic

year, and the KSOB then hired a full-time Associate Director of Diversity and Inclusion. [Filing

No. 46-1 at 30-31; Filing No. 46-6 at 12.] Because Professor Palmer resigned as Diversity Coach,

he no longer received the $25,000 stipend associated with that position, the six-credit teaching

release, or the office in the building housing the MBA program. [Filing No. 46-1 at 31.]

0017

### M.    Professor Palmer's Salary Raises

Professor Palmer's starting base salary was $80,000, and IU gave him the following base salary raises:

- 1.25% to $81,000 for the 2011-12 academic year;

- 1.98% to $82,600 for the 2012-13 academic year;

- 1.69% to $84,000 for the 2013-14 academic year;

- 2% to $85,680 for the 2014-15 academic year;

- 1.65% to $87,090 for the 2015-16 academic year;

- 9.66% to $95,500 after his promotion to senior lecturer for the 2016-17 academic year;

- 1.3% to $96,750 for the 2017-18 academic year;

- 2.07% to $98,750 for the 2018-19 academic year; and

- 2.16% to $100,885 for the 2019-20 academic year.

[Filing No. 46-4 at 2; Filing No. 46-9 at 4; Filing No. 46-9 at 23.] Professor Palmer received an additional $8,000 increase in his base salary for the 2019-20 academic year, making it $108,885. [Filing No. 46-4 at 2-3.] Professor Palmer's total compensation was $141,000 in 2017, $127,550 in 2018, and $133,304 in 2018. [Filing No. 59-5 at 14.]

During his first and second years with the KSOB, Professor Palmer won multiple performance awards, including the Trustees Teaching Award in 2012, which is given for teaching that has positively impacted student learning. [Filing No. 57-10 at 2; Filing No. 59-7.] He was also a finalist for the Trustees Teaching Award in 2011, 2013, and 2016, and a finalist for the 2020 Panschar Teaching Excellence Award. [Filing No. 57-10 at 2; Filing No. 58-5.] Professor Palmer also won the IU Access the World Through Education Award in 2011, the Student Choice Award in 2012, and the IU Athletics Teaching Recognition Award in 2012, and was a finalist for the Neal-

Marshall Teaching Award in 2012.  [Filing No. 57-10.]  Professor Palmer was not considered for

an IU Trustees Teaching Award for 2017, 2018, or 2019, and one individual who was considered

in 2019 had a lower average for her student evaluation score than did Professor Palmer.  [Filing

No. 59-4 at 5.]

Since Professor Palmer joined IU's faculty, he had the highest base salary of all lecturers

and senior lecturers within the Marketing Department up until the 2019-2020 academic year, and

has received the highest dollar amount of salary increases of all lecturers and senior lecturers who

have remained employed with IU during Professor Palmer's employment.  [Filing No. 46-19.]

**N.      IU Hires Professor Gildea**

IU hired Professor Joshua Gildea, who is Caucasian, as a lecturer in the Marketing

Department, effective August 1, 2016, at a starting base salary of $82,500.  [Filing No. 46-9 at 5.]

Professor Gildea was also hired as the director of the Business Marketing Academy ("BMA")

within the full-time MBA program.  [Filing No. 46-20 at 3-4.]  When Professor Gildea began his

employment, he also received an additional annual stipend of $30,000 for the BMA director

position in lieu of a credit to his teaching load, which he continued to receive through the 2019-20

academic year.  [Filing No. 46-8 at 15; Filing No. 46-10 at 16; Filing No. 46-20 at 5.]  In the 2020-

21 academic year, Professor Gildea will no longer receive the $30,000 stipend and will, instead,

receive 7.5 credits against his teaching load.  [Filing No. 46-20 at 5.]  When IU hired Professor

Gildea, he had no teaching experience but did have corporate experience.  [Filing No. 55-2.]

**O.      Professor Gildea's Raises and Awards as Lecturer**

In 2017, the KSOB gave Professor Gildea a 4.85% pay increase, making his salary $86,500.

[Filing No. 55-6 at 3.]  In 2018, Professor Gildea received an 8.67% raise, making his salary

$94,000.  [Filing No. 46-4 at 2-3; Filing No. 55-6 at 3; 55-7 at 3.]  Professor Palmer received a 2.07% salary increase the same year.  [Filing No. 55-6 at 3.]

In April 2018, Professor Gildea received the Fettig/Whirlpool Distinguished Lecturer Award, which was given at the discretion of Associate Dean Maines without departmental input, which provided Professor Gildea with an additional annual stipend of $5,000, and for which Professor Gildea did not apply.  [Filing No. 55-8; Filing No. 60-1 at 13; Filing No. 60-3 at 15.]  In 2017, Professor Gildea was nominated for the Panschar Award, which considers performance over three years of teaching, even though he had only been teaching at IU for 1.5 years.  [Filing No. 59-8; Filing No. 60-3 at 12; Filing No. 60-3 at 18.]

P.     **Professor Gildea's Teaching Opportunities**

In his first year of teaching at IU, Professor Gildea was offered overload teaching and for nearly every year of his career at IU he "taught a full load and a full overload, which is 15 additional credits plus the academy, which is an additional six or seven and a half credits."  [Filing No. 60-3 at 8.]  Professor Gildea used his overload credits on Kelley Direct online courses because they paid better.  [Filing No. 60-3 at 14.]  With his overload teaching, Professor Gildea's total compensation was $144,300 in 2017, $213,925 in 2018, and $215,360 in 2019.  [Filing No. 59-5 at 14.]

Q.     **Professor Gildea is Promoted**

During the first year of his employment, Professor Gildea attended annual meetings with Associate Dean Maines regarding the promotion process in order to learn about the requirements for promotion.  [Filing No. 46-20 at 9-10.]  In January 2018, Professor Gildea spoke to Professor Krishnan, who was the chair of the Marketing Department at the time, regarding his decision to apply for promotion to senior lecturer at the end of his third year of employment with IU.  [Filing No. 46-9 at 5-6; Filing No. 46-20 at 10-11.]  Professor Krishnan told Professor Gildea that

Professor Gildea's contributions were "lining up with the requirements" for early promotion, and that the only risk was that if he did not get the promotion in his third year, he would have to wait until his sixth year to reapply. [Filing No. 60-3 at 13-14.] Based on his own evaluation of his teaching and service, and his conclusion that he had achieved excellence in teaching, Professor Gildea decided on his own to apply for promotion. [Filing No. 46-20 at 10-11.]

Professor Ray Burke, who had just replaced Professor Krishnan as the chair of the Marketing Department, helped Professor Gildea with his dossier materials and made sure that Professor Gildea had a peer observation of his teaching. [Filing No. 57-20 through Filing No. 57-29; Filing No. 59-1.] Professor Gildea submitted his dossier for promotion to senior lecturer at the end of his third year of employment. [Filing No. 46-11 at 4.] The Marketing Department and the Senior Lecturer Review Committee voted to promote Professor Gildea, and Professor Burke recommended Professor Gildea's promotion. [Filing No. 46-11 at 4.] Professor Burke felt that Professor Gildea deserved to be promoted because he "had done a considerable amount of teaching," due to "the quantity of courses that he had taught, [and] the number of sections he had taught," and had "a considerable teaching record." [Filing No. 60-1 at 18.] Although Professor Gildea had not taught before coming to IU, Professor Burke felt that the quality of Professor Gildea's teaching was reflected in student evaluations of his teaching and his service activities, including "teaching in the MBA program, in the Kelley Direct program," and "serv[ing] as academy director for the [BMA]." [Filing No. 60-1 at 18.] Associate Dean Maines and Dean Kesner approved Professor Gildea's promotion, and he was promoted to senior lecturer effective August 1, 2019. [Filing No. 46-11 at 4; Filing No. 46-20 at 11.] Professor Gildea was given an 8.7% raise as part of his promotion, making his base salary $103,400 for the 2019-20 academic year. [Filing No. 46-4 at 3.]

21

### R.      Professor Palmer Raises Concerns Regarding Bias and Discrimination

In the summer of 2018, Professor Palmer raised concerns regarding "a salary discrepancy that [he] had noticed…relative to the marketplace and relative to [Professor] Gildea," and also regarding "racial discrimination as it relates to not just [his] salary but opportunities [he] had been given," including "opportunities to go up early for promotion." [Filing No. 46-1 at 37.] Professor Burke and Professor Palmer planned to meet to discuss these concerns once Professor Palmer returned to campus. [Filing No. 46-23 at 4.]

On July 19, 2018, Professor Palmer emailed Professor Burke and stated:

I just checked project salaries, and [Professor Gildea] received a $7,500 raise for the 2018/2019 school year to bring his base pay up to $94,000. That's $14,000 in 3 years.

What do I need from the university? I need at least $10,000 to keep my salary competitive with the marketplace and my family's needs. And from a URM perspective, this doesn't look right at all! And you can share that with leadership. It looks very biased. I'll put my experience and accomplishments next to his any day.

[Filing No. 46-23 at 2.] Professor Burke and Professor Palmer spoke on the phone later that day regarding Professor Palmer's concerns. [Filing No. 46-11 at 4; Filing No. 46-23 at 2.]

Professor Palmer also reached out to Arlen Langvardt, a retired faculty member in the KSOB, regarding his concerns of alleged discrimination and asked for advice on how to proceed. [Filing No. 46-1 at 60; Filing No. 46-24 at 2-3.] Professor Langvardt told Professor Palmer that he should contact Associate Dean Maines. [Filing No. 46-1 at 61.] Professor Palmer emailed Associate Dean Maines on August 7, 2018, stating:

As [Professor Langvardt] mentioned to you, I am very unhappy, as I feel that there are a number of situations where [Professor Krishnan] has been actively biased and/or discriminated against me as an under-represented US minority. The issue with my compensation, especially in relationship to favoritism shown to [Professor] Gildea, is just the tipping point.

I am hoping that you can address the issues to a satisfactory degree. However, I do not want to simply hear someone justify [Professor Krishnan's] actions. I definitely feel that [Professor Krishnan] has not at all been an advocate for US based diversity candidates.

