# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

### Appeal No.: 21-1634

| | | |
|---|---|---|
| PAUL PALMER, JR. II, | ) | Appeal from the U.S. District Court |
| | ) | for the Southern District of Indiana, |
| Plaintiff-Appellant, | ) | Indianapolis Division |
| | ) | |
| *vs.* | ) | Cause No. 1:19-cv-4610-JMS-MJD |
| | ) | |
| INDIANA UNIVERSITY and | ) | Hon. Jane E. Magnus-Stinson |
| THE TRUSTEES OF INDIANA | ) | |
| UNIVERSITY | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

## CORRECTED* REPLY BRIEF OF APPELLANT

Sandra L. Blevins
Courtney E. Endwright
BETZ + BLEVINS
One Indiana Square, Suite 1660
Indianapolis, Indiana  46204
Office: (317) 687-2222
Fax: (317) 687-2221
E-mail:  litigation@betzadvocates.com

*Attorneys for Plaintiff-Appellant Paul Palmer, Jr. II*

\*  Corrected in accordance with the *Brief Deficiency Letter* issued by the Clerk of United States Court of Appeals for the Seventh Circuit on September 13, 2021.

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................... i

TABLE OF AUTHORITIES .................................................................................... iv

I.    SUMMARY OF THE ARGUMENT ............................................................... 1

II.    LEGAL ARGUMENT ....................................................................................... 2

A.  IU endorses clones as comparators, rather than those similarly situated like Gildea and Palmer, who shared sufficient commonalities for a meaningful comparison between them on both Palmer's failure to promote and inequitable pay claims ........... 2

1.  Substantial overlap exists between Palmer's and Gildea's applications for early promotion—e.g., similar job titles (including an administrative position), the same department, and the same basic criteria ...................................................... 2

a.  Although IU never examined Palmer's job responsibilities or time commitment as Diversity Coach, IU incredibly claims Gildea and Palmer lacked the "same level" of service responsibilities ........................................... 3

b.  IU's reliance on additional teaching by Gildea as support for Gildea's early promotion is a red herring ............................................................... 6

2.  IU's own employee confirms Gildea had nothing to do with the BMA's growth in student participants, even though both Burke and Krishnan cite the BMA's growth as substantial factors in Gildea's early promotion and exponential raises ...................................................................................................................... 8

3.  Considering their positions were in the same department, under the same supervisors, with the same core opportunities, governed by the same pay policies, Palmer and Gildea were sufficiently comparable ...................................................... 10

a.  IU wrongly claims Palmer is required to compare his pay to the pay of all lecturers in the Marketing Department ........................................... 10

b.  IU ignores the realities of the differential treatment in suggesting Gildea is incomparable to Palmer ................................................................. 12

B.  Palmer presented evidence from which a reasonable jury could find IU's denial of Palmer's early promotion and IU's inequitable pay of Palmer were pretextual, which IU sweeps away with factual inferences in its favor and a disregard of Palmer's evidence ................................................................................................................... 13

1. IU never explained its failure to assign Palmer (and only Palmer among several other senior lecturers) an office over a two-year period despite the availability of such offices ...................................................................................14

2. Allyn Curry's testimony, together with Palmer's other circumstantial evidence, supports an inference of discrimination ..................................................15

3. Palmer has sufficient personal knowledge to know Krishnan's and Burke's praise of Gildea for the creation of two new classes was based on false, or at least exaggerated, pretenses .....................................................................16

4. Considering nominations for the Trustees Teaching Awards are automatic, Palmer's exclusion from these nominations—despite having a higher student evaluation average than other lecturers in the Department who were nominated—is further evidence of pretext ...........................................17

5. Irrespective of their direct connection to Palmer's compensation or promotion decisions, Kesner's conduct and actions toward Palmer provide evidence of unlawful animus..................................................................18

6. Krishnan's and Burke's reasons for failing to assign Palmer additional classes were illogical, contrary to reality, omitted from deposition testimony, and therefore suggestive of pretext ...........................................................18

C. Because Palmer was unaware of IU's discrimination in failing to promote him early until Gildea's promotion, or at the earliest Gildea's application for promotion, and because Palmer applied for an early promotion but was rejected by Krishnan, the Court should reverse the Order's grant of summary judgment on Palmer's failure to promote claim.................................................................................................21

1. Because Palmer's testimony confirmed he was unaware of IU's discrimination in failing to promote him early until he discovered Gildea's early promotion (or at the earliest Gildea's early promotion application), equitable tolling should apply .......................................................................................21

2. Palmer took the "first step" in the promotion process by speaking with Krishnan, who denied him the necessary support from a department chair for promotion, thereby denying Palmer's application for early promotion............21

3. Even if Krishnan's refusal to support Palmer was not a denial of Palmer's early promotion application, Krishnan's refusal to support Palmer and the generally antagonistic environment against African Americans within KSOB created a promotion process that deterred Palmer from obtaining an early promotion..............................................................................................23

III.    CONCLUSION.................................................................................................................25

IV.    CERTIFICATE OF COMPLIANCE..............................................................................26

V.    PROOF OF SERVICE ...................................................................................................26

# TABLE OF AUTHORITIES

**Cases**

*Abuelyaman v. Ill. State Univ.*, 667 F.3d 800 (7th Cir. 2011) ..................................................... 23-24

*Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731(2020) ............................................................ 10-11

*Coleman v. Donahoe*, 667 F.3d 835 (7th Cir. 2012) ................................................................ 2, 8, 14

*David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216 (7th Cir. 2017) ............................ 12

*Elghanmi v. Franklin Coll. of Indiana, Inc., No. IP-99-879-CH/G*, 2000 WL 1707934 (S.D. Ind. Oct. 2, 2000) ................................................................................................................................ 4

*Eaton v. Ind. Dept. of Corrections*, 657 F.3d 551 (7th Cir. 2011) .................................................. 10

*Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038 (10th Cir. 2020) ......................... 11

*Garcia v. Bd. of Inspectors of Joliet Pub. Sch. Dist. 86*, No. 16-CV-7968, 2020 WL 6275001 (N.D. Ill. Oct. 23, 2020) ............................................................................................................... 4-5