[Filing No. 46-24 at 3.]

Associate Dean Maines responded the next day, stating in part:

With respect to a meeting, I am happy to speak on the phone or meet in person at a time that is convenient for both of us. In the initial meeting, I believe that I just need to listen to get a solid understanding of your concerns. If you want, that meeting could be a phone call. Then I would look into your concerns and we could meet again. I think it would be best for that second meeting to be in person, and I suspect you would be back from your overseas trip before I would finish my investigation and we have the second meeting.

[Filing No. 46-24 at 2.]

Professor Palmer and Associate Dean Maines spoke on the phone on August 10, 2018, and Professor Palmer told Associate Dean Maines that he had concerns about his salary and that the percentage amount of his raises had been lower than Professor Gildea's. [Filing No. 46-4 at 3.] He also told Associate Dean Maines that Professor Krishnan had advised him not to apply for a promotion during his third year. [Filing No. 46-10 at 30.] Professor Palmer also complained regarding his assignment of a cubicle in the Marketing Department rather than a private office, and stated that this made it difficult for him to meet with corporate visitors. [Filing No. 46-4 at 3; Filing No. 46-10 at 27-32.] Professor Palmer told Associate Dean Maines that the collaboration and conference rooms were not sufficient to meet his needs. [Filing No. 46-4 at 3; Filing No. 46-10 at 31-32.] He noted that Professor Gildea was provided an individual office with a window. [Filing No. 46-4 at 3; Filing No. 46-10 at 31-32.] Associate Dean Maines told Professor Palmer that she would look into his allegations and follow up with him. [Filing No. 46-4 at 3; Filing No. 46-10 at 27.]

23

0023

After the August 10, 2018 phone call, Associate Dean Maines looked at the salary data for all of the lecturers within the Marketing Department and determined that it showed that Professor Palmer had, and had always had throughout his employment, the highest base salary of any other lecturer or senior lecturer within the Marketing Department.  [Filing No. 46-4 at 3-4.]  Associate Dean Maines also looked at the raises for each faculty member and concluded that Professor Palmer's raises each year were consistent with the raises of other lecturers and senior lecturers. [Filing No. 46-4 at 3-4.]  Although Associate Dean Maines did not find any discrepancies with Professor Palmer's salary or percentage raises, she recognized that he had recently lost his $25,000 stipend as Diversity Coach and, in an effort to allow him to recoup that loss, she requested and received approval for Professor Palmer to receive an $8,000 raise.  [Filing No. 46-4 at 3-4.]

Associate Dean Maines also looked into Professor Palmer's concerns regarding his office space, and confirmed that when the building housing the Marketing Department was renovated, Professor Palmer still had an office in the building housing the MBA program.  [Filing No. 46-4 at 4.]  Because he had that separate office space, Professor Palmer was not provided with an additional office in the Marketing Department, but was still provided a cubicle there.  [Filing No. 46-4 at 4.]  When Professor Palmer stepped down as Diversity Coach at the end of the 2016-2017 academic year, there were no vacant offices that had been allocated to the Marketing Department. [Filing No. 46-4 at 4.]

On October 17, 2018, Associate Dean Maines met with Professor Palmer to discuss what she had learned through her investigation into his allegations.  [Filing No. 46-4 at 4.]  She acknowledged several of Professor Palmer's concerns, and offered to increase his salary by $8,000 for the 2019-2020 academic year, which was the next cycle for salary raises.  [Filing No. 46-4 at 4.]  Additionally, Associate Dean Maines told Professor Palmer that the KSOB was in the process

24

of building additional offices and that she thought there would be office space available for him in late December 2018 or early 2019. [Filing No. 46-4 at 4.] Professor Palmer was aware of offices that were empty and available during this time. [Filing No. 60-7 at 3-4; Filing No. 60-7 at 34.] Associate Dean Maines also told Professor Palmer that he could use a former KSOB Dean's office until she could secure more permanent office space for him. [Filing No. 46-4 at 4.] Associate Dean Maines was under the impression that she had addressed Professor Palmer's concerns through this conversation, and that they had agreed upon a solution. [Filing No. 46-4 at 4.] Between the Fall of 2017 and the Summer of 2019, Professor Palmer was the only senior lecturer in the Marketing Department who did not have an assigned office. [Filing No. 60-7 at 34.] A PhD student was assigned office space in the Marketing Department for an entire summer before Professor Palmer received his assigned office. [Filing No. 60-7 at 43-44.]

On February 8, 2019, Professor Burke announced to the Marketing Department in an email that Professor Gildea had decided to seek promotion to senior lecturer, which was during his third year of employment at IU. [Filing No. 46-25 at 1-2.] Professor Palmer responded to Professor Burke's email, writing "Isn't this way early?  I thought you had to wait until year 5, 6 or 7 to go up for promotion for senior lecturer?  Could you please explain the urgency/break from history?" [Filing No. 46-25 at 1.] Professor Burke responded to Professor Palmer the next day, stating:

> Thanks for your note.  Kelley School lecturers have always had the option to come up early for promotion to senior lecturer.  In [Professor Gildea's] case, he consulted with [Professor Krishnan] last year and, after reviewing evidence of his teaching quantity, breadth, and quality, they felt he had demonstrated "Excellence in Teaching" by the Kelley School standards.  In [Professor Gildea's] three years at Kelley, he has taught more than 96 credit hours across the undergraduate, graduate, and Kelley Direct programs in multiple disciplines (Sales, B2B Marketing, International Marketing, Core Marketing Strategy, etc.).  Ninety-six credit hours works out to more than five years of full load teaching (18 credit hours per year). He has also contributed significantly on the service side with his leadership of the BMA, which is now the largest academy in the MBA program.

> If you have any comments, concerns or questions about [Professor Gildea's] performance, please be sure to attend Tuesday's meeting and share your thoughts. The School wants the Department's perspective as input to its evaluation of promotion cases.

> \*                    \*                    \*

> p.s. – As a side note, I should mention that, in very rare cases, a new faculty member skips the process and is hired as a senior lecturer.  However, this hasn't happened in Marketing for several years :-).

[Filing No. 46-25 at 1.]

On February 10, 2019, Professor Palmer sent an email to Associate Dean Maines to follow

up on the issues they had discussed during the fall semester, writing:

> On August 10, we met via phone, where I outlined to you that I had a number of significant concerns regarding racial discrimination and/or bias by IU and [Professor Krishnan] (as my department chair) against me.  During the call, I detailed for you how racial discrimination had negatively impacted my salary, promotion to senior lecturer, office space allocation, and additional teaching opportunities within the marketing department and the [KSOB].

> On October 17, we met in your office to resolve the concerns that I had provided. In that meeting you acknowledge[d] a number of my concerns, including the fact that I was being paid approximately $8,000 annually less than I should be (and should have been) paid when you compare my salary increases and performance with the raises of my non-minority peers.  In addition, we talked about the fact that I am forced to sit in a cubicle, while a white, significantly junior colleague in my department is afforded an office, with an external facing window.  [Professor Krishnan] did not feel that I warranted the use of an office for university business, and in many cases, the use directly supports and advances the interest of the university and the [KSOB].

> To date, there has been little follow-up on any of my concerns.  My salary concerns have still not been addressed.  You mentioned that you had some office space coming available in January 2019 that I could have access to, but I still sit in a small cubicle.  All of my courses involve real world projects and partnerships, oftentimes with significant corporate partners of IU and the [KSOB]….

> Now I receive an email that [Professor] Gildea, the non-minority, significantly junior colleague is going up for promotion nearly 3 full years earlier than I was allowed… Early in my tenure at IU, I had asked [Professor Krishnan] about going up for promotion early as well and was discouraged by him from doing so.  In fact, in an email to [Professor Krishnan] dated 1/22/2013 (on which Ray Burke was also

26

0026

cc'ed), I specifically told [Professor Krishnan] that "I want to talk about my options, specifically going through the review for the extension out to 2016 or going up early for a promotion to Sr. Lecturer."  My request came on the heels of winning the Trustees Teaching Award and an award from IU Disability Services for Students.  I knew that teaching was something I truly loved.  Instead of being supportive, [Professor Krishnan] blatantly discriminated against me, which included making me wait twice as long as [Professor Gildea] to go up for promotion to senior lecturer.  This discrimination occurred even though my student evaluation scores were always in the 6.7s and 6.8s, and higher than those received by [Professor Gildea].

Of course, my grievance is not about [Professor] Gildea, but about the lack of opportunity and income and collegiality extended to me by my department and by [the KSOB].

This situation is untenable and unacceptable to me.  As I mentioned to you during our prior talks, I want to give you the opportunity to make the situation right before I have to sit down and consider other options.  By my calculations, this racial discrimination and bias has cost my family and I nearly $90,000 in compensation alone to date.  That number will continue to climb by $8,000-10,000 per year until it is addressed.

[Filing No. 46-26 at 1-2.]  Professor Palmer attached to his email a spreadsheet comparing the percentage raise increases he received for his second and third years of employment with the percentage raise increases that Professor Gildea received during his second and third years of employment.  [Filing No. 46-26 at 4.]  The spreadsheet, which appears to have been prepared by Professor Palmer, reflects that Professor Palmer received a 1.25% raise in his second year (2011-12 academic year) and a 1.98% raise in his third year (2012-13 academic year), and Professor Gildea received a 4.85% raise in his second year (2017-18 academic year) and an 8.67% raise in his third year (2018-19 academic year).  [Filing No. 46-26 at 4.]

Associate Dean Maines responded to Professor Palmer the same day, writing:

Thanks for your email.  Let me address some of the issues you mention.

1.      As you indicate, when we met in October I indicated that we would be adding $8000 to your salary at the next raise period (July 2019).  (The university makes adjustments to faculty salaries once a year).  That is still the plan.

27

0027

2.      At the October meeting, I indicated that you have access to Dan Smith's office whenever you needed to meet with your corporate guests. My understanding from our meeting was that you would have the staff let you in his office as needed, but if you would prefer a different arrangement for getting access to his office, please let me know.  I can have FOS get you a key to the office if you prefer.