*Gordon v. United Airlines, Inc.*, 246 F.3d 878 (7th Cir. 2001) .............................................. 2, 19, 21

*Hudson v. Chicago Transit Auth.*, 375 F.3d 552 (7th Cir. 2004) ................................................... 23

*Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923 (7th Cir. 2020) ..................................................... 1, 18

*Loyd v. Phillips Bros.*, 25 F.3d 518 (7th Cir. 1994) ...................................................................... 22

*McKinney v. Office of Sheriff of Whitley Cty.*, 866 F.3d 803 (7th Cir. 2017) .................................. 4

*Spencer v. Virginia State Univ.*, 919 F.3d 199 (4th Cir. 2019) ................................................... 10-11

*Summy-Long v. Pa. State Univ.*, 226 F. Supp. 3d 371 (M.D. Pa. 2016) ........................................... 8

*Vega v. Chi. Park Dist.*, 954 F.3d 996 (7th Cir. 2020) .................................................................. 15

**Federal Statutes**

42 U.S.C. § 2000e ..................................................................................................................... 11, 14

# I.  SUMMARY OF THE ARGUMENT

"Taken together" Palmer's evidence of discrimination—including preferential treatment given to his comparator, Josh Gildea; false and inconsistent explanations for Palmer's treatment; false justifications for Gildea's inequitable pay and early promotion; and, words and conduct suggestive of an animus against Palmer—would "permit a reasonable jury to infer an overall likelihood of discrimination that merits a trial, not summary judgment." *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 929-30 (7th Cir. 2020).

Rather than "[l]ooking at the evidence as a whole," as this Court requires, however, IU encourages this Court to ignore Palmer's evidence of discrimination that doesn't contain an explicit statement of an intent to discriminate or use of a racial epithet. *Joll*, 953 F.3d at 929-30. Nevertheless, as this Court recently reiterated, "[e]mployers long ago taught their supervisory employees not to put discriminatory beliefs or attitudes into words oral or written." *Id.*

Moreover, the "focus" in reviewing IU's motion for summary judgment is "on the most persuasive story possible on the non-movant's behalf [in] asking whether a verdict in her favor would be reasonable or could result only from irrational speculation," rather than the story IU spins in its summary judgment motion while drawing all inferences in its favor. *Id.* at 928. Considering Palmer's evidence as a whole and construing all relevant facts and reasonable inferences in Palmer's favor, a reasonable jury could readily find that IU discriminated against Palmer based on his African American race.

Accordingly, the Court should reverse the Order granting summary judgment in its entirety and allow Palmer to present his claims to a jury.

## II.    LEGAL ARGUMENT

### II.A.    IU ENDORSES CLONES AS COMPARATORS, RATHER THAN THOSE SIMILARLY SITUATED LIKE GILDEA AND PALMER, WHO SHARED SUFFICIENT COMMONALITIES FOR A MEANINGFUL COMPARISON BETWEEN THEM ON BOTH PALMER'S FAILURE TO PROMOTE AND INEQUITABLE PAY CLAIMS.

"[T]he similarly-situated inquiry is flexible, common-sense, and factual" because it essentially questions whether there are "enough common features between the individuals to allow a meaningful comparison." *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012). Courts "are not bound by the labels that an employer uses and must scrutinize the conduct behind those labels to determine if they are applied to similar conduct." *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 891 (7th Cir. 2001).

Fact finders determine whether a comparator qualifies as similarly situated, and "summary judgment is appropriate only when no reasonable fact-finder could find that plaintiffs have met their burden on the issue." *Coleman*, 667 F.3d at 846-47. The Order and IU wrongly define comparators so narrowly that no two faculty members in academia could serve as comparators.

### 1.    Substantial overlap exists between Palmer's and Gildea's applications for early promotion—e.g., similar job titles (including an administrative position), the same department, and the same basic criteria.

Here, Gildea and Palmer shared the same title (lecturer) from which they sought a promotion, each held an administrative position, and each were judged by the same basic standards in determining whether they had attained a promotion to senior lecturer based on the categories of excellence in teaching and service. Furthermore, the difference in treatment between Palmer and Gildea specifically related to the behavior of Burke and Krishnan for each early application—Krishnan providing full support to Gildea while denying any support

to Palmer, and Burke providing immense support for Gildea while denying the same to Palmer.

Significantly, IU ignores that the promotion to senior lecturer was not exclusive to one candidate but was available to any candidate who met the qualifications for senior lecturer. Thus, whether Gildea and Palmer were superior to each other is not the central focus of Palmer's failure to promote claim. Instead, the issue is whether a reasonable jury could find Palmer had also earned an early promotion.

Ignoring that Gildea and Palmer shared the same basic core duties and disregarding Palmer need only show that his performance also warranted an early promotion, IU argues Gildea had superior qualifications to Palmer for an early promotion because of additional teaching hours and service activities. IU's argument is unavailing.

> **a.** **Although IU never examined Palmer's job responsibilities or time commitment as Diversity Coach, IU incredibly claims Gildea and Palmer lacked the "same level" of service responsibilities.**

IU argues it was "undisputed" that Palmer "has never had the same level of service . . . responsibilities" Gildea "has consistently had" [Dkt. 21 at 38] when Palmer had a significant administrative role in the same MBA Program as Gildea at the time he sought an early promotion. At the time Palmer sought early promotion, IU never asked Palmer about his service responsibilities as Diversity Coach—IU gave no job description to Palmer for this role, and no one asked Palmer about the substantial time he invested as Diversity Coach. Not until October 2016 did Palmer submit a memorandum about his role to Shanker Krishnan and Ash Soni. (A-822 at 30:24-31:20; A-832 at 69:20-70:8; A-605¶11; A-718-19 at 72:19-73:2; A-728 at 162:20-163:3; A-884-86 at 91:6-97:15; A-557-61).