3.      The new faculty offices in the UCSO space are not ready and my understanding from Teresa Kase is that they are unlikely to be ready until Spring Break.  (At this point, only the classroom is finished and it was five weeks behind schedule.)  I have you on the list as having an office reserved.  As soon as we have the exact date for the availability of the offices, I will make sure that you know.

With respect to your concern about [Professor] Gildea, I will discuss this with [Dean Kesner] who I have copied on this email.  It is possible that I may need to discuss this with [Professor Burke] as well.  Are you ok with me discussing your concerns about [Professor Gildea] with Ray?

[Filing No. 46-27 at 3.]

After discussing the issue of Professor Gildea's promotion with Professor Burke, Associate Dean Maines told Professor Palmer that "department chairs only give advice about the likelihood of success" of promotion and that faculty members can apply for early promotion even when the department chair cautions them against doing so.  [Filing No. 46-4 at PP 20; Filing No. 46-10 at 30.]

At the February 12, 2019 departmental meeting to discuss Professor Gildea's promotion, Professor Palmer questioned the basis for Professor Gildea's early promotion and considerations discussed during the meeting were that: Professor Gildea felt like he was being "watched" because he was a probationary employee until his promotion to senior lecturer, and was on a shorter term contract; he was the "[p]rimary breadwinner of his household"; he took a "significant pay cut to come" to IU; and he needed to "take care of his family."  [Filing No. 59-4 at 3-4.]  Professor Gildea's student evaluation numbers were not listed in his promotion materials, but his mean Dean's 8 rating was 6.44 and his overall average rating was 6.34 on the 7.0 scale.  [Filing No. 59-5 at 15.]

### S.      The EEOC Charge

On May 15, 2019, Professor Palmer filed a Charge with the Equal Employment Opportunity Commission ("EEOC").  [Filing No. 1-1.]  He checked boxes indicating that he was complaining of race discrimination that was continuing in nature, and detailed his allegations regarding being discouraged from pursuing an early promotion, salary inequities, and disparities related to teaching opportunities and office space assignments.  [Filing No. 1-1 at 1-2.]

### T.      The Lawsuit

The EEOC issued a Right to Sue Letter on August 21, 2019, [Filing No. 1-2], and Professor Palmer initiated this litigation on November 19, 2019, [Filing No. 1].  Professor Palmer sets forth a claim of race discrimination under Title VII against IU.  [Filing No. 1.]

### II.
### IU'S MOTION TO EXCLUDE THE EXPERT WITNESS STATEMENT OF DR. FAIRFIELD-SONN

### A.      Applicable Law

Federal Rule of Evidence 104 instructs that "[t]he court must decide any preliminary question about whether a witness is qualified…or evidence is admissible." Fed. R. Evid. 104(a). Federal Rule of Evidence 702 provides that expert testimony is admissible if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.  A trial judge "must determine at the outset…whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.  This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue….

29

0029

Many factors will bear on the inquiry…." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993).

The Court has a "gatekeeping obligation" under Rule 702, and "must engage in a three-step analysis before admitting expert testimony.  It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (quoting *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010)).  Put another way, the district court must evaluate: "(1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony." *Gopalratnam*, 877 F.3d at 779 (emphasis omitted).  The Seventh Circuit Court of Appeals "give[s] the district court wide latitude in performing its gate-keeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable." *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011).

### B.    Summary of Dr. Fairfield-Sonn's Opinion

Dr. Fairfield-Sonn joined the faculty of the Barney School of Business at the University of Hartford in 1982 as an untenured Assistant Professor of Management.  [Filing No. 58-4 at 3.]  He was promoted to tenured, and "rose through the ranks from an Assistant to an Associate and then on to a Full Professor of Management, which is the position [he] currently hold[s] at the school." [Filing No. 58-4 at 3.]  He has also held several administrative positions at the Barney School of Business, including Chair of the Department of Management, Director of the Executive MBA Program, Interim Dean, and permanent Dean of the School of Business, among other positions. [Filing No. 58-4 at 3.]

Dr. Fairfield-Sonn sets forth the scope of his opinion as follows:

This statement examines whether during Paul Palmer's employment with [IU] from 2010 to 2020, [IU] violated commonly accepted university policies and procedures, and whether or not he was provided the same opportunities as a similarly situated white, male colleague in his Marketing Department, including the opportunity to apply for early promotion, that resulted in the University failing to equitably pay him based on his African American race.

[Filing No. 58-4 at 3.]

In formulating his opinion, Dr. Fairfield-Sonn was provided various documents obtained

in discovery, certain deposition transcripts, various pleadings, IU's brief in support of its Motion

for Summary Judgment, and Declarations from various individuals.   [Filing No. 58-4 at 4.]   Dr.

Fairfield-Sonn summarized his opinion as follows:

> In my opinion, the central issue to be examined in this case is whether or not the cumulative impact of decisions made by agents of [IU] in regard to the terms and conditions of Paul Palmer's employment as a Lecturer and subsequently Senior Lecturer with the [KSOB] unfairly disadvantaged [Professor Palmer].  Specifically, while serving as a Lecturer and then later as a Senior Lecturer in the Marketing Department at the [KSOB] was [Professor Palmer] denied opportunities that were made available to a similarly situated white, male colleague, who joined the same Marketing Department as a Lecturer six years after [Professor Palmer's] arrival? Moreover, were these denied opportunities of sufficient importance and consequence that they constituted sufficient grounds to negatively impact his employment?
>
> Based on a review of information relevant to the case, the weight of evidence indicates that, yes, [Professor Palmer] was indeed treated differently than a similarly situated white, male colleague in the same Marketing Department in terms of the availability of opportunities such as: the timing of an early promotion review, timing of salary adjustments, additional service and teaching opportunities, and the provision of appropriate office space to support his work responsibilities.  These findings clearly speak to why there is evidence of prejudicial treatment in this case. Namely, because among other things, the creation and maintenance of an equal opportunity work environment requires, at a minimum, a level of clarity in Human Resource Management policy communication and consistency in policy practice and implementation that, unfortunately, was not met in this case.

[Filing No. 58-4 at 4-5.]

## C.      Discussion

In support of its Motion to Exclude, IU argues that Dr. Fairfield-Sonn's opinion regarding IU's alleged violation of accepted policies and procedures is inadmissible because it does not constitute reliable and helpful expert testimony.  [Filing No. 67 at 8-9.]  IU notes that Dr. Fairfield-Sonn does not identify any policy or procedure that the decisionmakers violated, and that whether Professor Palmer should have been given additional advice regarding seeking an early promotion and advancing his career is not the subject of the litigation – the subject is whether IU acted discriminatorily.  [Filing No. 67 at 9.]  IU asserts that Dr. Fairfield-Sonn's opinion that the advice not to seek an early promotion "was not completely in line with the [Lecturer Policy] and if he had sought the opinion of the Dean or his former Chair, he would have heard other contradictory counsel" offers no specialized knowledge and is pure speculation.  [Filing No. 67 at 9-11.]  As to Dr. Fairfield-Sonn's opinion that IU did not treat Professor Palmer fairly in comparison to Professor Gildea, IU argues that Dr. Fairfield-Sonn fails to identify any methodology he used to form his opinion, and that his opinion will not assist the jury.  [Filing No. 67 at 12-15.]  It further contends that Dr. Fairfield-Sonn's opinions regarding IU's assignment of office space and work environment are inadmissible because his "observations add nothing to the material issues in this case and do not constitute 'opinions'…."  [Filing No. 67 at 15-16.]  IU requests that the Court exclude Dr. Fairfield-Sonn's opinions from consideration when ruling on the Motion for Summary Judgment and from the jury's consideration at trial.  [Filing No. 67 at 16.]

In his response, Professor Palmer argues that IU's Motion to Exclude is a collateral motion that violates Local Rule 56-1(i), that the issue should have been raised as an objection in IU's reply brief in support of its Motion for Summary Judgment, and that the Motion to Exclude is being used to circumvent the page-limit for IU's reply brief.  [Filing No. 71 at 3.]  Professor Palmer also argues

that motions to strike evidence in summary judgment briefing are disfavored. [Filing No. 71 at 5-6.] He contends that IU does not challenge Dr. Fairfield-Sonn's background or experience, and that IU focuses mainly on Dr. Fairfield-Sonn's factual bases and not his conclusions. [Filing No. 71 at 6-8.] Professor Palmer asserts that Dr. Fairfield-Sonn's opinions relate to whether Professor Palmer was disadvantaged compared to Professor Gildea, "which is directly relevant to whether a similarly situated comparator was treated more favorably and directly relevant to pretext." [Filing No. 71 at 8.] Professor Palmer argues that courts commonly allow experts to testify regarding industry standards and whether the standards were followed, which is what Dr. Fairfield-Sonn is doing. [Filing No. 71 at 10-11.] He asserts that IU disregarded Dr. Fairfield-Sonn's opinion about Professor Krishnan's advice to Professor Palmer relating to seeking an early promotion, and that his opinions about IU's treatment of Professor Palmer compared to its treatment of Professor Gildea are admissible because it is proper for an expert to base opinions on personal knowledge and experience, Dr. Fairfield-Sonn is qualified, and he fully supported his opinions. [Filing No. 71 at 13-23.] Professor Palmer argues further that Dr. Fairfield-Sonn's opinions regarding salary inequities are admissible because he provided an adequate methodology and analysis. [Filing No. 71 at 23-24.] Finally, Professor Palmer argues that IU's disagreement with some of the facts set forth in Dr. Fairfield-Sonn's expert report is not a basis for excluding the report, and that Dr. Fairfield-Sonn's observations regarding the importance of an appropriate office space are relevant to his conclusion that IU did not treat Professor Palmer fairly and would be helpful to the jury. [Filing No. 71 at 24-27.]

In its reply, IU first argues that the Motion to Exclude was proper because it also seeks to exclude Dr. Fairfield-Sonn's opinions at trial, and that it would have been inefficient and a waste of judicial resources for IU to argue that Dr. Fairfield-Sonn's opinions were inappropriate both in

its reply brief in support of its Motion for Summary Judgment and in a Motion in Limine filed closer to trial. [Filing No. 73 at 2-3.] IU also argues that Professor Palmer relies on cases involving motions to strike non-expert declarations and not motions to exclude expert testimony. [Filing No. 73 at 5-6.] IU goes on to reiterate many of the arguments it made in its opening brief. [Filing No. 73 at 7-20.]