IU wrongly urges this Court to totally ignore Palmer's evidence concerning his responsibilities as Diversity Chair because Palmer supposedly "sets forth no evidence in support of his assumption that he performed similar duties" as Gildea. [Dkt. 21 at 39 n.5]. Contrary to this Court's rejection of this very notion, IU asserts that Palmer's evidence should be ignored because it is "self-serving," citing a non-precedential district court case. *Id.* (citing *Garcia v. Bd. of Inspectors of Joliet Pub. Sch. Dist. 86*, No. 16-CV-7968, 2020 WL 6275001, at *20 (N.D. Ill. Oct. 23, 2020)). *C.f. McKinney v. Office of Sheriff of Whitley Cty.*, 866 F.3d 803, 814 (7th Cir. 2017) (finding the trial court was "wrong to discount [employee's] testimony as "self-serving, speculative, and conclusory" because "the term 'self-serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment"). *See also Elghanmi v. Franklin Coll. of Indiana, Inc., No. IP-99-879-CH/G*, 2000 WL 1707934, at *4 n.2 (S.D. Ind. Oct. 2, 2000) (J. Hamilton) ("Evidence is required to be based on personal knowledge, but a witness need not support his own testimony with additional, 'objective' evidence.").

But Palmer did not solely present "self-serving" statements supporting his service as a Diversity Coach. Rather, Palmer presented multiple types of evidence, including objective data showing a sharp decline in the number of Consortium students on academic probation during Palmer's time as Diversity Coach that other faculty acknowledged (including Krishnan and Soni) (A-881 at 59:7-17; A-540; A-189-90); evaluations by other faculty—including Soni and Allyn Curry (A-881 at 59:7-17; A-946¶21); and objective factual information of the average number of hours he spent working with students, summertime work he invested as Diversity Coach (uncompensated), and other commitments required of

him as Diversity Coach. (A-605¶11; A-718-19 at 72:19-73:2; A-728 at 162:20-163:3; A-884-86 at 91:6-97:15; A-557-61).

Palmer's situation is easily distinguishable from *Garcia* cited by IU. In *Garcia*, the employee merely offered her opinion that the annual review on which her employer based her demotion did "not fairly represent her performance," and "portions of her evaluation were 'made up' and 'fabricated.'" 2020 WL 6275001, at *20. The district court found the employee's opinion "may reflect [her] feelings about the evaluation, but they are **not supported by the record** and do not allow [the employee] to carry her burden." *Id.* (emphasis added). Conversely, Palmer offered sworn, objective, and uncontroverted evidence about his commitments as Diversity Coach as well as the assessments of other faculty, as stated above.

Notably, IU's conclusory statements about Palmer's alleged inferior service contributions as compared to Gildea's exclusively relied on Burke's deposition testimony assessing Palmer's service, when Burke had no knowledge related to Palmer's administrative position as Diversity Coach. In fact, Burke admitted during his deposition he had no such personal knowledge. Burke testified that he "received no reports from the MBA program office on [Palmer's] diversity and recruiting activities," and he was unaware how many hours Palmer spent on his diversity and recruiting activities or how many students fell under Palmer's purview. (A-647 at 84:5-12). Burke was not copied on Palmer's October 2016 memorandum outlining his commitment as Diversity Coach, and Burke was not the Marketing Department Chair at the time. [Dkt. 21 at 38]. *See* A-557-61; A-631 at 7:20-8:6. Burke only discussed Gildea's service and never mentioned Palmer's service contributions. That Burke made

uninformed assessments about Palmer's service to IU is just another example of the bias Burke displayed against Palmer and supports the denial of summary judgment.

In addition, per Burke and Krishnan, Gildea's service as a Director was simply part of the consideration of whether Gildea met the criteria for an early promotion—it was not a separate and unrelated job that completely distinguished Gildea's position as a lecturer from Palmer's position as a lecturer, as IU suggests. *E.g.*, A-646-47 at 78:10-82:5; A-686 at 17:8-10; A-169-70¶18; A-240-42. Moreover, IU overlooks that its own policies state that "the fundamental criterion to this [lecturer] position is high quality teaching," not service commitments. (A-487). *See* A-504; A-506-507. Thus, simply because Gildea held a different administrative position than Palmer did not mean Gildea and Palmer were incomparable.

Furthermore, IU failed to dispute Palmer continued the same service activities between his seeking an early promotion in 2013 and his actual promotion in 2016. (A-833 at 69:15-19, 70:9-75:17; A-840 at 104:1-105:25). Considering Palmer continued the same service activities, and, at most, Palmer created a new version of another class to (in Krishnan's words) "sail[] through" the promotion process in 2016 (A-164¶15), there is certainly evidence Krishnan lacked an "honestly-held belief" Palmer "should add more data points to his dossier with respect to his teacher record and service contributions before applying for promotion." [Dkt. 21 at 42].

> **b.** **IU's reliance on additional teaching by Gildea as support for Gildea's early promotion is a red herring.**

IU's argument that Gildea had more teaching hours or "teaching . . . responsibilities" than Palmer at the time of Gildea's application for promotion to senior lecturer is a red herring. First, IU's *Policy Statement on the Lecturer/Senior Lecturer Rank* in the Kelly School of

Business ("KSOB") does not require or mention a minimum number of credit hours for early promotion; it simply measures performance by basic criterion of an "appropriate" "teaching load" and sufficiently strong student evaluation scoring. *See* A-489-91; A-511-13.

Moreover, when IU finally promoted Palmer in 2016, the types of classes he taught had not changed—only his total number of teaching hours increased; thus, if Palmer was qualified for promotion in 2016, he was qualified for an early promotion in 2013. (A-862-63 at 260:9-261:1) ("[T]he classes I've taught, my ratings, the impact that I'd made . . . I just continued to do the same things that I did the first three years for the second three years," and "[t]here wasn't a significant difference in terms of what I kept doing a good job working with the consortium students and did doing well teaching in the classroom.").

IU asserts Palmer's testimony in this regard was "not true." IU bases this assertion on Palmer's additional teaching hours (which were not a requirement for promotion) and on his development of a new course that Krishnan claimed "provided a larger number of data points and student evaluations for the reviewers to evaluate in determining" whether Palmer "achieved excellence in teaching (which is exactly what Dr. Krishnan told Prof. Palmer he needed when Prof. Palmer sought his advice on early promotion)." [Dkt. 21 at 42-43].