### 1. Procedural Appropriateness of the Motion to Exclude

At the outset, the Court considers whether IU's Motion to Exclude was procedurally appropriate under the circumstances presented. Professor Palmer relies upon Local Rule 56-1(i) in arguing that the Motion to Exclude is procedurally improper. That rule provides:

> The court disfavors collateral motions – such as motions to strike – in the summary judgment process. Any dispute over the admissibility or effect of evidence must be raised through an objection within a party's brief.

L.R. 56-1(i).

The Court finds that IU's filing of the Motion to Exclude does not violate Local Rule 56-1(i). IU specifically requests that Dr. Fairfield-Sonn's testimony be excluded from the jury's consideration at trial, distinguishing the motion from a request in summary judgment briefing that a certain piece of evidence be stricken. And the Court agrees with IU's point that, had IU only objected to the Court considering Dr. Fairfield-Sonn's testimony on summary judgment in its reply brief, it would have had to raise the issue again closer to trial, through a Motion in Limine. It is not unusual for a party to rely upon expert testimony in connection with a summary judgment motion or a response to the motion, and for the opposing party to object to that reliance and to file a motion to exclude the expert testimony both on summary judgment and at trial. *See, e.g.*, *Fromer v. Riggs*, 2019 WL 1416728 (S.D. Ind. 2019); *Levy v. Marion Cnty. Sheriff*, 2019 WL 535706 (S.D. Ind. 2019).

Moreover, IU did raise its objection to Dr. Fairfield-Sonn's testimony in its reply brief. [*See* Filing No. 65 at 7.] And, even if it had not, denying the Motion to Exclude for procedural reasons – as Professor Palmer urges – would elevate form over function. Professor Palmer had the opportunity to respond to IU's Motion to Exclude, did so by filing a 28-page response brief, and has not been prejudiced in any way by IU filing the Motion to Exclude contemporaneously with its reply brief in support of its Motion for Summary Judgment. The Court declines to deny IU's Motion to Exclude on procedural grounds.

         2.    *Substantive Issues*

Dr. Fairfield-Sonn's expert report boils down to the following conclusion: IU treated Professor Palmer less favorably than Professor Gildea with respect to the timing of an early promotion review, the timing of salary adjustments, additional service and teaching opportunities, and the provision of appropriate office space. [Filing No. 58-4 at 4-5.] The Court discusses two issues that are dispositive of the Motion to Exclude – whether Dr. Fairfield-Sonn is qualified to render his opinion and whether his opinion would aid the trier of fact.

         a.    <u>Whether Dr. Fairfield-Sonn is Qualified</u>

Federal Rule of Evidence 702 allows the opinions of witnesses who have the requisite "knowledge, skill, experience, training, or education." Dr. Fairfield-Sonn has extensive experience as a member of the faculty at a business school – the Barney School of Business at the University of Hartford – and has served in several administrative positions there. [*See* Filing No. 58-4 at 3.] But Dr. Fairfield-Sonn has not demonstrated that he is qualified to testify regarding any type of industry-wide standards, to the extent such standards exist. Nor does his experience at the Barney School of Business – a school that presumably has different policies and procedures than IU – qualify him to testify regarding IU's policies and procedures for promoting non-tenured faculty.

The Court finds that Dr. Fairfield-Sonn is not qualified to testify as an expert regarding IU's treatment of Professor Palmer.  Although the Court's inquiry could end here, it discusses the remaining relevant factors.

      b.    <u>Whether Dr. Fairfield-Sonn's Testimony Would Aid the Trier of Fact</u>

"Expert testimony is admissible only when it will assist the trier of fact, and fact-intensive findings are within lay competence and are the prerogative of the jury." *Aponte v. City of Chicago*, 2011 WL 1838773, at *3 (N.D. Ill. 2011).  The Court acknowledges that it can be helpful in certain situations for an expert to testify regarding a defendant's legal duties.  *See, e.g.*, *Lees v. Carthage College*, 714 F.3d 516, 522 (7th Cir. 2013) ("Where the specifics of a defendant's duty of care involve specialized knowledge, plaintiffs must introduce expert testimony to establish this element of a …claim").  But this situation is unlike those where the standard a jury must apply is not defined by the law, but rather by a custom, practice, or even difficult-to-understand technology – for example, the standard of care a doctor must exercise, or the use of a state of the art device.  Here, IU was required to follow a standard defined by the law, and the jury will receive instructions setting forth what that law is.  Expert testimony regarding a standard defined by the law would encroach on the Court's role of instructing the jury on that issue.  *S.E.C. v. Tourre*, 950 F.Supp.2d 666, 675 (S.D.N.Y. 2013) ("Expert testimony may not usurp the province of the judge to instruct on the law….").

Indeed, Dr. Fairfield-Sonn's opinion is even simpler in this case.  He does not opine regarding whether IU violated some industry standard per se, but focuses instead on whether IU treated Professor Gildea more favorably than Professor Palmer.  This is an issue of fact, which the jury must analyze and upon which the jury must reach a conclusion.  Expert testimony is simply not necessary or appropriate. *Sullivan v. Alcatel-Lucent USA Inc.*, 2014 WL 3558690, at *6 (N.D.

Ill. 2014) ("Expert testimony does not assist the trier of fact when [it] is able to evaluate the same evidence and is capable of drawing its own conclusions without the introduction of a proffered expert's testimony").

Specifically, the jury would be required to determine whether IU treated Professor Palmer less favorably than Professor Gildea based on the promotions they were given, the salary each individual was paid, the teaching opportunities they were given, and the office space they were provided. This determination will be based on the facts presented to the jury, and expert testimony is not needed to aid the jury in making that determination. *See Wilson v. Muckala*, 303 F.3d 1207, 1218 (10th Cir. 2002) (testimony from human resources expert properly excluded where "the facts were not so complicated as to require the testimony of an expert witness on either the adequacy of the [sexual harassment] plan or policy or the investigation that followed") (quotation and citation omitted); *Ward v. Westland Plastics, Inc.*, 651 F.2d 1266, 1271 (9th Cir. 1980) (expert testimony excluded because the "question whether gender was the basis of differential treatment is not so technical as to require the aid of an expert to enlighten the jury or court").

Should the jury find favorable treatment was provided, the jury's ultimate question would be whether any favorable treatment IU gave Professor Gildea was related to race. To the extent Dr. Fairfield-Sonn will opine that IU treated Professor Palmer and Professor Gildea differently due to race, [*see* Filing No. 58-4 at 3 (Dr. Fairfield-Sonn stating that he examined the opportunities IU provided to Professor Palmer and Professor Gildea in order to determine whether the denials of opportunities to Professor Palmer "resulted in the University failing to equitably pay him based on his African American race")], such testimony would be impermissible. *Smith v. Colorado Interstate Gas Co.*, 794 F. Supp. 1035, 1044 (D. Colo. 1992) (expert testimony regarding gender and race discrimination excluded because "[g]ender and race discrimination are issues an average

37

person can evaluate and understand without the assistance of an expert," and an expert may not "impermissibly seek to direct the result [of the] case").

Put simply, even if he were qualified to testify as an expert in this case, Dr. Fairfield-Sonn's testimony would not aid the jury. A jury is perfectly capable of evaluating the evidence regarding promotions, salaries, teaching opportunities, and office space, and deciding which individual was treated better by IU. And any testimony that IU treated Professor Palmer different due to his race is impermissible as it is the ultimate question the jury must decide. The Court **GRANTS** IU's Motion to Exclude the Expert Witness Statement of Dr. James R. Fairfield-Sonn. [Filing No. 66.]

### III.
#### PROFESSOR PALMER'S MOTION FOR LEAVE TO FILE SURREPLY

In his motion, Professor Palmer argues that he is entitled to address the following issues in a surreply: (1) IU's request that the Court strike the expert opinion of Dr. Fairfield-Sonn; (2) IU's objections to three demonstrative exhibits submitted by Professor Palmer; (3) IU's argument that Professor Palmer does not provide citations to the record to support a statement regarding teaching opportunities provided to him; and (4) IU's "new arguments," including that the Court should not consider certain public salary reports, that some of Professor Palmer's evidence is "self-serving," that evidence regarding office space assignments that occurred from 2017 to 2019 does not constitute evidence of pretext, and that some of Professor Palmer's evidence is irrelevant. [Filing No. 69 at 2-3.] Professor Palmer submits a 21-page surreply as an exhibit to his motion. [Filing No. 69-1.]

In its response, IU argues that it did not introduce new evidence or raise new arguments in its reply in support of its Motion for Summary Judgment, so a surreply is inappropriate. [Filing No. 72 at 1.] It asserts that its separate Motion to Exclude Dr. Fairfield-Sonn's expert opinion was proper, that Professor Palmer misconstrues IU's statements regarding the public salary reports, and

that a portion of Professor Palmer's proposed surreply is "an improper attempt to further develop the same arguments he has already made on whether [Professor] Gildea is a proper comparator." [Filing No. 72 at 2-8.] IU contends that its argument related to office space is merely a response to the position Professor Palmer set forth in his response brief, and that Professor Palmer misconstrues IU's arguments regarding the evidence needed to prove a race discrimination claim. [Filing No. 72 at 8-10.] Finally, IU argues that Professor Palmer improperly uses his proposed surreply to reiterate or expand upon some of his arguments. [Filing No. 72 at 10-12.]

In his reply brief, Professor Palmer reiterates many of his initial arguments. [Filing No. 74.]