In fact, Krishnan's statement is flatly wrong: Palmer first taught the course referenced by Krishnan (M255) in the Summer of 2011—over a year before Palmer spoke to Krishnan about his request for an early promotion in January 2013. *Compare* A-830 at 62:13-19; A-839 at 99:5-17; A-531 *with* A-169¶15. *See* Dkt. 13 at 21. Accordingly, this additional "data point" existed well before Palmer approached Krishnan about an early promotion, and indeed, Krishnan never mentioned the creation of this class as a reason for Palmer's promotion to

senior lecturer in 2016. IU only mentioned this in a declaration on summary judgment. *Compare* A-188-89 *with* A-188-89. Palmer had been teaching the "immersion course" identified by Krishnan (M544/X574) since 2012, but Palmer later created "a version of the [same] course in the wintertime." (A-830 at 62:13-63:10; A-840 at 104:1-105:25; A-531). Krishnan even admitted this was "a variation of the M544 course . . . with a project and New York City travel component." (A-188-89).

Furthermore, that Gildea had additional teaching hours was a product of IU's more favorable treatment of Gildea in the assignment of classes. For instance, unlike Palmer, Gildea was specifically instructed on how to obtain and did obtain the maximum amount of overload courses each semester, whereas Palmer was not. [Dkt. 13 at 25-27]. Krishnan and Burke also provided false explanations for failing to assign or offer additional classes to Palmer, such as Palmer's residing part-time in Ohio and his alleged inability to teach an upper-level class (a class Palmer had previously taught multiple times). [Dkt. 13 at 35, 44-46].

If it were up to IU, only identical "clones" would be suitable as comparators, which is simply unrealistic in the academic setting. It is also contrary to this Court's standard for assessing similarly-situated comparators. *Coleman*, 667 F.3d at 846. *See generally Summy-Long v. Pa. State Univ.*, 226 F. Supp. 3d 371, 406 (M.D. Pa. 2016) (quoting *Coleman*, 667 F.3d at 846) (non-precedential).

    **2.**     **IU's own employee confirms Gildea had nothing to do with the BMA's growth in student participants, even though both Burke and Krishnan cite the BMA's growth as substantial factors in Gildea's early promotion and exponential raises.**

IU completely ignores Palmer offered evidence Academy Directors had nothing to do with the size of the Academy because students choose their Academy "at the beginning of

the first year just as they enter the program." (A-875 at 28:8-14; A-876 at 29:19-30:18).
According to IU's Executive Associate Dean for Academic Programs, who oversees the
MBA Program, IU does not "look at the numbers" of students per Academy to determine
"how successful an academy is," because students come to IU with certain interests and
select their academy based on those interests: "it's the structure of the [MBA] program." (A-
875 at 27:22-28:14; A-876 at 30:5-30:18). IU cannot and does not explain why Burke and
Krishnan placed so much emphasis on the growth of the BMA student participants to
support Gildea's early promotion. Burke and Krishnan should have known Gildea did not
control the number of students in the BMA. Krishnan specifically cited Gildea's
"transform[ing] [the BMA] into the largest academy in the MBA program" as a factor in
Gildea's 2017-18 and 2018-19 academic year raises. (A-169¶16).

Moreover, even if the purported growth in the number of students of the BMA was
attributable to Gildea, Burke exaggerated the BMA's growth. For instance, the BMA had the
most students for two years (2017-18 and 2018-19), but that growth stopped. (A-943; A-
1050). By the start of 2019-20, the BMA was down to third in student participants (24
students), slipping below the Marketing Department's other Academy, the CMA (27
students). (A-943; A-1050). In the 2020-21 school year, the BMA had only 14 total students,
which was fourth among all Academies and 7 less than the CMA. *Id.*

By his August 2020 deposition, Burke was well aware the BMA's numbers were slipping,
but Burke never mentioned it. Instead, Burke attributed Gildea's success in large part due to
the BMA becoming "the largest academy" in KSOB with "the largest number of students"
under Gildea's leadership. (A-646 at 79:11-80:23). For 2 of the preceding 3 years, however,

the BMA was not the "largest academy." Moreover, despite Burke's being "pretty amaz[ed]" at the BMA's growth under Gildea, the BMA's percentage share of incoming students has not varied by more than 10% since Gildea's arrival; and, in 2020, it had a lower share of students (15%) than in 2015 (17%) and 2016 (16%)—before Gildea's arrival. (A-943; A-1050; A-653-54 at 112:7-113:3).

Even though Gildea had nothing to do with the number of students in the BMA and the BMA's numbers dwindled, Burke and Krishnan both cited the BMA's continuing growth to justify Gildea's early promotion and significant pay increases, which provides further evidence IU's asserted reasons for treating Gildea more favorably than Palmer were inflated and untruthful.

3. **Considering their positions were in the same department, under the same supervisors, with the same core opportunities, governed by the same pay policies, Palmer and Gildea were sufficiently comparable.**

   a. **IU wrongly claims Palmer is required to compare his pay to the pay of all lecturers in the Marketing Department.**

Ignoring applicable case law from the United States Supreme Court and the Seventh Circuit, IU argues—referencing a non-precedential case—it was "misleading" for Palmer "to choose" Gildea "as his comparator while ignoring the raises received by other white faculty members in the Marketing Department who are more comparable" to Palmer. [Dkt. 21 at 41] (citing *Spencer v. Virginia State Univ.*, 919 F.3d 199, 204 (4th Cir. 2019)).

Despite IU's reliance on the Fourth Circuit's opinion, the Seventh Circuit has specifically determined "the similarly situated analysis does not require numerosity," and "the plaintiff need offer evidence as to only one similarly situated comparator." *Eaton v. Ind. Dept. of Corrections*, 657 F.3d 551, 556 (7th Cir. 2011). Moreover, in *Bostock*—decided after *Spencer*—

the United States Supreme Court recently emphasized that under Title VII, "our focus should be on individuals, not groups." *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1740 (2020). *See also Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1046-47 (10th Cir. 2020) ("[A] sex-plus plaintiff does not need to show discrimination against a subclass of men or women.").