Local Rule 56-1(d) provides that "[a] party opposing a summary judgment motion may file a surreply brief only if the movant cites new evidence in the reply or objects to the admissibility of the evidence cited in the response. The surreply…must be limited to the new evidence and objections." The Court has already ruled on IU's Motion to Exclude the Expert Witness Statement of Dr. James R. Fairfield-Sonn, so any discussion of that motion in Professor Palmer's proposed surreply is moot. As to the other categories of argument which Professor Palmer seeks to address in his surreply, the Court finds as follows:

- IU's objection to three demonstrative exhibits: While the Court is not convinced that IU's arguments regarding the exhibits are really objections to their admissibility, as opposed to arguments regarding their significance, the Court will, out of an abundance of caution, consider Professor Palmer's arguments in his proposed surreply regarding that issue.

- IU's claim that Professor Palmer does not provide citations to the record to support certain arguments: This argument does not constitute new evidence nor an objection to the admissibility of evidence – the only categories for which a surreply is permitted under Local Rule 56-1(d). The Court is perfectly capable of determining whether the parties have supported their various arguments by citation to the record, as required by Local Rule 56-1(e), and will not consider Professor Palmer's arguments in his proposed surreply on that issue.

39

0039

- IU's "new arguments" regarding the public salary reports of Professor Palmer and Professor Gildea, evidence relating to their performance, Professor Palmer's burden of proof regarding his office space assignments evidence, and Professor Palmer's burden of proof regarding certain other evidence: Again, these arguments are not new evidence or objections to the admissibility of evidence, and a surreply is not permitted. The nature of a reply brief is that it addresses arguments made in the response brief, so it may discuss arguments no previously made in the opening brief. The existence of a new argument does not allow the non-movant to file a surreply. And the Court is capable of evaluating the arguments the parties have made, including whether certain evidence supports that party's claims and whether a party has sustained its burden of proof.

In sum, the Court **GRANTS IN PART** Professor Palmer's Motion for Leave to File Surreply, [Filing No. 69], to the extent that it will consider the arguments in Professor Palmer's proposed surreply, [Filing No. 69-1], which relate to IU's arguments regarding the three demonstrative exhibits. The Court **DENIES IN PART** Professor Palmer's Motion for Leave to File Surreply, [Filing No. 69], to the extent that it will not consider the other arguments in Professor Palmer's proposed surreply.

### IV.
### IU's Motion for Summary Judgment

#### A.    Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Failure to properly support

40

a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the granting of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them." *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

### B.   Discussion

Professor Palmer bases his race discrimination claim on four alleged actions by IU:   (1) failure to promote him early; (2) failure to pay him an equitable salary; (3) failure to provide him with teaching opportunities in an equitable manner; and (4) failure to provide him with comparable office space.   The Court first sets forth the law applicable to Professor Palmer's Title VII claim, and then addresses each of his theories in turn.

### 1.   Applicable Law

Title VII of the Civil Rights Act of 1964 forbids an employer from discriminating against any individual with respect to his or her "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "[T]he singular question that matters in a discrimination case [is]: '[W]hether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the…adverse employment action,'" *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018) (quoting *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)), and a plaintiff must provide such evidence in order to survive summary judgment, *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 710 (7th Cir. 2017).

A plaintiff may rely on both direct and circumstantial evidence to support an inference of causation and intent.   *Joll v. Valparaiso Comm. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020).   A plaintiff can also "enlist the burden-shifting framework of *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792 (1973)]" "[t]o clarify and to simplify [his] task." *Joll*, 953 F.3d at 929 (quotation and citation omitted).   The Court's focus is to "consider[ ] [the evidence] as a whole, rather than asking whether any particular piece of evidence proves the case by itself – or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Golla v. Office of Chief Judge of Cook Cnty.,*

*Ill.*, 875 F.3d 404, 407 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 765).   In determining whether the evidence would permit a reasonable factfinder to conclude that Professor Palmer's race caused him to be treated unfairly, "the burden-shifting framework of *McDonnell Douglas* remains relevant as a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases." *Owens v. Old Wis. Sausage Co., Inc.*, 870 F.3d 662, 667 (7th Cir. 2017) (quotation and citation omitted).   But the Court "review[s] the evidence holistically to see if it permits an inference of race discrimination." *Lloyd v. Mayor of City of Peru*, 761 F. App'x 608, 610 (7th Cir. 2019).   "[A]ll evidence belongs in a single pile and must be evaluated as a whole." *Igasaki v. Ill. Dept. of Fin. & Prof. Reg.*, --- F.3d ----, 2021 WL 613425, at *5 (7th Cir. 2021) (citation and quotation omitted).

Under the *McDonnell Douglas* framework, a plaintiff must "make a prima facie case of discrimination, at which point the burden shifts to the employer to offer a nondiscriminatory motive, and, if the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext." *Purtue v. Wisconsin Dep't of Corr.*, 963 F.3d 598, 601-02 (7th Cir. 2020).   To make a prima facie case under *McDonnell Douglas*, a plaintiff must show: (1) he belongs to a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated employee outside of his protected class received better treatment from his employer.   *Marshall v. Indiana Dep't of Corr.*, 973 F.3d 789, 791-92 (7th Cir. 2020).

### 2.    *Failure to Promote Professor Palmer Early*

In support of its Motion for Summary Judgment, IU argues that Professor Palmer's claim based on a failure to promote him early is time-barred because he did not file his EEOC Charge until nearly six years after he was discouraged from seeking an early promotion.   [Filing No. 47 at

43

22.]  IU contends that Professor Palmer's February 10, 2019 email to Associate Dean Maines reported alleged discriminatory conduct related to his January 2013 early promotion conversation with Professor Krishnan, and shows that he knew of his early promotion claim at that time, yet did not file his EEOC Charge until May 15, 2019. [Filing No. 47 at 22-23.] IU further argues that Professor Palmer's claim based on a failure to promote fails because he did not apply for early promotion. [Filing No. 47 at 30.]  It asserts that, even if Professor Krishnan discouraged him from applying, Professor Palmer still chose not to apply. [Filing No. 47 at 31-32.]  Additionally, IU argues that Professor Gildea is not a proper comparator to Professor Palmer because, for example, Professor Gildea had taught over 90 credit hours in multiple courses for different programs by the time he applied for early promotion and Professor Palmer had only taught 48 credit hours, including only three undergraduate courses and one Kelley Direct course. [Filing No. 47 at 32-33.] Finally, IU argues that there is no evidence that Professor Palmer's race had anything to do with Professor Krishnan discouraging him from applying for early promotion, noting that Professor Krishnan believed that Professor Palmer needed to build his teaching record and stating that "[t]here is simply no evidence that [Professor] Krishnan did not honestly believe that [Professor] Palmer should add more data points to his dossier with respect to his teaching record and service contributions before applying for promotion." [Filing No. 47 at 33-34.]

In response, Professor Palmer argues that his race discrimination claim based on a failure to promote should be equitably tolled because he "had no suspicion that the failure to promote him early was based at least in part on his race until his Caucasian comparator, [Professor] Gildea, was confirmed for early promotion on April 9, 2019," and that he then filed his EEOC Charge on May 14, 2019. [Filing No. 54 at 31-32.] He asserts that Professor Gildea is a proper comparator because he and Professor Gildea both had administrative appointments at the time of their consideration

44

for early promotion, that Professor Palmer's student evaluations were better than Professor Gildea's, and that both were judged by the same promotion criteria. [Filing No. 54 at 23-26.] Professor Palmer argues that IU "overlooks and downplays [his] qualifications and contributions to IU and ignores the numerous teaching opportunities and assistance it provided to [Professor] Gildea that it did not offer to [Professor] Palmer," and that "[d]iscrimination is at the root of the alleged superior qualifications IU argues that [Professor] Gildea had." [Filing No. 54 at 24.] Professor Palmer argues that IU "discounted" his role as Diversity Coach and the successes he achieved in that role, and that the Policy Statement on the Lecturer/Senior Lecturer Rank does not mention needing a minimum number of credit hours before early promotion is awarded. [Filing No. 54 at 24.] He relies on several demonstrative exhibits which show the breakdown of students in various academies including the BMA, a comparison of Professor Palmer's and Professor Gildea's compensation, and their Dean's 8 scores. [Filing No. 59-5 at 13-15.] Professor Palmer also notes that both he and Professor Gildea won numerous teaching awards in their first three years as lecturers. [Filing No. 54 at 25.] Professor Palmer argues that IU offered Professor Gildea more teaching opportunities than Professor Palmer, so it cannot rely on Professor Gildea's teaching experience to argue that Professor Gildea is not a proper comparator. [Filing No. 54 at 25.] As for IU's argument that Professor Palmer never applied for the promotion, Professor Palmer argues that meeting with Professor Krishnan and being discouraged from applying constituted applying and being rejected, and that even if he did not formally apply, he is not required to show this element because IU's discriminatory practices deterred him from applying. [Filing No. 54 at 26-28.] Finally, Professor Palmer argues that a reasonable jury could find that IU's behavior was pretextual because his achievements were ignored or understated, every other senior lecturer in the Marketing Department was treated more favorably with office space assignments, overload

45

teaching opportunities and an opportunity to teach overseas were not given to Professor Palmer, Dean Kesner "made multiple, unsupported assertions in an effort to justify IU's discriminatory conduct towards [Professor] Palmer" in her deposition, and Professor Burke and Professor Krishnan "offer post hoc reasons for treating [Professor] Palmer differently." [Filing No. 54 at 29-31.]