Even if IU's cited case *Spencer* (involving a tenure denial, not a promotion to senior lecturer) was relevant to Palmer's case, IU oversimplified and distorted the district court's findings. Rather than "holding" that "it is 'misleading' [as a general matter] to claim that two professors were significantly overpaid in comparison to [plaintiff]" where the two professors 'were overpaid relative to all other professors, both men and women'" [Dkt. 21 at 41], *Spencer* found it was "misleading" for Spencer as the plaintiff to assert an Equal Pay Act violation by relying on the alleged analysis of her expert, Rosenberg. *Spencer*, 919 F.3d at 205, *as amended* (Mar. 26, 2019), *cert. denied*, 140 S. Ct. 381 (2019). This was because Spencer distorted the analysis of her expert, Rosenberg. Rather than asserting Spencer's comparators were overpaid relative to her, "Rosenberg asserted that [her two comparators] were overpaid relative to *all* other professors, both men and women," and thus Spencer distorted her expert's findings on these two comparators from two completely different departments. *Id.* Rather than relying on an expert's comparison of pay for all professors at IU, Palmer properly compared himself to Gildea. Palmer is not required to examine all other potential comparators in the Department. But even if he were, IU never explained its unsupported assertion all other lecturers necessarily were directly comparable to Palmer, while claiming Gildea was not sufficiently comparable.

### b. IU ignores the realities of the differential treatment in suggesting Gildea is incomparable to Palmer.

IU claims Gildea cannot serve as a comparator to Palmer because Gildea was simply a superior performer. Looking deeper than IU's claims, however, Palmer and Gildea shared the same job title (lecturer); worked in the same Marketing Department; worked under the same supervisor; and shared the same core duties, which together provide a meaningful comparison between their positions. *C.f. David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 223-27 (7th Cir. 2017).

Ultimately, during the relevant three-year period, Palmer had 6 more years of work experience than Gildea and was a senior lecturer for 2 of the 3 years (while Gildea was still a lecturer), yet a more than $170,000.00 pay difference existed between Gildea and Palmer. This substantial difference remains undisputed.

IU's attempt to explain away this substantial pay difference by claiming Gildea was a superior performer simply falls flat. IU only looks at the pay inequities based on salary rather than total compensation, where the substantial gap between Palmer's and Gildea's compensation existed. All compensation is relevant to Palmer's pay inequity claim.

Although IU attributes much of Gildea's exponentially increasing salary to Gildea's role as BMA Academy Director in the MBA Program, IU completely ignores it handsomely compensated Gildea for his role as BMA Director by providing Gildea $30,000.00 annually (so long as he continued to teach a full load) as well as a summer stipend of $7,500 for his position as BMA Director until the 2019-20 school year. (A-689 at 30:17-32:2; A-462). (IU, in contrast, never compensated Palmer for any of his time as Diversity Coach during the summer, albeit Palmer left this role before the relevant time period).

Similarly, Krishnan cited Gildea's overload teaching as a reason to provide additional compensation to Gildea, when Gildea again had already been generously compensated for teaching the additional classes, to the tune of $15,000 per 3 credits for Kelley Direct. (A-649 at 90:10-91:10; A-750 at 100:22-24). Significantly, these same opportunities for Kelley Direct overload teaching were not offered to Palmer, although Gildea was permitted to max out his overload teaching every semester. (A-688 at 27:20-28:8). Palmer's lack of assignment to additional classes was one of multiple disadvantages imposed by IU on Palmer that remains unexplained.

This apparently contributed to significant differences in both salary raises and overload teaching pay between Gildea and Palmer. Significantly, Krishnan *never* mentioned a lack of additional, available courses for Palmer to teach—Krishnan only cited Palmer's alleged lack of presence on campus and alleged failure to make "requests to teach additional courses and/or to develop new courses" as reasons for his failure to be promoted early (A-167-68¶8). Considering Kelley Direct courses are online, Palmer's alleged lack of presence on campus should not have stopped Krishnan from assigning Palmer to teach those classes. (A-609¶38). Tellingly, Krishnan never talked to Palmer about his commuting choice or presence on campus and instead just withheld these opportunities. (*Id.*; A-609¶¶34-38). IU provided Gildea the opportunity to earn a tremendous amount of compensation through overload teaching when that was denied to Palmer.

**II.B.** **PALMER PRESENTED EVIDENCE FROM WHICH A REASONABLE JURY COULD FIND IU'S DENIAL OF PALMER'S EARLY PROMOTION AND IU'S INEQUITABLE PAY OF PALMER WERE PRETEXTUAL, WHICH IU SWEEPS AWAY WITH FACTUAL INFERENCES IN ITS FAVOR AND A DISREGARD OF PALMER'S EVIDENCE.**

Throughout its Brief, IU misconstrues what constitutes pretext and attempts to hold Palmer to a higher standard than is required under Title VII. No smoking gun, and no direct admission of discrimination is required, yet IU asserts Palmer's circumstantial evidence "assumes racism without proof." [Dkt. 21 at 27]. Nonetheless, "an evaluation of context" of IU's conduct "is essential to determine whether [IU's] explanation[s] [are] fishy enough to support an inference that the real reason" for denying Palmer an early promotion and inequitably paying Palmer were discriminatory. *Coleman*, 667 F.3d at 854-55. Palmer has offered circumstantial evidence, including numerous instances of unexplained differential treatment and an animus against Palmer, that when taken as a whole show IU's conduct against Palmer was singular and biased against Palmer because of his race. [Dkt. 13 at 35-46, 51-54]. Yet IU sweeps away this evidence by claiming Palmer "ignore[d] undisputed facts" (i.e., inferences in IU's favor rather than actual "undisputed" facts) and arguing such evidence was "wholly irrelevant to his claims." [Dkt. 21 at 27].

1.      **IU never explained its failure to assign Palmer (and only Palmer among several other senior lecturers) an office over a two-year period despite the availability of such offices.**

IU downplays Palmer's lack of an office space over a two-year period by claiming Palmer had previously been given an office by the MBA Program. IU also justifies its failure to assign Palmer an office by claiming it assigned offices "based on the hierarchical nature of faculty" and "the need to support faculty in leadership roles with external visibility and partnerships." [Dkt. 21 at 50]. IU further absolves its conduct by arguing it offered Palmer a chance to use someone else's office for any meetings. [Dkt. 21 at 49]. But none of IU's excuses matter, because none explain why offices were open and vacant during this time that

IU refused to assign to Palmer for 2 years. [Dkt. 13 at 24-25, 36-38]; (A-845 at 124:4-22; A-847 at 131:6-13). Moreover, IU's claim that offices are assigned by the "hierarchical nature of faculty" exposes the disparate treatment of Palmer, who was the only senior lecturer out of 6 senior lecturers—i.e., someone of a higher stature than a lecturer—without an office for 2 years while other lecturers were assigned offices. (A-847 at 131:14-132:4). In addition, the excuse that "external visibility and partnerships" determine office assignments also exposes IU's disparate treatment of Palmer since Palmer frequently brought in guest speakers and engaged in class projects that required privacy, including with partners of KSOB. (A-847 at 129:2-131:13; A-643 at 65:16-25).