In its reply, IU again argues that Professor Palmer's May 14, 2019 EEOC Charge was untimely, pointing to Professor Palmer's August 10, 2018 email to Associate Dean Maines in which he detailed how racial discrimination had impacted his ability to earn an early promotion, and to Professor Palmer's February 10, 2019 email in which he acknowledges that Professor Gildea is going up for early promotion. [Filing No. 65 at 3-5.] IU reiterates its argument that Professor Palmer did not apply for early promotion, and contends that it is undisputed that faculty members are not required to have the department chair's approval to seek early promotion, and that the procedure to follow in order to apply was clearly set out, but Professor Palmer chose not to follow it. [Filing No. 65 at 5-6.] IU argues that Professor Palmer has not explained how Professor Krishnan's advice regarding early promotion deviated from an IU policy or was related to Professor Palmer's race. [Filing No. 65 at 7.] IU asserts that Professor Gildea had "very different responsibilities and a more extensive workload than [Professor] Palmer," making him an improper comparator. [Filing No. 65 at 9.] It also notes that Professor Gildea and Professor Palmer had different supervisors, that Professor Palmer's belief that he had superior qualifications to Professor Gildea is irrelevant, and that he has not presented any evidence that IU's treatment of him was related to his race. [Filing No. 65 at 10-11.] As for teaching opportunities, IU notes that Professor Gildea and Professor Palmer had experience in different areas, and that a different person was

46

responsible for assigning their courses. [Filing No. 65 at 12.] Finally, IU argues that Professor Palmer has not presented any evidence of pretext. [Filing No. 65 at 13-17.]

a.   Timeliness of EEOC Charge

In order for Professor Palmer to bring claims under Title VII in federal court, he must have: (1) timely filed a charge with the EEOC, and (2) received a right to sue letter from the EEOC. *See* 42 U.S.C. § 2000e-5(b), (e), and (f). To meet the timeliness requirement, a plaintiff must file a charge with the EEOC within 180 days of the allegedly discriminatory act, *id.*, or within 300 days "if a [plaintiff] initially institutes proceedings with a state or local agency that possesses the authority to address the alleged discrimination," *Russell v. Delco Remy Div.*, 51 F.3d 746, 750 (7th Cir. 1995). This deadline "protect[s] employers from the burden of defending claims arising from employment decisions that are long past." *Mull v. ARCO Durethene Plastics, Inc.*, 784 F.2d 284, 291 (7th Cir. 1986) (internal quotation and citation omitted). Where the alleged discriminatory act is not immediately discovered, a plaintiff must file the EEOC Charge within a reasonable time. *Thelen v. Marc's Big Boy Corp.*, 64 F.3d 264, 268 (7th Cir. 1995).

Professor Palmer and Professor Krishnan discussed the possibility of Professor Palmer's early promotion in January 2013. [Filing No. 46-12 at 23-24; Filing No. 46-14 at 1.] Professor Palmer first raised his concerns about Professor Gildea's early promotion in the summer of 2018 during a conversation with Professor Burke, [Filing No. 46-1 at 37], and then again in an August 10, 2018 phone conversation with Associate Dean Maines, [Filing No. 46-10 at 30]. In a February 10, 2019 email to Associate Dean Maines, Professor Palmer referenced the August 10, 2018 phone conversation, and reiterated his concerns regarding "how racial discrimination had negatively impacted [his]…promotion to senior lecturer." [Filing No. 46-26 at 1-2.] In the February 10, 2019

0047

email, Professor Palmer specifically mentioned Professor Gildea "going up for promotion nearly 3 full years earlier than I was allowed." [Filing No. 46-26 at 1-2.]

Professor Palmer's race discrimination claim for failure to promote him early accrued in January 2013, when he alleges that Professor Krishnan – whose support he believed he needed for an early promotion – discouraged him from applying. *Thelen*, 64 F.3d at 267 ("A plaintiff's action accrues when he discovers that he has been injured, not when he determines that the injury was unlawful"). The deadline for filing the EEOC Charge may be equitably tolled where "despite all due diligence, he is unable to obtain enough information to conclude that he may have a discrimination claim." *Id.* (citing *Chakonas v. City of Chicago*, 42 F.3d 1132, 1135 (7th Cir. 1994); *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990)). Giving Professor Palmer every benefit of the doubt, it is clear that he had concluded that he may have a discrimination claim by August 10, 2018, when he discussed the early promotion issue with Associate Dean Maines. This is confirmed by his February 10, 2019 email to Associate Dean Maines, in which he stated that during their August 10, 2018 phone call, he had "outlined to you that I had a number of significant concerns regarding racial discrimination and/or bias by IU and [Professor Krishnan]…against me," and had "detailed for you how racial discrimination had negatively impacted my…promotion to senior lecturer."[5] [Filing No. 46-26 at 1-2.] The Court finds that by his August 10, 2018 phone conversation with Associate Dean Maines, Professor Palmer had

---

[5] Professor Palmer argues that he did not know racial discrimination had occurred until Professor Gildea actually received his promotion, on April 9, 2019. [Filing No. 54 at 32.] But this is directly contradicted by Professor Palmer's own words in his February 10, 2019 email to Associate Dean Maines. [Filing No. 46-26 at 1-2 ("During the [August 10, 2018] call, I detailed for you how racial discrimination had negatively impacted my…promotion to senior lecturer…."). ] It is disingenuous for Professor Palmer to argue that he had not concluded that he might have a race discrimination claim related to early promotion until Professor Gildea was actually promoted, given that he specifically mentioned such a claim in his February 10, 2019 email (and in his August 10, 2018 phone call with Associate Dean Maines).

concluded that he may have a discrimination claim related to Professor Krishnan's advice not to seek early promotion.

Professor Palmer ultimately filed his EEOC Charge on May 15, 2019, more than nine months after the August 10, 2018 phone conversation with Associate Dean Maines.  Professor Palmer did not have a new 300 days in which he had to file his EEOC Charge, but rather needed to do so "within a reasonable time," which the Seventh Circuit Court of Appeals has defined as "days, and at most weeks."  *Thelen*, 64 F.3d at 268.  Professor Palmer does not provide any explanation for why he waited over nine months to file his EEOC Charge, and the Court finds that this time period was not reasonable and that his EEOC Charge related to his early promotion claim was not timely.  Accordingly, his race discrimination claim based on his early promotion theory is time barred.

b.   Merits of Early Promotion Claim

But even if his EEOC Charge were timely, Professor Palmer's race discrimination claim fails for additional reasons.

i.   **Failure to Apply for Promotion**

In the failure-to-promote context, a plaintiff must produce evidence demonstrating that: "(1) [he] was a member of a protected class; (2) [he] was qualified for the position sought; (3) [he] was rejected for the position; and (4) the employer promoted someone outside of the protected class who was not better qualified for the position." *Riley v. Elkhart Comm. Schs.*, 829 F.3d 886, 892 (7th Cir. 2016).  The requirement that the plaintiff must have applied for the position sought may be relaxed where "a plaintiff is deterred from applying by the very discriminatory practices he is protesting." *Loyd v. Phillips Bros.*, 25 F.3d 518, 523 (7th Cir. 1994*); see also Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 385 (7th Cir. 2016) ("[A]n application is unnecessary when

49

a plaintiff can show [he] would have applied had it not been for the complained-of discriminatory practices").

Here, Professor Palmer alleges that he did not continue with the process for applying for early promotion because Professor Krishnan did not support him, and that Professor Krishnan's lack of support was discriminatory. What is lacking, however, is any evidence that Professor Krishnan's lack of support for Professor Palmer had anything to do with his race. As Professor Krishnan testified, he discouraged Professor Palmer from applying for an early promotion because early promotion was rare, he believed that Professor Palmer needed more teaching experience so that he would have more data points for the department to consider, and he believed that Professor Palmer should become more visible in the Marketing Department as Diversity Coach and through other service activities. Professor Palmer bases his failure-to-promote claim on the fact that Professor Gildea received an early promotion over six years later and that – by Professor Palmer's account – he was more qualified than Professor Gildea when he sought Professor Krishnan's advice regarding early promotion. Again, though, there is simply no evidence that Professor Krishnan's advice to Professor Palmer had anything whatsoever to do with his race. Because Professor Palmer has not provided evidence that Professor Krishnan's advice to him regarding early promotion was discriminatory, the Court finds that Professor Palmer's failure to formally apply for early promotion is fatal to his claim.

### ii.    Improper Comparator

"All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination. The 'similarly situated' prong establishes whether all things are in fact equal." *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019) (quotation and citation omitted). The requirement that a comparator

50

be similarly situated to the plaintiff "eliminate[s] other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable – discriminatory animus." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (quotation and citation omitted).  A similarly situated employee "need not be identically positioned," *Igasaki*, 2021 WL 613425, at *6, but they "must be 'directly comparable' to the plaintiff 'in all material respects,'" *Patterson v. Indiana Newspapers, Inc.*, 589 F.3d 357, 365-66 (7th Cir. 2009) (quoting *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610-11 (7th Cir. 2006)).

Considerations for promotion to senior lecturer include, for example, the quality of teaching, the quality of service to IU in support of teaching, evidence of peer observation and evaluation of teaching, receipt of teaching awards, participation in the leadership and development of IU, participation in curriculum development and innovation, and development of new course and teaching materials.  [Filing No. 46-13 at 6-7.]  Professor Palmer and Professor Gildea possessed different qualifications at the three-year mark of their employment with IU.

- Professor Gildea had taught over 90 credit hours of ten different courses in several different subject areas in the undergraduate, residential MBA, and online Kelley Direct programs; Professor Palmer had taught 48 credit hours of three undergraduate courses and one Kelley Direct course.

- Professor Gildea was the Director of the BMA, which involved a level of responsibility normally given to a clinical faculty member; Professor Palmer was the Diversity Coach, which did not involve that level of responsibility.

- Professor Gildea had experience in business-to-busines marketing when he joined IU, which qualified him to teach courses in that area and to direct the BMA; Professor Palmer had experience in consumer marketing.

- Professor Gildea was not prohibited from teaching certain types of classes on an overload basis; Professor Palmer could not teach certain classes on an overload basis because of his position as Diversity Coach.

51

0051

- When Professor Palmer sought early promotion, Professor Burke had assigned academic courses for the years immediately preceding that time; Professor Krishnan assigned courses for the years relevant to Professor Gildea's early promotion.