### 2. Allyn Curry's testimony, together with Palmer's other circumstantial evidence, supports an inference of discrimination.

IU asks the Court to completely reject testimony from Allyn Curry regarding differential treatment because of its alleged lack of "any examples or details" [Dkt. 21 at 50-51], but this mischaracterizes Curry's testimony. IU argues Palmer's cited case, *Vega v. Chi. Park Dist.*, is distinguishable because it contained "specific examples," unlike Curry's declaration. In fact, the sum total of the testimony summarized by the Seventh Circuit was that one employee had been "assigned to 'rough' parks on purpose, while [another employee], told the jury that she retired from her 35-year career at the Park District after a police officer told her that the Park District investigators were watching her and her staff," which the Seventh Circuit determined was "behavior toward or comments directed at other employees in the protected group" that constitutes "one type of circumstantial evidence that can support an inference of discrimination." *Vega v. Chi. Park Dist.*, 954 F.3d 996, 1005 (7th Cir. 2020).

Here, Curry's declaration stated he chose to retire "because of racial biases against African Americans" in KSOB, but he also stated that "there were very few African Americans employed" at KSOB over Curry's 30-year employment with IU; and when he reported "issues of racial biases against African Americans" to Kesner, Soni, and James Wimbush, the Vice President for Diversity, Equity and Multicultural Affairs at IU, he received no response." (A-945-46¶¶13-23).

As Curry's declaration provides personal knowledge of the treatment of other African Americans within KSOB, it provides additional circumstantial evidence that, together with Palmer's other circumstantial evidence, supports an inference of discrimination.

### 3. Palmer has sufficient personal knowledge to know Krishnan's and Burke's praise of Gildea for the creation of two new classes was based on false, or at least exaggerated, pretenses.

IU asks this Court to reject Palmer's testimony discrediting the emphasis by IU on Gildea's alleged creation of two new classes as support for his early promotion because of relevance and seemingly because Palmer lacks personal knowledge. Yet, as previously cited by Palmer but ignored by IU, Krishnan cited Gildea's "develop[ing] new courses," including M272, as a reason supporting Gildea's performance as an outlier (A-169¶17), and Burke specifically included Gildea's "creation" of M272 as well as "a major redesign of C570" as reasons supporting his early promotion. (A-241). Considering Palmer is a member of the Marketing Department who read Gildea's dossier and sat in on Gildea's promotion meeting, Palmer certainly had personal knowledge of these statements. (A-603¶1; A-605-606¶¶13-18; A-67 at 208:2-21; A-856 at 221:1-14). And, if Burke and Krishnan are providing false (or

exaggerated, at best) bases for Gildea's promotion, that is certainly relevant evidence of differential treatment and pretext.

    4.    **Considering nominations for the Trustees Teaching Awards are automatic, Palmer's exclusion from these nominations—despite having a higher student evaluation average than other lecturers in the Department who were nominated—is further evidence of pretext.**

Disclaiming knowledge of the qualifications and requirements for its own teaching awards, IU suggests it is confused as to why Palmer's exclusion from the Trustees Teaching Award between 2017 and 2019 would be relevant when he had been selected as a finalist for the 2020 Panschar Teaching Award. However, as Palmer stated, "[t]he Trustees Teaching Award **automatically** compiles nominations for the 'top 6% of full-time lecturer and clinical faculty—combined.'" [Dkt. 13 at 14] (citing A-893). *See also* A-1132 (Opinion stating same); A-639 at 37:17-38:9. Palmer also stated he "was not considered for an IU Trustees Teaching Award for 2017, 2018, or 2019 even though this was supposed to be an automatic consideration" and presented evidence another lecturer who had a lower student evaluation average than Palmer was nominated for the Trustees Teaching Award. (A-926; A-607¶¶23-26; A-893). *See* Dkt. 13 at 24 ("In 2019, as one example, the nominee from the Marketing Department for the IU Trustees Teaching Award, Jennifer Riley Simone, only had an average of 6.55/7.00 for her student evaluation scores in comparison to Palmer's average of 6.65/7.00 over the same time period.").

Considering the nominations are automatic, IU's excluding Palmer from consideration for the Trustees Teaching Award over a three-year period provides circumstantial evidence of pretext. IU's eventual nomination of Palmer for the Panschar Award, after he complained about discrimination multiple times, does not mean his exclusion from automatic

consideration of another teaching award for three prior years is not evidence of discrimination by IU against Palmer.

5. **Irrespective of their direct connection to Palmer's compensation or promotion decisions, Kesner's conduct and actions toward Palmer provide evidence of unlawful animus.**

IU rewords statements Kesner made about Palmer, ignoring that on summary judgment, all reasonable factual inferences are made in Palmer's favor, not IU's. Even if IU could contrive an innocent explanation for multiple, unwarranted criticisms of Palmer, that does not automatically make such criticisms irrelevant.

More importantly, that Kesner "never once indicated that those conversations she referenced played any role in deciding" Palmer's compensation or promotion is unavailing—no direct connection to a promotion or compensation decision was necessary. [Dkt. 21 at 54-55]. The Seventh Circuit has cautioned that "[i]n considering a defendant's attempt to neuter a sexist or racist comment as a stray remark, a court deciding a summary judgment motion must keep in mind its duty to consider the evidence as a whole and to do so in the light reasonably most favorable to the non-moving party," and "[a] remark or action by a decision-maker reflecting unlawful animus may be evidence of his or her attitudes more generally." *Joll*, 953 F.3d at 935. As Dean, Kesner had ultimate decision-making authority over promotions and compensation of faculty; thus her demonstrated animus against Palmer is relevant. (A-785 at 23:9-24:5).