Given that Professor Palmer and Professor Gildea differed in the very factors which were considered for early promotion, the playing field was not level such that a difference in treatment could support a claim of discrimination.[6] Professor Palmer's race discrimination claim based on his failure to be promoted in 2016 fails for the additional reason that Professor Gildea is not a sufficiently similar comparator.[7]

### iii.    Evidence of Pretext

Even assuming that Professor Palmer could make out a prima facie case of race discrimination based on a failure to promote him in 2016, he must then present evidence that the reasons Professor Krishnan offers for discouraging him from applying for early promotion are pretextual. Again, Professor Krishnan testified that he discouraged Professor Palmer from applying for an early promotion because he felt that Professor Palmer did not have enough teaching experience, and that additional time would allow Professor Palmer to garner more evaluations and

---

[6] IU argues that Professor Krishnan was the chair of the Marketing Department when Professor Palmer sought advice regarding early promotion, but that Professor Burke was the chair of the Marketing Department when Professor Gildea was promoted. This difference is immaterial, as the crux of Professor Palmer's claim relates to the advice Professor Krishnan provided. When Professor Gildea sought advice regarding early promotion, Professor Krishan was still the department chair, and advised him that his experience was "lining up with the requirements" for early promotion. [Filing No. 60-3 at 13-14.] That Professor Burke became the department chair shortly thereafter is irrelevant to Professor Palmer's claim.

[7] Professor Palmer argues at times that he was more, or as, qualified for early promotion than Professor Gildea, but also argues that if he was less qualified, it was because IU discriminated against him by providing him with fewer opportunities than Professor Gildea. However, he has not provided any evidence that race had anything to do with the opportunities he was presented with by IU prior to the time he inquired about early promotion.

"data points" for faculty to evaluate.  Professor Krishnan also thought that additional time would allow Professor Palmer to build his presence in the Marketing Department through his position as Diversity Coach, and to be involved in additional service activities.  Professor Palmer has not presented any evidence that Professor Krishnan really prevented him from applying for early promotion due to his race.  This lack of evidence of pretext is another reason why Professor Palmer's failure-to-promote claim fails.[8]

Professor Palmer's race discrimination claim based on a failure to promote him in 2016 fails as a matter of law because Professor Palmer did not timely file his EEOC Charge related to that claim, he did not apply for early promotion, Professor Gildea is not a similarly situated comparator, and Professor Palmer has not provided any evidence that Professor Krishnan's reasons for discouraging Professor Palmer from applying for an early promotion were pretextual.  The Court **GRANTS** IU's Motion for Summary Judgment on Professor Palmer's failure-to-promote claim.

### 3.    Pay Inequities

The Court notes at the outset that in his response brief, Professor Palmer clarified that his pay inequity claim is limited to the pay he received from May 2017, forward.  [Filing No. 54 at 33.]  Accordingly, the Court only considers the parties' arguments that are related to this time period.

In support of its Motion for Summary Judgment, IU argues that it is undisputed that Professor Palmer has always been paid the highest base salary of any lecturer or senior lecturer in

---

[8] As set forth above, the Court has considered Professor Palmer's surreply as it relates to the demonstrative exhibits upon which he relies to support his failure-to-promote claim.  [Filing No. 69-1 at 16-18 (discussing Filing No. 59-5 at 13-15).]  Even considering the demonstrative exhibits, however, Professor Palmer has not provided evidence of pretext.

the Marketing Department since he was hired.   [Filing No. 47 at 24.]   IU acknowledges that

Professor Palmer's pay inequity claim is based on the percentage of pay raises he received, and

asserts that Professor Krishnan recommended that Professor Gildea receive higher percentage

raises for the 2017-18 and 2018-19 academic years because he was the director of the BMA and

"had transformed it into the largest academy in the MBA program," and he had taught classes in

the residential MBA, online Kelley Direct, and undergraduate programs "with consistently strong

performance." [Filing No. 47 at 27.]   For these reasons, IU argues, Professor Gildea is not a proper

comparator to Professor Palmer because Professor Palmer mainly taught in the undergraduate

program and did not have any leadership positions within the Marketing Department or the KSOB.

[Filing No. 47 at 27.] IU acknowledges that Professor Gildea received the highest percentage raise

of any faculty member, but that "salary raises in the last ten years have typically ranged from

between 1% and 2.5%." [Filing No. 47 at 28.]   Lastly, IU argues that Professor Palmer has not

provided any evidence that discrimination played a role in the salary decision.   [Filing No. 47 at

29-30.]

　　　　In response, Professor Palmer argues that his pay equity claim is based on "the

compensation that [Professor] Gildea and [Professor] Palmer made during the same years." [Filing

No. 54 at 34.] He notes that he made $3,300 less than Professor Gildea in 2017, $86,375 less in

2018, and $82,056 less in 2019. [Filing No. 54 at 34.] Professor Palmer asserts that, even factoring

out the $30,000 per year that Professor Gildea earned in 2018 and 2019 for his position at BMA,

IU still paid Professor Gildea $111,731 more than him from 2017 to 2019.   [Filing No. 59 at 34.]

He contends that IU did not have a mathematical formula for determining raises, and that the

Marketing Department's numerical reviews of faculty members did not always yield

commensurate raises.   [Filing No. 54 at 34-35.]   Professor Palmer argues that Professor Gildea's

raises were "completely outside the norm and without explanation in any documentation at the time [they] were given," that Professor Krishnan's post hoc justifications for Professor Gildea's raises were not referenced when the raises were given, and that Professor Palmer had a lighter load due to IU's discrimination.   [Filing No. 54 at 35-36.]

In its reply, IU reiterates its argument that Professor Gildea it not a proper comparator. [Filing No. 65 at 17-18.]   As for its procedure for determining raises, IU notes that the numerical reviews of faculty are but one factor that is considered.   [Filing No. 65 at 19.]   IU argues that Professor Krishnan's explanations for Professor Gildea's raises in 2017-18 and 2018-19 expand on the short comments he added to a spreadsheet at the time the raises were given.   [Filing No. 65 at 20.]   Finally, IU argues that there is no evidence that the decisions regarding Professor Palmer's raises were based in any way on race.   [Filing No. 65 at 20.]

The following table reflects the compensation that Professor Palmer and Professor Gildea earned in the 2017-18, 2018-19, and 2019-20 academic years, and the percentage increases from the previous year:

|         | Professor Palmer | Professor Gildea |
|---------|------------------|------------------|
| **2017-18** | $96,750 base salary (1.3% raise)<br><br>$141,000 total salary[9] | $86,500 base salary (4.8% raise)<br><br>$144,300 total salary |
| **2018-19** | $98,750 base salary (2.07%)<br><br>$127,550 total salary | $94,000 base salary (8.67% raise)<br><br>$213,925 total salary |

---

[9] Neither party clearly explains the difference between the base salary and the total salary numbers for Professor Palmer and Professor Gildea, but the Court concludes that amounts earned above base salary came from teaching awards, stipends, and overflow teaching.   The issue of overflow teaching opportunities is discussed below.

55

| 2019-20 | $100,885 base salary (2.16%) + $8,000 base salary $133,304 total salary | $103,400 (8.7% raise) $215,360 total salary |
|---|---|---|

While Professor Palmer had a higher base salary than Professor Gildea up until the 2019-20 academic year, it is undisputed that Professor Gildea received higher percentage raises each of the three years at issue. Again, however, the Court finds that Professor Gildea is not an appropriate comparator. Professor Gildea held an administrative position during those three years, and Professor Palmer did not. Moreover, the administrative position was a significant one, as head of the BMA. Professor Krishnan, who was involved in setting Professor Gildea's salary raises for the 2017-18 and 2018-19 academic years, determined that the raises were appropriate because Professor Gildea "had transformed [the BMA] into the largest academy in the MBA program." [Filing No. 46-9 at 5.][10] While Professor Palmer had held the position of Diversity Coach, he had resigned by the time the 2017-18 academic year started. Moreover, Professor Gildea taught classes in the residential MBA program, the online Kelley Direct program (in which he taught the core marketing class), and undergraduate classes "with consistently strong performance." [Filing No. 46-9 at 5.] While Professor Palmer also received excellent teaching evaluations, he taught mainly in the undergraduate program, in addition to two online Kelley Direct elective courses. [Filing No. 46-9 at 5.] Professor Palmer's own belief that he was as qualified as Professor Gildea, and

---

[10] Professor Palmer seeks to discount Professor Krishnan's Declaration, in which he explains why he recommended the salary raises that Professor Gildea ultimately received, arguing that at the time he recommended the raises, Professor Krishnan only stated in documentation provided to Associate Dean Maines "Great start to teaching, leader BMA, likely to go up for promotion 2018-19 cycle." [Filing No. 54 at 35.] The Court finds this argument puzzling. Of course, Professor Krishnan was entitled to elaborate in his Declaration on his reasons for recommending Professor Gildea's raises. And that elaboration is entirely consistent with the notations on the documentation he provided to Associate Dean Maines at the time.

56

should have been paid commensurately, is unavailing. *See Rabinovitz v. Pena*, 89 F.3d 482, 487 (7th Cir. 1996) (an employee's "own opinions about his qualifications [do not] give rise to a material factual dispute").

In any event, even if Professor Gildea were a sufficient comparator, there is simply no evidence that Professor Krishnan's reasons for giving Professor Gildea higher percentage raises are pretextual. This Court "does not act as a superpersonnel department." *Milligan-Grimstad*, 877 F.3d at 710 (internal quotation omitted). Instead, it looks only to whether IU's explanation for giving Professor Gildea higher percentage raises is supported by legitimate reasons, and not at whether it was the best decision. *See David v. Bd. of Trustees of Comm. Coll. Dist. No. 508*, 846 F.3d 216, 229 (7th Cir. 2017) ("Our role…is not to inquire into the wisdom of an employment decision, but simply to determine if the employer is dissembling to cover up a discriminatory purpose"); *Coleman*, 667 F.3d at 852 ("[T]he only question is whether the employer's proffered reason [for the adverse employment action] was pretextual, meaning that it was a lie") (quotation and citation omitted); *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006) ("[I]t is not our role to determine the competency of or interfere in employment decisions simply where we believe an employer has made a poor choice. Federal courts have authority to correct an adverse employment action only where the employer's decision is unlawful, and not merely when the adverse action is unwise or even unfair"). Professor Palmer simply has not provided any evidence that IU's reasons for giving Professor Gildea higher percentage raises were a pretext for race discrimination. Accordingly, Professor Palmer's race discrimination claim related to pay inequity fails as a matter of law and IU's Motion for Summary Judgment on that claim is **GRANTED**.