6. **Krishnan's and Burke's reasons for failing to assign Palmer additional classes were illogical, contrary to reality, omitted from deposition testimony, and therefore suggestive of pretext.**

Though IU suggests that the Court abandon all logic and simply accept Krishnan and Burke sincerely represented Palmer's long-distance commute caused them to inequitably assign Palmer's classes, courts "need not abandon good reason and common sense in assessing an employer's actions." *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 889 (7th Cir. 2001). Given Krishnan's and Burke's reasons for not assigning Palmer more classes were illogical, contrary to reality, and not stated until their declarations on summary judgment, their offered explanations were hardly "objectively reasonable." *Id.* ("[T]he more objectively reasonable a belief is, the more likely it will seem that the belief was honestly held.").

Although Burke and Krishnan claimed they were foreclosed from assigning Palmer to additional classes because Palmer "typically commute[d]" and remained "on campus Monday through Wednesday" and this foreclosed them from assigning Palmer to Tuesday/Thursday classes, Burke and Krishnan never spoke with Palmer about teaching a Tuesday/Thursday class. (A-228¶6; A-166-67¶8; A-608-609¶¶34-37). Despite this commuting excuse, other Departmental faculty also averaged three days a week on campus and were not deprived of teaching assignments. (A-823 at 33:20-34:6). Furthermore, contrary to Krishnan's and Burke's assertions, Palmer was "typically" on campus 3 days a week "at a minimum" and was willing to do "whatever" was "necessary to support students at IU." (A-823 at 33:20-34:6).

Most significantly and completely ignored by IU, the vast majority of classes Palmer missed out on teaching were Kelley Direct online courses, not in-person courses, where "presence" on campus was completely unnecessary. Neither Burke nor Krishnan ever explained the failure to assign Palmer to these Kelley Direct courses.

Paradoxically, IU argues Palmer's raising the commute was "undercut by his own requests to teach at specific times due to his commute" based on a single alleged request in August 2011, when IU's restriction on Palmer teaching overload courses reduced him to a single class for the semester with a class time he had already been assigned that he simply asked to keep—rather than making a special "request to teach at [a] specific time[]." (A-597) ("If I'm down to only one class for the spring, if it's possible **I'd prefer to keep the 1pm class?**") (emphasis added).

IU, moreover, fails to explain Krishnan's altered story on summary judgment. During his deposition, Krishnan only mentioned Palmer's absence from "graduation ceremonies, receptions to meet incoming students, receptions for workshop students, incoming students, recruiters wishing to meet with faculty on Friday;" he never mentioned any inability to assign Palmer to overload courses because of his alleged lack of presence on campus. (A-764-65 at 212:16-213:10). On summary judgment, Krishnan added class assignments to the list. Yet, even Krishnan's deposition testimony was false—Palmer annually attended Consortium graduation events, receptions, summer activities, and other events as part of his regular duties as a Diversity Coach. (A-832-33 at 70:9-75:17).

IU tries to justify Krishnan's uninformed judgment Palmer could not teach a class— M544—based on the uninformed word of another Department faculty, rather than any observation of Palmer's teaching, any discussion with Palmer, or any review of his teaching record and qualifications. If Krishnan had checked, he would have found Palmer had previously taught the same class twice. So, IU points out the class was being offered as part of the in-person, residential program versus Kelley Direct online. Nonetheless, IU points to

no evidence in the record showing any difference in the class content between in-person and online classes.

Palmer presented evidence Krishnan's and Burke's justifications for their failure to equitably assign Palmer's classes were completely unreasonable and contrary to the facts. Thus, Palmer presented "specific evidence from which the finder of fact may reasonably infer that the proffered reasons do not represent the truth." *Gordon*, 246 F.3d at 889. Accordingly, Palmer created "a factual issue as to whether [IU's] explanation is credible or merely a pretext for discrimination" that should have been presented to the jury. *Id.*

**II.C.** **BECAUSE PALMER WAS UNAWARE OF IU'S DISCRIMINATION IN FAILING TO PROMOTE HIM EARLY UNTIL GILDEA'S PROMOTION, OR AT THE EARLIEST GILDEA'S APPLICATION FOR PROMOTION, AND BECAUSE PALMER APPLIED FOR AN EARLY PROMOTION BUT WAS REJECTED BY KRISHNAN, THE COURT SHOULD REVERSE THE ORDER'S GRANT OF SUMMARY JUDGMENT ON PALMER'S FAILURE TO PROMOTE CLAIM.**

    **1.** **Because Palmer's testimony confirmed he was unaware of IU's discrimination in failing to promote him early until he discovered Gildea's early promotion (or at the earliest Gildea's early promotion application), equitable tolling should apply.**

Although IU places much emphasis on a Fall 2018 email from Palmer that mentioned a promotion rather than an early promotion, it ignores Palmer testified consistently several times that he did not suspect bias in his early promotion until the Spring of 2019. (A-63 at 191:24-192:14; A-67 at 207:12-208:6; A-851 at 162:15-163:24; A-855 at 220:4-7).

    **2.** **Palmer took the "first step" in the promotion process by speaking with Krishnan, who denied him the necessary support from a department chair for promotion, thereby denying Palmer's application for early promotion.**

Although Palmer admittedly took the important "first step" in 2013 of applying for the promotion (as recognized by Krishnan himself) by informing Krishnan he intended to apply

for an early promotion (A-755 at 118:20-120:11), IU claims "the Lecturer Guidelines clearly state that the promotion process begins with the preparation of the candidate's dossier." [Dkt. 21 at 32]. Despite the formal policy, as the chair is admittedly the "surrogate" for the Marketing Department, and IU has never promoted *anyone* without the support of his chair, chair approval is a necessary first step to obtain a promotion. (A-767 at 221:4-222:3, 222:12-15; A-804 at 164:17-165:9; A-826 at 46:9-48:6).

IU disputes Palmer's statement it has never promoted anyone without the support of his chair, as being "unsupported by the record" [Dkt. 21 at 33]; yet when Krishnan was asked whether he had ever failed to recommend someone for promotion that was eventually promoted, he answered, "[d]uring my term as department chair, no." When asked if she knew of "anyone who's ever been promoted early without the recommendation of the department chair," Maines similarly could not identify anyone. (A-767 at 221:4-222:3, 222:12-15; A-804 at 164:17-165:9).