4.    *Teaching Opportunities*

While perhaps not technically a separate basis for Professor Palmer's race discrimination claim, the Court notes that Professor Palmer insinuated throughout his briefing that if IU viewed him as having inferior qualifications due to teaching fewer courses, that was a result of IU discriminating against him due to his race by not offering him additional teaching opportunities. This theme is woven throughout Professor Palmer's arguments, and the Court finds it appropriate to discuss this separate theory briefly.

IU notes in its Motion for Summary Judgment that Professor Palmer expressed interest on one occasion in creating a course for the Kelley Direct Program, but did not make any additional requests to the Marketing Department chair regarding adding courses to his teaching load, and that he lived in Cleveland, Ohio and was on campus only three days per week, which affected the courses he was offered to teach. [Filing No. 47 at 5.] IU also explains that Professor Palmer was only permitted to teach 12 credits of overload courses while he was Diversity Coach, a position he held until the 2017-18 academic year, and could only teach Kelley Direct Program courses on an overload basis. [Filing No 47 at 5-6.]

Professor Palmer argues that he was denied Kelley Direct overload courses "[o]n multiple occasions," [Filing No. 54 at 11], and that teaching Kelley Direct classes did not require his presence on campus, [Filing No. 54 at 31].

In its reply, IU contends that Professor Gildea is not a proper comparator because he and Professor Palmer had different areas of expertise. [Filing No. 65 at 12.]

Again, the Court finds that Professor Gildea is not a proper comparator. Professor Gildea's expertise was in business-to-business marketing, while Professor Palmer had experience in consumer marketing. Professor Palmer was restricted to teaching only 12 overload credits in the

58

Kelley Direct Program.  Professor Gildea had no such restriction.  And, in any event, even if Professor Gildea were a proper comparator, Professor Palmer has presented no evidence that his course assignments were in any way a product of race discrimination.  To the extent that his race discrimination claim is based on the teaching opportunities that IU provided to him, no reasonable jury could conclude that his course assignments were a result of race discrimination and the Court **GRANTS** IU's Motion for Summary Judgment on that claim.

     5.    *Office Space*

Finally, IU argues in support of its Motion for Summary Judgment that Professor Palmer's race discrimination claim based on office space assignments is time-barred because Professor Palmer first complained about office space in an August 7, 2018 email to Associate Dean Maines. [Filing No. 47 at 22-23.]  It notes that, as Diversity Coach, Professor Palmer had a private, interior office in the building housing the MBA program from his hire to the end of the 2016-17 academic year, and also had an office that he shared with another faculty member in the Marketing Department from his hire until the building housing the Marketing Department was renovated. [Filing No. 47 at 35.]  When the renovation was complete, IU states, Professor Palmer was given a cubicle in the building housing the Marketing Department so that he could still have space in that area in addition to his private office in the building housing the MBA program.  [Filing No. 47 at 35.]  IU explains that when Professor Palmer resigned as Diversity Coach, there were no available private offices in the building housing the Marketing Department but Professor Palmer still had a cubicle there, could use collaboration rooms for a private meeting space, was given permission to use another colleague's office, and was given his own private office in the building housing the Marketing Department as soon as one became available.  [Filing No. 47 at 35.]  IU's argues that the office space situation, while an inconvenience, was not an adverse employment

59

action, and that there is no evidence that Professor Palmer's race had anything to do with his office assignments.  [Filing No. 47 at 35-36.]

In response, Professor Palmer does not address IU's timeliness argument, but asserts that Associate Dean Maines admitted that offices were available in the building housing the Marketing Department between the Fall of 2017 and the Summer of 2019, but just were not available to Professor Palmer.  [Filing No. 54 at 14.]  He asserts that Professor Gildea was provided an office with a window upon his hire in 2018, that "[a]ll other senior lecturers and [Professor] Gildea had an office for a 2-year period that [Professor] Palmer had a small cubicle that did not even allow enough space for meetings with students or guest speakers," and that "[e]ven a graduate student was assigned an office while [Professor] Palmer was not." [Filing No. 54 at 30.]

IU reiterates its arguments in its reply brief.  [Filing No. 65 at 14-15.]

Professor Palmer's race discrimination claim based on office space assignments fails for several reasons.  First, Professor Palmer does not respond to IU's argument that this claim is time-barred, so he has waived any opposition to that argument.  *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument…results in waiver"); *Laborers' Inter. Union of North America v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (holding that arguments not presented in response to motion for summary judgment are waived); *De v. City of Chicago*, 912 F. Supp. 2d 709, 734 (N.D. Ill. 2012) ("Failure to set forth any evidence or to develop any arguments in opposition to the moving party's summary judgment motion results in waiver of the nonmoving party's arguments and an abandonment of his claims").  In any event, Professor Palmer's claim related to office space assignments is time-barred.  Professor Palmer first complained regarding his office space assignment compared to Professor Gildea's assignment in an August 10, 2018 phone conversation with Associate Dean Maines.  They discussed the issue

60

again on October 17, 2018, and in his February 10, 2019 email, Professor Palmer specifically mentioned that during the October 17, 2018 conversation he had set forth "how racial discrimination had negatively impacted my…office space allocation." [Filing No. 46-26 at 1-2.] Yet, as with his claim regarding early promotion, Professor Palmer did not file his EEOC Charge until May 15, 2019 – well after the deadline for doing so, and also outside a reasonable timeframe after the deadline had passed.

Second, Professor Palmer does not respond to IU's argument that the office assignments were not adverse employment actions, and has waived any opposition to that argument. *Bonte*, 624 F.3d at 466. And the Court finds that the office space assignments do not constitute adverse employment actions – a necessary element of Professor Palmer's race discrimination claim. *See Markel v. Bd. of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002) ("[N]ot everything that makes an employee unhappy is an actionable adverse action"); *Brownlee v. Catholic Charities of the Archdiocese of Chi.*, 2021 WL 269824, at *22 (N.D. Ill. 2021) (moving plaintiff from private office to cubicle did not constitute adverse employment action); *Hubers v. Gannett Co., Inc.*, 2019 WL 1112259, at *6 (N.D. Ill. 2019) (not being provided with an office was not an adverse employment action).

Finally, Professor Palmer's race discrimination claim based on office space assignments fails because he has not presented any evidence that race had anything to do with the assignments. To the contrary, the evidence indicates that the circumstances and physical office space constraints dictated the assignments. Initially, Professor Palmer had an office in the building housing the MBA program through his role as Diversity Coach, in addition to a cubicle in the building housing the Marketing Department. When he resigned as Diversity Coach, he still had a cubicle in the building housing the Marketing Department due to limitations on office availability, but had access

61

to collaboration rooms and a colleague's office space.  To the extent Professor Palmer relies upon the office space assignments as evidence of pretext to support his other race discrimination claims, it is not.  *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 900 (7th Cir. 2016) ("[Plaintiff] argues that only he had the laundry list of negative experiences and that he was the only African-American foreman in the department, which he suggests should be enough to show that people outside his protected class received systematically better treatment, [but] the experiences [plaintiff] has identified do not point directly to a discriminatory reason for the employer's action") (quotation and citation omitted)).  There is simply no evidence that IU's rationale for not providing Professor Palmer with a private office until it finally did so was pretextual or that the office space assignments had anything to do with race.  The Court **GRANTS** IU's Motion for Summary Judgment on Professor Palmer's race discrimination claim related to office space assignments.

## V.
### Conclusion

Professor Palmer's race discrimination claim for failure to promote was not pursued on a timely basis.  Even if it had been, the claim is premised on Professor Palmer's personal assessment that he was as qualified, or more qualified, than Professor Gildea, and that IU treated Professor Gildea more favorably.  His claims for disparate pay and teaching opportunities are similarly grounded.  But the fact that Professor Palmer is African American and Professor Gildea is white is not enough to show that IU discriminated against Professor Palmer because of his race.  *Cole*, 838 F.3d at 900 ("Simply being a member of a protected class, without something more to link that status to the action in question, is not enough to raise a reasonable inference of discriminatory animus").  Among other deficiencies with Professor Palmer's claims, there is no evidence that IU's justifications for its decisions – whether they were the right or best decisions – had anything to do with race.  Finally, his claim for inequity in office assignments fails to state a claim.  For the

62

reasons discussed above, the Court **GRANTS** IU's Motion to Exclude the Expert Witness Statement of Dr. James R. Fairfield-Sonn, [66], **GRANTS IN PART** and **DENIES IN PART** Professor Palmer's Motion for Leave to File Surreply and Supplemental Designation of Evidence In Opposition to Defendant's Motion for Summary Judgment, [69], as set forth above, and **GRANTS** IU's Motion for Summary Judgment, [46]. Final judgment shall enter accordingly.

Date: 3/10/2021

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**

63

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| PAUL PALMER, JR. II, | ) |
| | ) |
| _Plaintiff_, | ) |
| | ) |
| v. | )   No. 1:19-cv-04610-JMS-MJD |
| | ) |
| INDIANA UNIVERSITY and TRUSTEES OF INDIANA | ) |
| UNIVERSITY, | ) |
| | ) |
| _Defendants_. | ) |

**FINAL JUDGMENT PURSUANT TO FED. R. CIV. P. 58**

For the reasons set forth in the Court's Order entered this day, the Court now enters **FINAL**

**JUDGMENT** against Plaintiff and in favor of Defendants, such that Plaintiff shall take nothing

by way of his Complaint.

Date: 3/10/2021

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Roger A.G. Sharpe, Clerk

BY: _____

Deputy Clerk, U.S. District Court

**Distribution via ECF only to all counsel of record**

1

0064

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing has been served upon the following counsel

of record this 23rd day of July, 2021, via ECF Service:

> Michael C. Terrell
> Melissa A. Macchia
> TAFT STETTINIUS & HOLLISTER LLP
> One Indiana Square, Suite 3500
> Indianapolis, IN 46204

> *s/ Courtney E. Endwright*
> Courtney E. Endwright

BETZ + BLEVINS
One Indiana Square, Suite 1660
Indianapolis, Indiana 46204
Office: (317) 687-2222
Fax: (317) 687-2221
E-mail: litigation@betzadvocates.com