Most importantly, IU misled the Court by completely ignoring Palmer's citation to his own deposition testimony in which he uncontrovertibly testified the department chair told him that "not only is going up early for a promotion your third year very, very, very, very rare, but it has never been successful, in the history of [KSOB], without support of the department chair." (A-826 at 46:9-48:6). IU may not like this evidence, but it is uncontradicted, and it is from "the record." IU misleadingly omitted this additional testimony in claiming Palmer's argument was "unsupported" by the record.

Beyond simply discouraging Palmer, Krishnan's refusal to support Palmer in his early promotion application was a denial of his promotion application—Palmer had no path to an

early promotion without Krishnan's support. Accordingly, IU denied Palmer a promotion by Krishnan's refusal to support him.

If this was not an outright rejection, Krishnan's refusal to support Palmer was effectively a bar prohibiting Palmer's promotion. *Loyd v. Phillips Bros.*, 25 F.3d 518, 523 (7th Cir. 1994).

>    **3.    Even if Krishnan's refusal to support Palmer was not a denial of Palmer's early promotion application, Krishnan's refusal to support Palmer and the generally antagonistic environment against African Americans within KSOB created a promotion process that deterred Palmer from obtaining an early promotion.**

Considering KSOB's environment as a whole, a reasonable jury could find IU systemically disfavored Palmer, and therefore, IU's "discriminatory practices deterred [Palmer] from applying" for the early promotion. *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 558 (7th Cir. 2004).

Since a promotion was impossible without Krishnan's support, Krishnan deterred Palmer from applying for the promotion. Significantly, unlike Palmer, Krishnan provided advantages to Gildea that he denied to Palmer, including advising Gildea that the risks of applying and being denied were minimal: Gildea could seek promotion again during his sixth year without consequence, and Krishnan assisted Gildea throughout the promotion process. [Dkt. 13 at 27-30].

Although Palmer presented additional evidence KSOB systemically disfavored African Americans, including Allyn Curry's declaration relating his experiences as an African American and with African Americans at KSOB, IU encourages this Court to ignore Curry's testimony, citing *Abuelyaman v. Ill. State Univ.*, 667 F.3d 800, 811-812 (7th Cir. 2011) as "holding that another faculty member's conclusory affidavit was insufficient to create a

triable issue of fact." [Dkt. 21 at 35]. As an initial matter, Palmer was not solely relying on Curry to create a triable issue of fact—Curry's declaration constituted part of a collection of circumstantial evidence showing the environment at KSOB systemically disfavored African Americans.

Further, the declaration at issue in *Abuelyaman* was "largely bereft of specific allegations of discrimination," and "much of [the] affidavit" was "spent recounting other professors' wholly conclusory beliefs that they had been discriminated against." *Abuelyaman*, 667 F.3d at 812. Conversely, Curry, who worked at KSOB for 30 years, declared that KSOB's environment was generally unfavorable to African Americans because of the "very few African Americans employed" at KSOB over Curry's 30-year employment; and, when Curry reported "issues of racial biases against African Americans" to multiple administrators at KSOB, IU never responded. (A-945-46¶¶13-23). These are specific examples of IU's biased environment. Curry also explained his choice to retire from KSOB in 2018 "because of racial biases against African Americans," including believing Palmer was denied opportunities because he is black. (A-945-46¶¶13-23).

Although Palmer mentioned the distinct disadvantages Palmer experienced as an African American in KSOB given a lack of DEI initiatives with any impact and a dearth of diversity among KSOB and Marketing faculty, IU argues Palmer did not "explain how his perceived lack of 'DEI initiatives' or lack of diversity among the faculty 'during either of [his] promotion applications' prevented him from applying for early promotion—especially in light of the fact that he did ultimately apply for and received promotion to senior lecturer in the spring of 2016." [Dkt. 21 at 36]. Yet, Palmer specifically identified several distinct road

blocks in the promotion process that Palmer experienced compared to Gildea, such as: 1) lack of any support or assistance in either his early application for promotion in 2013 or his 2016 application for promotion; 2) lack of another black faculty member in the Department during either of Palmer's promotion applications; 3) Palmer not being told he could request to teach certain classes; and 4) Palmer not being informed that teaching certain classes would be weighted more by others for purposes of promotion and salary. That IU eventually promoted Palmer in 2016 does not mean that these practices did not deter Palmer from applying for an early promotion in 2013.

Taking into consideration all these circumstances, a jury could find that IU deterred Palmer from applying for an early promotion because of IU's discriminatory conduct against him.

### III.     <u>CONCLUSION</u>

Because a reasonable jury could find in favor of Appellant Paul Palmer, Jr. II on each of his claims, the Court should reverse the Order granting Defendant's Motion for Summary Judgment in its entirety and allow Palmer to present his claims to a jury.

Respectfully submitted,

*s/ Sandra L. Blevins*
Sandra L. Blevins
Courtney E. Endwright

*Attorneys for Plaintiff-Appellant Paul Palmer, Jr. II*

BETZ + BLEVINS
One Indiana Square, Suite 1660
Indianapolis, Indiana 46204
Office: (317) 687-2222
Fax: (317) 687-2221
E-mail: litigation@betzadvocates.com

## IV.    CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Corrected Reply Brief of Appellant complies with

the type-volume limitations of Fed.R.App.P. 32(a)(7)(B) and Cir.R.32(c). This brief contains

6,999 words this 13th day of September, 2021.

*s/ Sandra L. Blevins*
Sandra L. Blevins

## V.    PROOF OF SERVICE

I hereby certify that a copy of the foregoing has been served upon the following counsel

of record this 13th day of September, 2021, via ECF Service:

Michael C. Terrell
Melissa A. Macchia
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, IN 46204

*s/ Sandra L. Blevins*
Sandra L. Blevins

BETZ + BLEVINS
One Indiana Square, Suite 1660
Indianapolis, Indiana 46204
Office: (317) 687-2222
Fax: (317) 687-2221
E-mail: litigation@betzadvocates.com